101 A.3d 635

In re Magisterial District Judge Mark A. BRUNO,
Magisterial District 15–1–01.

**Petition of Mark A. Bruno.**

Supreme Court of Pennsylvania.

Argued Sept. 10, 2013.

Decided Aug. 28, 2014.

Opinion Filed Oct. 1, 2014.

506

508

510

512

514

Robert A. Graci, Esq., Judicial Conduct Board of Pennsylvania, for Judicial Conduct Board.

Samuel C. Stretton, Esq., Law Office of Samuel C. Stretton, West Chester, for Mark A. Bruno.

David J. Barton, Esq., Bentz Law Firm, P.C., Dennis R. Joyce, Esq., Pittsburgh, for Special Court Judges Association of PA.

A. Taylor Williams, Esq., Administrative Office of Pennsylvania Courts, for AOPC.

Michael A. Bloom, Esq., Morgan Lewis & Bockius, L.L.P., Philadelphia, Robert L. Byer, Esq., Duane Morris LLP, Pittsburgh, Forest Neil Myers, Esq., Forest N. Myers Law Offices, Shippensburg, Thomas G. Wilkinson Jr., Esq., Cozen O'Connor, Philadelphia, for Pennsylvania Bar Association.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Chief Justice CASTILLE.

On August 28, 2014, this Court vacated its Order dated February 1, 2013, by which the Court suspended Magisterial District Judge Mark A. Bruno without pay pending further Order of this Court. *See In Re: Bruno*, 627 Pa. 243, 99 A.3d 526, 2014 WL 4251283, (Pa.2014) (*per curiam* ). This Opinion follows.

The matter before the Court arises out of our supervisory actions following the 2011 federal investigation and subsequent indictment of Philadelphia Traffic Court personnel on allegations of corruption involving "ticket-fixing." [1] The immediate

---

1. The federal investigation has resulted to date in the prosecution of nine judges elected, or assigned, to Traffic Court: Michael J. Sullivan, Michael Lowry, Robert Mulgrew, Willie Singletary, Thomasine Tynes, Mark A. Bruno, H. Warren Hogeland, Kenneth Miller, and Fortunato N. Perri, Sr.; administrative personnel: William Hird; and two local businessmen: Henry P. Alfano and Robert Moy. As the federal district court has recounted, the central allegation was that "the Traffic Court was used by the alleged conspirators to give preferential treatment to certain ticketholders, most commonly by 'fixing' tickets for those with whom they were politically and socially connected." *See U.S. v. Sullivan*, 2013 WL 3305217 (E.D.Pa. July 1, 2013). The cases of Hogeland,

issue is whether this Court has the power to act and order the interim suspension from the bench of a sitting jurist charged with a felony for conduct on the bench, and particularly whether such authority exists given the formal disciplinary process available, as vested in the Judicial Conduct Board (the "Board") and Court of Judicial Discipline (the "CJD"). This Opinion thus resolves overarching constitutional questions of the Court's authority and jurisdiction with respect to sitting members of the Judiciary. For the reasons that follow, we hold that:

1. The Supreme Court has the supervisory power, an aspect of its authority at King's Bench, to order the interim suspension without pay of sitting jurists.

2. The Supreme Court has exclusive jurisdiction at King's Bench to resolve the instant dispute, which implicates supervisory actions of the Court relating to personnel of the Unified Judicial System.

3. Acting within their respective authorities and jurisdictions, both the Supreme Court and the CJD have authority to issue orders of interim suspension and to impose sanctions upon jurists. To the extent that any such orders ultimately or necessarily conflict, the order of the Supreme Court is "supreme" and controlling.

Aside from foundational issues regarding the Court's power and jurisdiction is the difficult discretionary question of when to exercise the Court's authority. This Opinion discusses the broad considerations attending that question.

## I. Background

On January 29, 2013, a federal grand jury indicted Judge Bruno in the U.S. District Court for the Eastern District of Pennsylvania ("district court") on felony charges of criminal conspiracy, mail fraud, and wire fraud. On February 1, 2013,

Miller, Perri, Hird and Alfano were resolved by plea. The remaining defendants proceeded to a joint trial, which resulted in the outright acquittal of Sullivan, Bruno, and Moy. Mulgrew, Tynes and Lowry were convicted of perjury; Singletary was convicted of making false statements to the FBI.

the Supreme Court entered an order, without dissent, that relieved Judge Bruno "of any and all judicial and administrative responsibilities as a judge of the Magisterial District Court" and suspended Judge Bruno "without pay" pending further Order of this Court. The Order issued without prejudice to the right of Judge Bruno to seek relief in this Court for the purposes of vacating or modifying the Order. Order, 2/1/2013 (*per curiam*) ("February 2013 Order").[2] Judge Bruno did not immediately seek such relief.

Meanwhile, on January 31, 2013, the Board filed a petition with the CJD seeking relief similar to that accorded by this Court, the interim suspension without pay of Judge Bruno. The CJD scheduled a telephone conference for February 1, 2013, to consider the Board's petition. According to the Board, around 2:30 P.M. on February 1, 2013, the CJD received notice of this Court's action and, as a result, cancelled its conference and took no immediate action on the Board's petition.

On March 13, 2013, Judge Bruno filed an application for relief in the federal district court seeking declaratory and injunctive relief from this Court's February 2013 Order, on the theory that the Order violated his due process rights. On May 13, 2013, the district court denied the request for a preliminary injunction. *See Bruno v. Supreme Court of Pennsylvania*, 946 F.Supp.2d 392 (E.D.Pa.2013). The district court also denied reconsideration. In June and July 2013, Judge Bruno filed several other motions in the district court, which he then withdrew following the directive of this Court to reinstate his pay during his suspension.

In parallel, Judge Bruno also responded to the Board's request that the CJD suspend him without pay. The CJD held a hearing on April 8, 2013. On May 24, 2013, nearly four months after Judge Bruno was indicted, the CJD issued an order, accompanied by opinion, suspending Judge Bruno **with** pay. The CJD ordered that any compensation withheld from

---

**2.** President Judge James P. MacElree of the Chester County Court of Common Pleas independently suspended Judge Bruno on the day of the indictment. That action is not challenged in this matter.

Bruno since February 2013 be paid immediately to him. *See In re Bruno*, 69 A.3d 780 (Pa.Ct.Jud.Disc.2013). The CJD's directive necessarily assumed a power to overturn this Court's prior order.

On May 28, 2013, Judge Bruno filed a petition with the Supreme Court to vacate its February 1, 2013, Order for suspension without pay. The Administrative Office of the Pennsylvania Courts (the "AOPC") entered its appearance as respondent. On June 20, 2013, Judge Bruno filed a petition to expedite decision, in which he requested a hearing before the Court. On July 11, 2013, the Court acted on Judge Bruno's petition to vacate by listing the matter for oral argument. The Court requested briefing and argument on three constitutional issues. The issues briefed are:

(1) Whether the Pennsylvania Supreme Court has jurisdiction to enter orders of interim suspension of jurists.

(2) Whether the Court of Judicial Discipline has exclusive jurisdiction to enter orders of interim suspension of jurists, or whether the Court of Judicial Discipline's jurisdiction is concurrent with the jurisdiction of the Pennsylvania Supreme Court.

(3) If both tribunals act, which order is supreme.

*In re Bruno*, 620 Pa. 598, 71 A.3d 249 (2013) (*per curiam*). The Court also directed the AOPC to recommence paying Judge Bruno's salary retroactive to February 1, 2013, pending resolution of the dispute, albeit we did not vacate our prior order. Finally, the Court invited the Judicial Conduct Board to participate in oral argument. The petition for expedited consideration and a "timely hearing" was dismissed as moot. *Id.*

On July 25, 2013, upon a joint application by the parties that the Court granted, this matter was consolidated for briefing and argument with the distinct case involving Philadelphia Traffic Court Judge Christine Solomon, a case which was tangentially related to the federal investigation into Traffic Court corruption, but which implicated similar constitutional

claims.[3] In addition, the Court received *amicus curiae* briefs

3. We do not dispose of the *Solomon* matter in this Opinion. However, our expression necessarily describes and touches upon arguments which the parties illustrate by reference to Judge Solomon's circumstances. Briefly, the background facts of *Solomon* relevant to the issues argued by the parties are as follows.

In October 2011, upon notice of the ongoing federal investigation, the First Judicial District of Pennsylvania (comprising Philadelphia County) (the "FJD"), which was already undertaking a reform initiative authorized by this Court, expanded the scope of its autonomous administrative review to encompass Traffic Court operations. The FJD directed the consulting firm it had retained for its reform initiative, Chadwick Associates, to conduct the review. The immediate goal of the review was to secure and preserve evidence, to facilitate full cooperation with the federal investigation, and to reestablish the probity of Traffic Court operations. Judge Solomon, who had recently been elected to a vacancy on the Traffic Court, met with the Honorable Gary S. Glazer, Judge of the Philadelphia County Court of Common Pleas, who was serving as the new Administrative Judge of the Philadelphia Traffic Court, and representatives of Chadwick Associates on March 13, April 5, and April 10, 2012. In November 2012, the FJD released the report prepared by Chadwick Associates ("FJD Report"), which indicated that Judge Solomon had refused to cooperate with the administrative review.

On April 18, 2013, this Court issued a rule to show cause why Judge Solomon "should not be subject to a suspension from her judicial duties without pay for a period of ninety (90) days based upon her refusal to cooperate with the Court-ordered administrative review of the Traffic Court." The rule was returnable on April 29, 2013. *See* Order, 4/18/2013 (*per curiam*). Mr. Justice McCaffery noted his dissent. Judge Solomon filed an answer to the rule to show cause, challenging the findings of the FJD Report regarding her lack of cooperation.

On May 21, 2013, this Court appointed the Honorable William H. Platt, Senior Judge of the Superior Court of Pennsylvania, to serve as the Court's Special Master in the *Solomon* matter. The AOPC would attend the hearings and participate as necessary. The Court retained jurisdiction. *See In re Solomon*, 620 Pa. 216, 66 A.3d 764 (2013) (*per curiam*). On May 31, 2013, Judge Solomon asked the Judicial Conduct Board to participate in any proceedings relating to the rule to show cause. On June 6, 2013, the Board followed up with a petition filed in this Court to stay proceedings on the rule to show cause or, in the alternative, for permission to intervene in the proceedings before Judge Platt. The Board challenged the Supreme Court's authority to issue a rule to show cause, to act upon the rule, or to appoint a special master. The AOPC responded to the Board's petition.

On July 12, 2013, this Court granted the Board's petition, stayed the proceedings before Judge Platt, and directed the Board to participate in oral argument on the constitutional issues raised regarding the Court's authority to act in the case of Judge Solomon. In the *Solomon* matter, the constitutional questions are the same as those in the *Bruno* matter insofar as they relate generally to an order for the suspension of a jurist, whether a disciplinary action is pending or not before the CJD.

from the Special Court Judges Association of Pennsylvania (the "SCJAP") and from the Pennsylvania Bar Association (the "PBA").

In August 2014, a federal jury acquitted Judge Bruno of felony charges (criminal conspiracy, mail fraud, and wire fraud) relating to his service on the bench at Philadelphia's Traffic Court. Our Order of August 28, 2014, vacating the February 1, 2013, Order freed Judge Bruno to return to service on the bench. This Opinion now addresses the constitutional issues briefed.

## II. The Parties' Arguments

The arguments of the Board and Judge Bruno (together, "petitioners") overlap to a significant degree. Essentially, petitioners argue that the Supreme Court lacks power to enter orders suspending jurists and to act otherwise in any matter that may be considered "disciplinary." In these litigants' view, the CJD's jurisdiction is exclusive in these cases. As a result of this theory, the question of which order is supreme when both the CJD and the Supreme Court act should not and would not arise again. The AOPC responds that the Pennsylvania Supreme Court has "King's Bench" jurisdiction over the *Bruno* matter pursuant to its administrative and supervisory authority over the courts and judicial officers of the Unified Judicial System. According to the AOPC, this jurisdiction is concurrent with that of the CJD over disciplinary matters; however, this Court's authority is "supreme," overriding inconsistent directives of the CJD. In addition to the parties' arguments, we also recount those offered by the PBA in analyzing the constitutional issues implicated here. We note that the PBA has filed a particularly helpful brief, which dispassionately addresses the dispute before the Court in the true spirit of "friend of the Court" advocacy.[4]

---

4. This *sui generis* matter does not present the same prudential concerns of issue preservation and presentation normally posed in cases before the Court. *See Anderson v. McAfoos*, 618 Pa. 478, 57 A.3d 1141, 1149 (2012) ("Issue preservation and presentation requirements are enforced in our system of justice for principled reasons ... as they facilitate the open, deliberate, and consistent application of governing substantive

## A. Petitioners' Arguments

### 1.

Petitioners suggest that the Supreme Court lacks jurisdiction over the *Bruno* case. According to petitioners, the Court's general supervisory and administrative authority over all courts and magisterial district judges, while broad, does not include any matter implicating judicial discipline.

Petitioners begin by noting that any authority of this Court over inferior tribunals originates in the King's Bench power, which was first recognized by the Act of May 22, 1722, and is memorialized in the current Pennsylvania Constitution at Article V, Section 10. Board's Brief at 27–29 & nn. 10, 13 (citing PA. CONST. art. V, § 10(a) (1968); 42 Pa.C.S. § 502). According to petitioners, when Article V, Section 10 was drafted in 1968, the power of the Supreme Court was, "at best, loosely defined in the area of judicial discipline." Until 1968, petitioners state, the Constitution did not provide for the discipline of judges short of removal, which was available via one of three exclusive methods: impeachment, address, or conviction for misbehavior in office or of any infamous crime.[5] Petitioners

legal principles from the foundation of a case through its conclusion on appellate review. Loose shifting of positions after the entry of judgments by those challenging them disrupts the stability and predictability of the process, fostering the potential for unfairness."). Indeed, the AOPC, which has taken the nominal role of respondent in this matter, has in fact advocated from the role of "friend of the court" rather than of counsel, not having had the opportunity to confer with a "client." The Supreme Court in this sense is not a client of the AOPC in this matter, even while it stands in the position of a quasi-litigant.

5. Like its 1874 predecessor, as amended, the Constitution of 1968 provides for the following means of removing jurists by other branches of government, and for automatic forfeiture of the judicial office. The House of Representatives has the sole power of impeachment: "The Governor and all other civil officers shall be liable to impeachment for any misbehavior in office, but judgment in such cases shall not extend further than to removal from office and disqualification to hold any office of trust or profit under this Commonwealth." PA. CONST. art. VI, §§ 4, 6 (1968). Moreover, "[a]ll civil officers elected by the people, except the Governor, the Lieutenant Governor, members of the General Assembly and judges of the courts of record, shall be removed by the Governor for reasonable cause, after due notice and full hearing, on the address of two-thirds of the Senate." PA. CONST. art. VI, § 7 (1968).

note that the Supreme Court could also exercise "its inherent common law supervisory powers over the entire judicial system" to remove, suspend, or discipline jurists, but that the Court had never squarely addressed the extent of its disciplinary authority. This authority, petitioners assume, was never applied, it was "untried and untested," and, as a result, it was not an established power of the Court. Indeed, according to petitioners, with respect to removal of jurists, decisions of the Court suggested that the methods for removal expressly included in the Constitution were exclusive and the Supreme Court was absent from the removal process. Board's Brief at 28–29 (citing Burton R. Laub, THE JUDICIARY: REFERENCE MANUAL No. 5, at 158, 167, 169, 195 n. 1 (1968); *In re Bowman*, 225 Pa. 364, 74 A. 203, 204 (1909) ("constitutional direction as to how a thing is to be done is exclusive and prohibitory of any other mode which the Legislature may deem better or more convenient"); *Commonwealth v. Gamble*, 62 Pa. 343, 343 (Pa.1869) ("gift of power to remove a judge by impeachment or address excludes power to remove in any other manner"); and *Carpentertown Coal & Coke Co. v. Laird*, 360 Pa. 94, 61 A.2d 426, 428–29 (1948) ("*Carpentertown* ") (describing King's Bench power)); *see also* Bruno Brief at 22.

Petitioners maintain that, against this background, the Constitutional Convention of 1968 approved the creation of the Judicial Inquiry and Review Board ("JIRB"), whose processes were dominated by this Court: the Court appointed a majority of the members and the Court had ultimate *de novo* authority to decide whether discipline would be imposed and what form that discipline would take. The Convention added Section 18—addressing judicial discipline—and, for the first time, expressly removed disciplinary functions from the Court's administrative and supervisory powers. According to petitioners, the separate functions overlapped, and the disciplinary

Finally, Article V, Section 18 provides that "A justice, judge or justice of the peace convicted of misbehavior in office by a court, disbarred as a member of the bar of the Supreme Court or removed under this section shall forfeit automatically his judicial office and thereafter be ineligible for judicial office." PA. CONST. art. V, § 18(d)(3) (1968).

system was "an adjunct" to the power of the Court to administer and supervise the courts. The Supreme Court maintained disciplinary decisional authority following action and recommendations by the JIRB. Petitioners argue that the Court's power was not "limitless" because the Court could only act upon recommendation of the JIRB rather than commence proceedings independently. Board's Brief at 30–33 (citing *In re Subpoena on Jud. Inquiry & Rev. Bd.*, 512 Pa. 496, 517 A.2d 949, 952 (1986) ("*JIRB Subpoena*"); *First Amendment Coalition v. Jud. Inquiry & Rev. Bd.*, 501 Pa. 129, 460 A.2d 722, 724 (1983); JOURNAL OF THE PA. CONST. CONVENTION, Vol. I, No. 44, at 835 (Feb. 15, 1968)); *see also* Bruno Brief at 22–26.

Petitioners note that the judicial disciplinary scheme changed in 1993, when the people, acting upon the General Assembly's proposal, amended the Pennsylvania Constitution to eliminate the JIRB in favor of the Board and the CJD. Petitioners offer that the 1993 amendment separated the two functions: this Court retained general administrative and supervisory authority while a new two-tier apparatus was created with exclusive jurisdiction over disciplinary functions. In petitioners' view, the amended Article V, Section 18 limits the general powers of supervision and administration that the Supreme Court has under Article V, Section 10(a). Petitioners argue that the specific enumeration of the powers and authority in the disciplinary sphere of the Board and of the CJD acts as an implicit limitation on any general power of the Court. Petitioners go so far as to claim that the Court's power to discipline in the first instance, as an adjunct of its administrative or supervisory authority, "has been eliminated." Board's Brief at 32–35 (citing PA. CONST. art. V, §§ 10(a), 18); *see also* Bruno Brief at 26–28, 57–58. Additionally, petitioners assert that this Court's published decisions and orders in disciplinary matters reveal that the Court exercises an "extremely limited" power of review and respects the CJD's exercise of discretion, which implicitly shows that the Court recognizes the CJD's exclusive authority to discipline jurists. Bruno Brief at 39 (citing *In re Merlo*, 619 Pa. 1, 58 A.3d 1, 14–15 (2012)).

For petitioners, the salient question in this matter is whether the Supreme Court's intervention by its action against a judicial officer is either supervisory or disciplinary in nature. Petitioners emphasize a perceived dichotomy in the exercise of the Supreme Court's authority: petitioners concede that the Court has plenary power to address supervisory or administrative matters but they insist that the Court lacks any authority to "discipline" jurists in the first instance. Board's Brief at 41–43 (citing *In re Assignment of McFalls,* 568 Pa. 228, 795 A.2d 367, 373 (2002) and *In re Assignment of Avellino,* 547 Pa. 385, 690 A.2d 1138, 1143 & n. 6 (1997) ("*Avellino I*"); Bruno Brief at 38–39 (quoting *In re Melograne,* 571 Pa. 490, 812 A.2d 1164, 1167 (2002) ("It is beyond cavil that the [CJD] has jurisdiction over the general subject matter presented here, namely, determining whether an individual engaged in judicial misconduct. In fact, that is the tribunal's constitutional *raison d'être.*"))); *see also In re Assignment of Avellino,* 547 Pa. 398, 690 A.2d 1144 (1997) ("*Avellino II*").[6] According to petitioners, the drafters of Section 18 believed that supervisory and administrative concerns are separable from disciplinary matters and, as a result, the drafters crafted a patently distinct provision governing discipline. Following the 1993 amendment, petitioners assert, the two-tiered disciplinary system operates independently from the Supreme Court. For example, the Supreme Court's general authority to promulgate rules of procedure does not apply in the disciplinary realm; the Board and the CJD promulgate their own rules of procedure. Board's Brief at 50 (comparing PA. CONST. art. V, § 18(a)(6) (1993) *with* PA. CONST. art. V, § 18(j) (1968) (repealed)).

Petitioners claim that the Court's decisions in *Avellino I* and *McFalls, supra,* are not to the contrary. In *Avellino I*

**6.** The *Avellino I* Court held that the Supreme Court had authority at King's Bench to impose sanctions when a judicial officer refused to comply with the assignment to preside over criminal trials in the "felony-waiver program" of the court of common pleas, for the calendar year 1997. In *Avellino II,* the Court held that a sanction of suspension without pay for three months, followed by submission of performance reports for six months, was warranted under the circumstances.

and *McFalls,* according to petitioners, the jurists had refused judicial assignments, creating administrative concerns properly addressed by the Court in its supervisory or administrative capacity. Petitioners assert that the *Avellino I* Court recognized the distinction, holding that the Court in that matter was exercising its supervisory power and addressing an affront to its authority, rather than stating that it had the authority to discipline or actually imposing any disciplinary sanction in the first instance. In both *Avellino I* and *McFalls,* petitioners assert, the Supreme Court intervened in ongoing disputes and acted quickly on the jurists' disobedience, suggesting administrative or supervisory action. By comparison, petitioners opine, the Court's actions in *Bruno* (and also in *Solomon* ) are disciplinary in nature and subject to the CJD's exclusive jurisdiction.

Petitioners explain the distinction between disciplinary and administrative action by reference to Judge Solomon's circumstances. *See supra* n. 3. According to petitioners, the Court's decision to issue a rule to show cause upon Judge Solomon suggests disciplinary action because more than a year lapsed between Judge Solomon's alleged failure to cooperate with the Traffic Court investigation and the Court's rule to show cause and, during this time, the FJD did not request any action by the Supreme Court to induce Judge Solomon's cooperation before the rule issued. Petitioners also observe that no other judges who failed to cooperate with the court-ordered review of Traffic Court, *e.g.,* by invoking the right against self-incrimination, were subject to a similar rule to show cause. Petitioners claim that the Supreme Court's targeted action involving the sitting jurist was intended to discipline rather than to assure the functioning of the judicial system. Furthermore, petitioners emphasize that the Supreme Court's action involves a fact-finding investigation into Judge Solomon's past conduct, which they believe takes the case "into the area of asserted misconduct" subject to the CJD's exclusive dominion. Board's Brief at 35–42; *see also* Bruno Brief at 59–62.

Finally, petitioners suggest policy concerns with the Court's actions. For instance, according to petitioners, an original investigation through a master "has the potential for intruding" upon the Board's constitutional duties to investigate and prosecute judicial misconduct and upon the CJD's constitutional authority to impose discipline. Petitioners claim that any disciplinary action would "arguably preclude" the CJD from imposing a sanction on a Board-filed complaint so as not to subject the jurist to two disciplinary sanctions for the same conduct. Moreover, petitioners remark that a Court inquiry would not be subject to the confidentiality and other due process protections afforded by Article V, Section 18. Bruno Brief at 57–58 (citing *JIRB Subpoena,* 517 A.2d at 954); *see also* Board's Brief at 42–44.

As an alternative, petitioners offer that, if the Supreme Court were to hold that it has authority to act in disciplinary actions, the Court should nevertheless refrain from acting and, instead, should refer the sitting judge to the Board.[7] This argument proceeds as follows: an approach of employing a master suffers from practical impediments and fails to ensure a fair process: for example, the parties receive no prehearing discovery; there is no predictable procedure or investigation; the charges are not specific; discipline takes place on an *ad hoc* basis; and resulting sanctions may lack parity. In such an instance, the Supreme Court "appear[s] to perform concurrently as the investigator, prosecutor and judge ... [a] comingling of constitutional functions" that violates due process. Accordingly, a hearing before the master is "unseemly" and "difficult."

Moreover, the Court's involvement at this stage would "undermine any later disciplinary case," as *res judicata* and collateral estoppel would operate. And, if the CJD were to impose parallel discipline, the Supreme Court would be in the difficult position of appearing to have prejudged the matter prior to the jurist's appeal of right, should one follow. Referral to the Board for disciplinary action is therefore preferable

7. This particular argument is made in the jurists' joint brief and is not forwarded here by the Board.

and would be sufficient to vindicate the Court's supervisory responsibilities and authority. The referral would allow agencies with appropriate resources to investigate and prosecute disciplinary matters. Bruno Brief at 48–62.

With respect to the circumstances specific to the *Bruno* matter, petitioners rely in part on the supervisory/disciplinary dichotomy already developed, but primarily develop an analysis of Article V, Section 18(d)(2), the constitutional provision which expressly addresses interim suspensions by the CJD.

Petitioners argue that Article V, Section 18(d)(2) vests by its plain language "exclusive" authority in the CJD to direct the interim suspension of a jurist who has been charged with a felony or against whom charges have been filed by the Board with the CJD. In petitioners' view, because the constitutional language refers to the authority of no entity other than the CJD to enter interim suspensions, the intent of the drafters was that only the CJD—and not the Supreme Court—would have that power. Petitioners further claim that the Constitution expressly eliminates the Supreme Court from the process entirely by prohibiting appeals of interim suspension orders. *See* Board's Brief at 46–48, 57; Bruno Brief at 18–19.

Looking beyond the plain language, petitioners remark that the 1993 amendment provided for the first time constitutional authority to order interim suspensions of jurists, and allocated that authority expressly to the CJD, with the intent to remove any residual supervisory and administrative authority vested in the Supreme Court. Petitioners assert that the drafters of the 1993 amendment to Section 18 of Article V must be presumed to have been aware of the state of the law at the time of promulgation, specifically, that the Court had relied on Article V, Section 10(a) to impose an interim suspension in *In re Franciscus*, 471 Pa. 53, 369 A.2d 1190 (1977). Board's Brief at 51–53 (citing PA. CONST. art. V, § 10(a)). Petitioners claim that, by granting the authority to impose interim suspensions to the CJD instead, the drafters of the 1993 amendment must have intended to remove the same authority from the Court. Interpreted together, the argument goes, Sections 10(a) and 18(d)(2) exclude the Supreme Court from disciplinary matters

because the CJD's Section 18(d)(2) authority is an express carve-out from and limitation on the general supervisory and administrative powers of this Court articulated in Section 10(a). According to petitioners, the Court's general administrative or supervisory power must yield to the CJD's specific authority in this regard, consistent with the rule of interpretation that "the specific must prevail over the general." *Id.* at 54; *accord* Bruno Brief at 33–37.

Petitioners also suggest that the legislative history of the 1993 amendment supports the interpretation that legislators sought a "dramatic" departure from the previous system of disciplining jurists, which had not functioned well, by creating an independent disciplinary system outside the control of the judiciary. *See* Board's Brief at 55–56 (citing 1992 Pa. Legislative Journal–House 1513, 1516–18, 1523 (June 24, 1992); 1992 Pa. Legislative Journal–Senate 2481, 2482–83 (July 1, 1992); 1993 Pa. Legislative Journal–House 53, 62 (January 27, 1993)). Petitioners add that the citizenry approved the amendment, whose purpose was described in the referendum ballot question as "establish[ing] a new system for disciplining Pennsylvania justices, judges, and justices of the peace (now known as district judges)." *Id.* at 57 (quoting Pa. Bull. Vol. 23, No. 8, at 816 (Feb. 20, 1993)). According to petitioners, the 1993 amendment was intended to eliminate judicial domination of the disciplinary system and to "strip" the Supreme Court of the power to impose discipline. Petitioners conclude that, as a result of the 1993 amendment, "[w]hatever authority this Court had exercised in those [interim] circumstances ha[s] been transferred to the CJD." The 1993 amendment "essentially removed this Court from participation in the system until an appeal from a final order from the CJD." *Id.; accord* Bruno Brief at 26–28.[8]

---

**8.** Judge Bruno alleges that the 1993 amendment was a reaction of "the public" and the General Assembly to the conduct of Supreme Court Justices in the discipline of former Justice Rolf Larsen. Bruno Brief at 24–28 (citing *Matter of Larsen*, 532 Pa. 326, 616 A.2d 529 (1992)). The AOPC notes that counsel's conjecture that Section 18 was a response to disputes among members of the Supreme Court is not "legislative history" as that term is generally understood. The AOPC also rejects the Board's choices of legislative history, stating that the Board misap-

Judge Bruno subscribes to the same interpretation of Section 18(d)(2) of Article V as the Board but adds, in the alternative, the argument that the Supreme Court may have the supervisory authority to suspend a jurist on a temporary interim basis, if the CJD does not act timely. According to Judge Bruno, once the Court orders an interim suspension, "the matter should be immediately transferred to the [CJD] for the [CJD] to make the final decision and to have a hearing on the issue of the interim suspension." After that, Judge Bruno asserts, the Pennsylvania Supreme Court would no longer have any authority because an interim suspension order is not appealable. Judge Bruno posits that this "compromise" solution would resolve any problems, including that the Court is not in the position to provide a timely hearing post-deprivation after ordering an interim suspension. Bruno Brief at 34, 36–37, 40–41.

## 2.

With regard to the second issue upon which we received briefing, petitioners assert that the CJD's jurisdiction is exclusive. Petitioners reject the notion of concurrent jurisdiction over "disciplinary" matters, pursuant to which both this Court and the CJD would have authority to issue orders of suspension. According to petitioners, the language of Article V, Section 18 is plain that the CJD has exclusive jurisdiction to discipline jurists for alleged wrongdoing and to issue interim suspensions pending resolution of a complaint by the Board or outcome of felony charges.

Petitioners assert that, although this Court has acted to issue interim suspensions in the past, the decisions upon which the Court relied, *e.g.*, *Franciscus*, *Avellino I*, and *McFalls*, do not support the exercise of the Court's authority here. Petitioners note that *Franciscus* pre-dates the 1993 amendment of

prehends the record. For example, the comments of Representative Piccola cited by Judge Bruno were made in the context of a rejected amendment and do not reflect the language of Section 18 as proposed to the people.

In light of our disposition, we find it unnecessary to resolve disputes regarding the alleged background or the legislative history of the 1993 amendment to Article V, Section 18.

Article V, Section 18, which changed the constitutional paradigm. Furthermore, petitioners remark that the authority the *Franciscus* Court relied upon to impose interim suspensions was the Court's supervisory power, rather than a broader King's Bench power. "If ever [King's Bench authority] was a separate source of this Court's power to issue interim suspensions, it no longer is," according to the Board. Board's Brief at 59–60 (citing *Franciscus*, 369 A.2d at 1192); *see also* Bruno Brief at 37–39.

Petitioners distinguish *Avellino I* and *McFalls* as "judicial assignment" and not "judicial misconduct" cases because those cases involved administrative circumstances, in which jurists refused to take the bench. The Court did not enter interim suspensions or endeavor "to head off public disesteem for the judicial system likely to develop when a judge charged with crimes continues to 'hold court' " pending resolution of criminal charges, as is the case with Judge Bruno. Petitioners also note that there was no exigency for the Court to act in *Avellino I* and *McFalls*, which is why the Court's action in those matters was administrative and, therefore, proper. Board's Brief at 58–59 (quoting *Bruno*, 69 A.3d at 805 (Clement, J., concurring)). By comparison, petitioners opine that the Court should have refrained from acting in recent "disciplinary" matters, such as *Bruno, In re Joyce*, No. 394 Jud. Admin. Docket 1 (Pa. Aug. 21, 2007) (*per curiam* ); *In re Merlo*, No. 361 Jud. Admin. Docket (Pa. Dec. 22, 2010) (*per curiam* ); *In re Melvin*, No. 384 Jud. Admin. Docket (Pa. May 18, 2012) (*per curiam* ); *In re Mulgrew*, No. 388 Jud. Admin. Docket (Pa. Sept. 19, 2012) (*per curiam* ); *In re Nocella*, No. 391 Jud. Admin. Docket (Pa. Nov. 9, 2012) (*per curiam* ); *In re Lowry*, No. 397 Jud. Admin. Docket (Pa. Feb. 1, 2013) (*per curiam* ); and *In re Sullivan*, No. 398 Jud. Admin. Docket (Pa. Feb. 1, 2013) (*per curiam* ). *Id.* at 58–59 & n. 23.[9]

9. The Board distinguishes the matter of *In re Singletary*, No. 377 Jud. Admin. Docket (Pa. Jan. 5, 2012) (*per curiam* ), on the ground that the interim suspension followed an administrative decision, which ultimately resulted in removal by the CJD. According to the Board, this Court had jurisdiction under such circumstances, for which Article V, Section 18(d)(2) of the Constitution does not provide.

Judge Bruno adds to the constitutional analysis the practical concern that concurrent jurisdiction creates a conundrum for the AOPC regarding which order to obey where, as here, orders of the CJD and of the Supreme Court are at odds.

**3.**

In light of its conclusion that the CJD's jurisdiction to enter interim suspension orders is exclusive, petitioners state that the last question we ordered to be briefed, concerning the hierarchy of orders if both the CJD and this Court act, need not be reached.

According to petitioners, this Court is not authorized to act, even where the CJD fails to act, because any action is within the CJD's exclusive discretion. Thus, the Board declares that, "[a] failure to order a suspension does not allow th[e Supreme] Court to do as it pleases if it disagrees with the action or inaction of the CJD in failing to order a suspension." Petitioners also offer that this Court has "already answered the question" of which order takes precedence by vacating its order imposing a suspension without pay and "essentially enforc[ing] the CJD's [o]rder." *See In Re: Bruno,* 620 Pa. 598, 71 A.3d 249 (2013) (*per curiam*). According to petitioners, competing orders force parties to litigate in two fora "unnecessarily and inappropriately." Petitioners characterize "such dual jurisdiction" as absurd and "to be avoided in constitutional construction." Petitioners seek resolution of the first two issues in accord with their positions "so that the third never occurs again." Board's Brief at 61–62; *accord* Bruno Brief at 46–47.

Judge Bruno adds that the conflict between orders of the Court and of the CJD, as well as the inconsistent adherence by the AOPC to directions regarding pay, affect the public's perception regarding the integrity and fairness of the judicial system. Judge Bruno contrasts his own situation (this Court ordered suspension without pay, the CJD ordered suspension with pay, and the AOPC withheld pay until further order of this Court) with the circumstances of former Justice Joan Orie Melvin and Judge Thomas M. Nocella, who were suspended

with pay by this Court and without pay by the CJD, and the AOPC again withheld pay premised upon the CJD's order. The "situation should never be reached," and will not be reached, Judge Bruno argues, if this Court refrains from entering interim suspension orders. Bruno Brief at 44–46.[10]

### B. Arguments of the AOPC and the PBA

#### 1.

The AOPC responds that the Supreme Court may exercise King's Bench jurisdiction to issue an order of interim suspension in a situation such as that involving Judge Bruno. According to the AOPC, the Court's authority is broad and includes superintendency over inferior tribunals and their members. The breadth of authority fits the Court's responsibility to safeguard the integrity of the Unified Judicial System, against judicial impropriety and even against the appearance of judicial impropriety. The AOPC argues that the 1993 amendment, while creating the Board and the CJD, did not divest the Supreme Court of its powers of superintendency over Pennsylvania courts and its judicial officers. AOPC Brief at 11–13 (quoting *Carpentertown*, 61 A.2d at 428–29). The PBA offers additional helpful perspective and detail regarding the Court's King's Bench jurisdiction.

King's Bench power, the PBA states, was vested in this Court by the Act of May 22, 1722, and has survived enactments and revisions of the Pennsylvania Constitution. PBA Brief at 3–4 (citing PA. CONST. SCHED. art. V, § 1; 42 Pa.C.S. § 502; *Carpentertown*, 61 A.2d at 429). Today, the Pennsylvania Constitution provides that the Court has "such jurisdiction as shall be provided by law." *Id.* (citing PA. CONST. art. V, § 2). Aspects of the Court's King's Bench authority are

10. *Amicus curiae* SCJAP filed a brief in which it purports to undertake an *Edmunds* analysis of Article V, Sections 10 and 18. SCJAP essentially replicates petitioners' arguments with respect to the plain language and legislative history of the provisions. In addition, SCJAP argues that the Supreme Court may not exercise extraordinary jurisdiction in a disciplinary matter because "the CJD is not a component part of the [U]nified [J]udicial [S]ystem" but "a constitutional agency independent in its own right." SCJAP Brief at 26–27 (citing PA. CONST. art. V, § 1, 42 Pa.C.S.A. §§ 301, 1701).

recited in the Constitution, at Sections 2 and 10 of Article V; these provisions address the Supreme Court as the "supreme judicial power" and as the "general supervisory and administrative authority." Moreover, Section 502 of the Judicial Code explicitly codifies that the authority of the Court of King's Bench has continued in the Supreme Court since 1722. *Id.* (citing 42 Pa.C.S. § 502). The PBA notes that the Court has called upon the King's Bench authority in cases similar to those of Judge Bruno and Judge Solomon. *Id.* at 5–7 (citing *Franciscus; Avellino I; Merlo, supra*).

The AOPC and the PBA emphasize that the 1993 amendment left Sections 2 and 10 of Article V intact. As the AOPC explains, the 1993 amendment did not "affect, restrict, or suspend *sub silentio*" the King's Bench powers of the Court but simply "altered" the mechanism for investigating and adjudicating charges of judicial misconduct. The PBA notes that Article V, Section 18 simply delineates the CJD's authority within the disciplinary process and does not purport to limit the Court's authority to supervise the court system, which is a separate matter. PBA Brief at 7–9 (citing *In re Merlo*, 609 Pa. 598, 17 A.3d 869, 871 (2011)); *accord* AOPC Brief at 25 ("[T]here is nothing 'inherently inconsistent' between the existence of the supervisory and administrative authority of the Supreme Court and the disciplinary authority of the [Board] and the CJD."). The PBA offers that the CJD is an inferior tribunal that is part of the Unified Judicial System and, as a result, is under this Court's supervisory authority. PBA Brief at 7–9 (citing PA. CONST. art. V, § 1); *see also* AOPC Brief at 29–30 (citing PA. CONST. art. V, § 18(c)(1)-(3) (right to appeal CJD decision to Supreme Court)). Accordingly, the PBA rejects the predicate dichotomy perceived by petitioners between the authority of the Court to act upon conduct resulting in disciplinary action and supervisory intervention. PBA Brief at 10–11 (quoting *Merlo*, 17 A.3d at 871).

The PBA submits that Sections 2 and 10 of Article V must be given effect alongside the 1993 amendment "because the Constitution is an integrated whole." To give full effect to the Supreme Court's constitutional supervisory power and its

designation as the "supreme judicial power of the Commonwealth" means that the Court has jurisdiction to act under circumstances such as those involving Judge Bruno. Indeed, the AOPC and the PBA note that the Court has already exercised its supervisory authority in similar circumstances since the 1993 amendment. AOPC Brief at 14–16 (citing *Avellino I*, 690 A.2d at 1143; *Office of Disciplinary Counsel v. Jepsen*, 567 Pa. 459, 787 A.2d 420, 425 (2002)); PBA Brief at 11.

The PBA adds that the Court "may undertake its own investigation of matters implicating the proper functioning of the judiciary. This is implicit ... in this Court's power to exercise its supervisory authority even in the absence of any related proceeding before a lower court ... [and] a necessary feature of this Court's King's Bench power." PBA Brief at 14 (citing *Avellino I*, 690 A.2d at 1140 and *Carpentertown*, 61 A.2d at 429); *accord* AOPC Brief at 29–30 (citing *Friedman v. Corbett*, 620 Pa. 569, 72 A.3d 255, 256 (2013)). The AOPC adds that "[t]he *Solomon* matter is solidly within the administrative authority of this Court" and is akin to an internal labor dispute or an employment hearing, like the disputes in *Avellino I* and *McFalls*.

The PBA and the AOPC also dismiss petitioners' policy concerns. Thus, the PBA argues that the exercise of supervisory power by the Supreme Court does not affect the separate authority of the Board to investigate a jurist's same conduct pursuant to Article V, Section 18 of the Pennsylvania Constitution. PBA Brief at 16–17 (quoting *McFalls*, 795 A.2d at 373) & 36–37. Moreover, the AOPC notes that the Board's investigation of jurists is confidential and the Court becomes aware that the CJD is acting only if the jurist waives confidentiality. As a result, the AOPC argues, there is uncertainty whether the Board and the CJD is acting and, accordingly, timely Supreme Court action is generally appropriate. AOPC Brief at 42–44.

Furthermore, the hearing before a Court's master, the AOPC states, comports with due process requirements. The AOPC extends the labor and employment analogy to suggest

that a similar standard of due process is required here: notice and an opportunity to be heard; an opportunity to obtain discovery is not required. *Id.* at 44 (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). Furthermore, the AOPC suggests that the Court need not guarantee confidentiality of the proceedings before a master because, in a case implicating the Court's supervisory authority, the public requires transparency. The PBA adds that "the requirements of due process are flexible" and "this Court may fashion appropriate procedures in carrying out its broad supervisory powers." Indeed, the PBA notes, this Court has already rejected the notion that its administrative and supervisory authority should be exercised by any particular mechanism prescribed by general rule, or that any right to discovery or a jury trial exists. PBA Brief at 14–15 (quoting *Avellino I,* 690 A.2d at 1140 n. 1 & 1142 n. 3).

The AOPC concludes that the Supreme Court is required to act in cases such as *Solomon,* "and properly did so within the Court's inherent supervisory authority." King's Bench authority serves in this context "to protect and promote the public confidence in the judicial system, to maintain a high standard of professional ethics and propriety, and to guard and protect the dignity and authority of the [C]ourt, and the safety and protection of the public." AOPC Brief at 16, 33–34 (internal quotations omitted) (quoting *Franciscus,* 369 A.2d at 1194–95). While the Court has in the past referred jurists to the Board for investigation, the AOPC notes, such an action is not required in every case; "the Supreme Court must retain its constitutional supervisory discretion to act as the supervisory power over the Unified Judicial System as necessary, and on a case by case basis." *Id.* at 45–46. The PBA agrees: the Court may elect to defer to the Board for investigation where appropriate, but it is not constitutionally required to do so. PBA Brief at 15 (citing *Avellino I,* 690 A.2d at 1143 n. 6).

In Judge Bruno's case, the AOPC disputes petitioners' reading of Article V, Section 18(d)(2). According to the AOPC, the two provisions of the Constitution at issue here, Sections 10(a) and 18(d)(2) of Article V, are not in conflict and

the Court should interpret them to give effect to both. The AOPC claims that Article V, Section 10(a) vests general, broad supervisory and administrative power in the Supreme Court, while Article V, Section 18(d)(2) is restricted by its express terms to disciplinary actions brought within the framework of Section 18. These separate powers available for addressing the same, or similar, circumstance do not create an inherent inconsistency, even though the result may be asymmetric. AOPC Brief at 25 (citing *Mohamed v. Dep't of Transp.*, 615 Pa. 6, 40 A.3d 1186, 1193 (2012) (quoting *Pa. Turnpike Comm'n v. Sanders & Thomas, Inc.*, 461 Pa. 420, 336 A.2d 609, 614 (1975))).

The language of Section 18(d)(2), the AOPC states, is plain: the CJD is authorized to enter interim suspension orders and the provision simply does not address whether the Supreme Court may do so as well. The AOPC notes that the word "exclusive," which the Board and Judge Bruno read into the provision as a necessary buttress for their argument, is absent from Section 18(d). The AOPC also argues that, in light of this plain language, the premise that the CJD's jurisdiction became exclusive following the 1993 amendment cannot be implied. Section 18(d)(2) did not repeal by implication Section 10(a) because the provisions are neither irreconcilable nor does Section 18(d)(2) cover the whole subject of Section 10(a) so as to invite an interpretation that it was clearly intended as a substitute for, or as an implied repeal of, the earlier provision. In the AOPC's view, this Court's prior decisions confirm this interpretation. AOPC Brief at 22–25, 27 (citing *In Re: Jud. Conduct Bd. Subpoena No. 96076*, 550 Pa. 132, 703 A.2d 461, 463 (1997) (*"JCB Subpoena"*); *Jepsen; Avellino I; Franciscus, supra*).

The PBA adds that interim suspension orders are entered by the Court in its supervisory function, to assure the integrity of the judicial system rather than being "meted out as a form of punishment." PBA Brief at 10 (citing *Franciscus*, 369 A.2d at 1195). The PBA notes that the Court acts upon the threat to the smooth functioning of the system posed, for example, by the pendency of misconduct charges. No final

decision is made related to the charges because an interim suspension is not the result of investigation or adjudication of misconduct charges. *Id.* (quoting *Merlo,* 17 A.3d at 871). Indeed, the PBA suggests that the same conduct that gives rise to the Court's administrative/supervisory action may also result in disciplinary sanctions. The Court's action of interim suspension, according to the PBA, does not affect the Board's independent authority to investigate the same conduct and, in fact, the Court has referred suspended jurists to the Board. *Id.* at 11–12 (citing *McFalls; Merlo, supra* ). The PBA notes that the judicial conduct at issue here threatens the public's perception of the judiciary and justifies administrative action, regardless of whether the allegations are ultimately pursued or proven via the Article V, § 18 process.

Similarly, the AOPC notes that the Court's authority to issue interim suspensions is not limited to instances in which a jurist "directly defies authority" within the judicial system. "The fact that some prior cases involved that circumstance does not serve to cabin [the Court's] supervisory authority." Indeed, the AOPC explains, the Court has suspended jurists for other reasons, such as when the jurist was indicted for crimes stemming from a fraudulent insurance claim. AOPC Brief at 16 (quoting *Merlo,* 17 A.3d at 871–72 and citing, *e.g., In re Joyce,* No. 301 Jud. Admin. Docket 1 (Pa. Aug. 17, 2007)).

### 2.

On the second issue, the AOPC and the PBA agree that the Court and the CJD have concurrent jurisdiction. The PBA reiterates that the 1993 amendment did not revoke or diminish the Supreme Court's supervisory powers, pursuant to which the Court may enter interim suspension orders. PBA Brief at 16.

Moreover, the PBA rejects the suggestion that the non-final and not-appealable-of-right nature of CJD interim suspension orders has any bearing on the question of the Court's authority to act. According to the PBA, a non-final order does not prevent review. The Court's exercise of supervisory powers,

the PBA argues, "is not confined to appellate review of lower court orders"; the Court may intervene and order an interim suspension, independent of the CJD. *Id.* at 19 (citing, e.g., Pa. R.A.P. 311 (interlocutory orders appealable of right); Pa. R.A.P. 312 (interlocutory appeals by permission); Pa. R.A.P. 313 (collateral order doctrine)); *accord* AOPC Brief at 38–39 (comparing PA. CONST. art. V, § 18(d)(2) with Pa. R.A.P. 341) (prohibition against taking appeal from interim suspension order is similar to general rule governing appeal from other interlocutory order and does not alter relationship between CJD and Supreme Court). The PBA states that an order from this Court issuing an interim suspension "is outside the ambit of Section 18(d)(2)'s restriction on appellate jurisdiction over orders entered by the CJD." "A contrary position" impairs the Court's ability to perform its constitutionally-mandated duties. *Id.* at 18–19.

Finally, the PBA rejects the notion that, in issuing interim suspension orders, this Court is prejudging the merits of a CJD disciplinary action, even when the disciplinary matter is premised upon the same conduct. The PBA notes that this Court may enter interim suspension orders simply upon reviewing the nature of the charges and the Court's assessment of their impact upon the public perception of the judiciary, rather than based upon any investigation or adjudication of the pending charges. PBA Brief at 20 (citing *Merlo,* 17 A.3d at 872); *see also* AOPC Brief at 36–37. This limited approach does not entail addressing the legal or factual merits of the underlying charges, which may be problematic. The PBA notes that the CJD has taken the approach of examining not only the nature of the charges, but also what the CJD deems to be the merits of the charges in deciding whether to issue interim suspensions. The PBA suggests that this approach "risks an inappropriate collateral attack on the validity of th[e criminal] charges" and potentially embarrassing conflicts with the criminal court adjudicating the charges. PBA Brief at 21.

The AOPC adds that concurrent jurisdiction is in accord with precedent, as explained in *Franciscus, Avellino,* and *McFalls. Melograne,* according to the AOPC, is not to the

contrary. In *Melograne,* the question before the Court was whether the CJD had jurisdiction to discipline a jurist who was no longer on the bench during the pendency of the disciplinary action. The *Melograne* decision simply did not address whether the CJD's jurisdiction was "exclusive," as petitioners claim, and the case is, therefore, inapposite. AOPC Brief at 18 (citing 812 A.2d at 1167 n. 2). The AOPC adds that the CJD has jurisdiction to act only after the Board determines that probable cause exists for discipline and files charges; but, the Supreme Court's broader powers take into consideration the Court's responsibilities to the judicial system and the necessity for immediate action in some circumstances. *Id.* at 19 (quoting *Franciscus,* 369 A.2d at 1193–94).[11]

### 3.

With regard to this last issue, the PBA states that the 1993 amendment "did not elevate" the CJD's authority over that of the Supreme Court. The Supreme Court, according to the PBA, retains its supervisory power over inferior tribunals, including the CJD. Moreover, the PBA argues that the Court need not decline to exercise jurisdiction here out of deference

11. The PBA also offers five recommendations intended to avoid future jurisdictional conflicts that it views as "counterproductive to a central purpose of the judicial discipline system," *i.e.,* "to promote public confidence in the integrity of the judiciary." *See* PBA Brief at 22–25. The recommendations are:

1. That the Supreme Court should allow the CJD to make interim suspension decisions in the first instance following a complaint and motion of the Board.

2. That, if the circumstances require the Supreme Court to enter an interim suspension order, the Court should specify whether the CJD may act; absent specification, the CJD should not be permitted to enter an inconsistent order.

3. A judicial officer who is the subject of an interim suspension order by the Supreme Court may apply to the Court to vacate or modify the suspension order.

4. The CJD should establish a "fast track" mechanism for addressing interim suspension requests.

5. The Supreme Court should define the scope of the inquiry for the CJD when reviewing a request for an interim suspension order. *Inter alia,* the CJD's inquiry should be confined to the nature of the charge and its effect on the public perception of the judiciary.

We appreciate the PBA's thoughtful input and, in many respects, our judgment is guided by these recommendations.

to the CJD, an argument already rejected in prior cases. PBA Brief at 17 (quoting *Franciscus,* 369 A.2d at 1194). And, because the Court is the "supreme judicial power in the Commonwealth," the PBA suggests that CJD orders are necessarily subordinate to and may not conflict with the Supreme Court's directives, unless the Court's order expressly allows for subsequent adjudication by the CJD.

Similarly, the AOPC argues that the Supreme Court is the highest court of the Commonwealth, vested with "supreme" judicial power; the Court's orders may not be modified, altered, amended, set aside, or disturbed by an inferior court, such as the CJD. The CJD, according to the AOPC, is a court inferior to the Supreme Court because the Supreme Court retains the ultimate power to review on appeal the CJD's decisions. The AOPC states that, while both the Supreme Court and the CJD are capable of determining appropriate discipline, the Court is the final arbiter of the sanction. AOPC Brief at 37–38 (quoting *Jepsen,* 787 A.2d at 423). The AOPC asserts that the Supreme Court may invoke either its extraordinary jurisdiction, to intervene in an ongoing matter, or its King's Bench jurisdiction, where no matter is pending before the CJD, to enter interim orders of suspension. When exercising these forms of jurisdiction, the AOPC argues, the decision of the Supreme Court is "preeminent." AOPC Brief at 40–42.

### III. The Opinion of the Court of Judicial Discipline

As noted, on May 24, 2013, the CJD issued an order of interim suspension with pay in the *Bruno* matter. The CJD's opinion in support of the order, as well as the concurring opinion, touched upon the constitutional issues which we address in our Opinion. Indeed, petitioners expressly rely upon a concurring expression in *Bruno* in fashioning their argument to this Court. The CJD reasoned as follows.

Initially, the CJD held that the crimes with which Judge Bruno was charged—one count of mail fraud, one count of wire fraud, and one count of conspiracy to commit wire and mail fraud, 18 U.S.C. §§ 1341, 1343, 1349, respectively—relate

to his everyday duties as a judicial officer and thus his continued presence on the bench pending resolution of these charges would have "a possible negative impact on the administration of justice and could possibly harm the public confidence in the judiciary." *In re Bruno*, 69 A.3d 780, 782 (Pa.Ct.Jud.Disc.2013). The CJD then held that suspension with pay was appropriate.

As relevant here, the CJD recognized that its order was in tension with this Court's February 2013 Order. The CJD considered whether the February 2013 Order barred the CJD's action on the Board's petition; it rejected the notion for three reasons. First, the CJD said that it issued its order based upon a developed record not available to the Supreme Court at the time that the February 2013 Order issued. Second, the CJD indicated its agreement with the CJD concurring opinion that Section 18(d)(2) of Article V "plainly confer[s] authority to issue orders of interim suspension on th[e CJD]," including under the circumstances of Judge Bruno's case. The CJD concluded that the Supreme Court recognized the authority of the CJD to issue interim orders of suspension in cases in which the Court had already acted, and that the CJD's order would control regardless of whether it conflicted with the initial order of the Supreme Court. *Id.* at 798–99.

The concurring opinion represented the views of three members of the CJD who also joined the majority opinion. The concurrence specifically addressed the CJD's decision to suspend Judge Bruno with pay while this Court's Order to suspend Judge Bruno without pay was in force. The concurrence opined that the CJD's authority to issue interim suspensions is exclusive. According to the concurrence, following the 1993 amendment of the Pennsylvania Constitution, the Supreme Court was "wrong" to rely on the decision in *Franciscus*, which interpreted Section 18 as added in 1968, to impose interim suspensions. In the view of the concurrence, the 1968 provision differed in quality from the 1993 amendment because the latter "greatly diminish[ed] the Supreme Court's supervisory powers." *Id.* at 802 (Clement, J., concurring,

joined by Cellucci and Mullen, JJ.) (emphasis omitted). The concurrence recounted that, under the 1968 version of Section 18, the Court had authority to impose discipline *de novo*, while the JIRB had no such authority at all, including to enter interim suspensions. The concurrence argued that the 1993 amendment "seriously circumscribed" the Supreme Court's review of disciplinary matters decided by the CJD and expressly transferred the power to enter interim suspensions to the CJD. "[I]t is quite reasonable to regard Section 18(d)(2) as an **express** transfer of responsibility for interim suspensions to [the CJD] because [the provision] contains an **express** diminishment in the Supreme Court's supervisory powers by **expressly** providing that the Supreme Court has **no authority** to review orders of [the CJD] imposing interim suspensions." *Id.* (emphasis in original). The concurrence concluded by opining that the drafters of Section 18(d)(2) "specific[ally] and emphatic[ally]" intended the CJD to have exclusive jurisdiction over interim suspensions, an intent that the Court's opinions since the 1993 amendment have nullified. *Id.* at 802–03 (citing *Avellino I, supra* ).

Moreover, the concurrence argued that there was a conflict between Sections 10(a) and 18(d)(2) of Article V, which, the concurrence believed, requires resolution in accordance with the legislative rules of statutory construction. According to the concurrence, "it is beyond argument" that the people of the Commonwealth, in delegating a power to enter interim suspension orders to the CJD—orders which may not be directly appealed as of right—"intended that those orders were not to be overridden and that the [CJD] should be free from interference in performing its duty so assigned." The concurrence maintained that when the Supreme Court enters interim suspension orders, whether in accord or in conflict with a CJD order in the same matter, Section 18(d)(2) is rendered meaningless. To resolve the conflict, the concurrence stated, Section 18 should be interpreted as the specific provision which controls the inquiry over and above Section 10, the general provision that grants the Supreme Court

authority over administrative matters—just as a statute would be interpreted under the precept governing general and specific provisions. According to the concurrence, the Court's powers under Section 10 do not include "matters of suspension, removal, discipline and other sanctions" because these are addressed by Section 18. The Supreme Court's power under Section 10, the concurrence opined, is restricted to assignment of judges. The title of Section 10 is "Judicial Administration" which, according to the concurrence, implies that discipline is not among the considerations of the provision.

The concurrence further argued that the decisions in *Avellino I* and *McFalls* supported its interpretation, insofar as both cases implicated the assignment of jurists rather than discipline. The concurrence also noted that the actions of the Court in *Avellino I* and *McFalls* were not "interim" suspensions but temporary suspensions without pay for refusal to take the bench. These scenarios, according to the concurrence, are distinguishable from the circumstances in *Franciscus,* where the Court entered an interim suspension so as to protect the integrity of the judiciary. The concurrence dismissed the decisions in *Avellino I* and *McFalls* as "not hav[ing] the precedential credentials ascribed to them by the Supreme Court" when they were cited to support interim suspension orders by the Court in post–1993 amendment cases.

The concurrence also challenged the Supreme Court's authority to enter interim suspension orders pursuant to the Court's King's Bench powers. Thus, the concurrence quoted this Court's decision in *Carpentertown* and concluded that the King's Bench power of superintendence is over lower courts and tribunals, but does not encompass "the behavior of lower court judges." *Id.* at 806. In a footnote, the concurrence noted that "the superintendence of the latter [lower court judges] is conferred separately" in Section 18, to the Board and the CJD. *Id.* at 806 n. 13.

The concurrence next quoted a report on the state of the law provided to the 1968 Constitutional Convention to support its conclusion that, while the Supreme Court may have had authority under King's Bench and as part of its general supervisory powers to "remove or discipline lower court judges," the power had not been exercised historically and, in fact, may have been rendered meaningless because the Supreme Court had held that "the express constitutional procedures for removing judges, *i.e.,* impeachment, address, and conviction of a crime, are exclusive." *Id.* at 807 (citing Laub at 168–69). Under these circumstances, the Convention created the JIRB which, according to the concurrence, was ill-equipped to address the emergent circumstances in *Franciscus.* As a result, the Court acted because, in the concurrence's opinion: "it does not 'look good' for a judge so charged [with crimes relating to his official duties as a justice of the peace] to be 'judging others,' at least until he should be exonerated. For a fact the public is apt to be scandalized, and any confidence it may have had in the integrity of the judicial system is jeopardized so long as that state of affairs continues." *Id.* The concurrence also felt that the JIRB's authority was inadequate to address the exigencies of the matter.

But, the concurrence argued, the CJD is equipped to prevent any delay in entering an interim order; and thus, the Supreme Court's intervention is no longer necessary. Accordingly, the concurrence concluded that, even if the Court were to decide that the authority of Section 10(a) or of the King's Bench power is a basis upon which to enter interim suspension orders, such action is not appropriate in light of the 1993 amendment to Section 18 of the Pennsylvania Constitution. *Id.* at 808–09.

In our analysis below, we will discuss the observations of the CJD majority and concurrence when these themes are made relevant by petitioners' own arguments, and also where relevant to our explication of the relative roles and powers of the CJD and this Court.

## IV. The Power of the Supreme Court Vis-à-vis the Court of Judicial Discipline[12]

We granted oral argument to address challenges to the jurisdiction of the Court. Although couched as jurisdictional, the parties' arguments touch upon the separate notions of "jurisdiction" and "power" of the Court, as evident from the parties' interchangeable use of the terms. The principles at work are distinct, however: jurisdiction "relates solely to the competency of the particular court or administrative body to determine controversies of the general class to which the case then presented for its consideration belongs." Conversely, the power or, more aptly, the authority of the Court is its capacity "to order or effect a certain result." *Vine v. Commonwealth,* 607 Pa. 648, 9 A.3d 1150, 1165 (2010); *accord* PA. CONST. SCHED. art. V, § 1 ("Supreme Court shall exercise all the powers and, until otherwise provided by law, jurisdiction now vested in the present Supreme Court"); PA. CONST. art. V, § 2(a) (addressing Supreme Court's power) & § 2(c) (addressing Supreme Court's jurisdiction); 42 Pa.C.S. § 502 (addressing Supreme Court's general powers) & §§ 721–726 (addressing Supreme Court's jurisdiction). Insofar as the subject matter jurisdiction of the Supreme Court is concerned, the presentations dispute whether the Court is competent to decide matters implicating the suspension of jurists for disciplinary or other

12. We preface our discussion by acknowledging the undercurrent of criticism, leveled at our prior decisions by petitioners and the CJD, premised upon the notion that the Court is in the position of passing upon its authority to act. The situation is not as remarkable as the criticism would suggest: courts resolve routinely questions implicating their jurisdiction and their authority to act in cases. *See, e.g., Commonwealth v. Morales,* 622 Pa. 352, 80 A.3d 1177 (2013) (*per curiam*); *Mercury Trucking, Inc. v. Pennsylvania Pub. Util. Comm'n,* 618 Pa. 175, 55 A.3d 1056, 1066–67 (2012); *Board of Revision of Taxes v. City of Philadelphia,* 607 Pa. 104, 4 A.3d 610, 620 (2010); *Vine v. Commonwealth,* 607 Pa. 648, 9 A.3d 1150, 1165–66 (2010). Any degree of discomfort that might be present if members of the Court had a personal interest in the ruling is absent where the interest at issue is vested in the Supreme Court itself and is, therefore, institutional—as here. *Cf. Driscoll v. Corbett,* 620 Pa. 494, 69 A.3d 197, 207 (2013). And, as an institution, the Court is not arrogating new powers for itself but is explaining its existing ones. Accordingly, we proceed to address the merits of petitioners' claims.

reasons. Regarding the Court's power, the presentations disagree on whether the Court has the authority to commence an investigation into the conduct of a jurist, and to order the interim or temporary suspension of a jurist.

All Pennsylvania courts derive power or authority, and the attendant jurisdiction over the subject matter, from the Constitution and laws of the Commonwealth. PA. CONST. art. V, § 2; 42 Pa.C.S. § 502; *see Mercury Trucking, Inc. v. Pennsylvania Pub. Util. Comm'n*, 618 Pa. 175, 55 A.3d 1056, 1067 (2012) (quoting *In re Administrative Order No. 1–MD–2003, Appeal of Troutman*, 594 Pa. 346, 936 A.2d 1, 5 (2007)); *Housing Auth. of County of Chester v. Pa. State Civil Serv. Comm'n*, 556 Pa. 621, 730 A.2d 935, 941 & n. 13 (1999). Our decision implicates the interpretation and application of the Pennsylvania Constitution of 1968, as amended, and of the Judicial Code. Accordingly, the inquiry is subject to *de novo* and plenary review. *Commonwealth v. Cromwell Twp.*, 613 Pa. 1, 32 A.3d 639, 646 (2011).

As an interpretive matter, the polestar of constitutional analysis undertaken by the Court must be the plain language of the constitutional provisions at issue. A constitutional provision requires unstrained analysis, "a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." *Jubelirer v. Rendell*, 598 Pa. 16, 953 A.2d 514, 528 (2008); *Commonwealth ex rel. Paulinski v. Isaac*, 483 Pa. 467, 397 A.2d 760, 766 (1979). Stated otherwise, the constitutional language controls and "must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 939 (2006); *Ieropoli v. AC & S Corp.*, 577 Pa. 138, 842 A.2d 919, 925 (2004).

In this case, petitioners in particular have adverted to statutory construction principles in advocating their view regarding what was intended by the 1993 amendment. We acknowledge that the canons of constitutional construction reflected in decisional law often employ the familiar language

of statutory construction rules to elucidate ambiguous language, including the notion that a specific provision would prevail over a general principle found elsewhere in the charter. And, while acknowledging that the Court will not delimit the meaning of the plain constitutional words by reference to a supposed intent, we have also referred to statements of the drafters of constitutional provisions to confirm a particular interpretation of the plain language of the Constitution. Finally, when necessary to our explicatory analysis of the plain language, we have addressed decisional law and policy considerations argued by the parties that may have been insightful and persuasive. Indeed, reference to interpretive rules is at times appropriate and helpful. *See, e.g., Walsh v. Tate,* 444 Pa. 229, 282 A.2d 284 (1971) ("[W]here a conflict exists between a specific constitutional provision, which is unquestionably applicable to a particular case, and certain general provisions, which, were it not for such conflict, might apply, the specific provision will prevail."); *see also Jubelirer,* 953 A.2d at 528 (same). *See, e.g., Robinson Twp. v. Commonwealth,* 623 Pa. 564, 83 A.3d 901, 952–53 (2013) (Opinion Announcing Judgment of Court) (referencing statement of drafter accepted into House Legislative Journal and explicatory questions and answers provided voters in advance of referendum upon amendment at issue); *id.* at 944 (citing *Jubelirer,* 953 A.2d at 525 n. 12 and *Edmunds,* 586 A.2d at 895 (addressing decisional law and policy considerations argued by parties)).[13]

13. This approach finds support in academic commentary concerning how state constitutional interpretation is to be undertaken. Recently, we referenced one such scholarly article penned by our colleague Mr. Justice Saylor, who noted that: "there is some degree of consensus [among courts interpreting state constitutions] that the overarching task is to determine the intent of voters who ratified the constitution. In furtherance of this aim, courts reference, *inter alia,* text; history (including 'constitutional convention debates, the address to the people, [and] the circumstances leading to the adoption of the provision'); structure; underlying values; and interpretations of other states." *Robinson Twp.,* 83 A.3d at 944 (quoting Thomas G. Saylor, Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged Prophylactic Rule, 59 N.Y.U. Annual Survey of Am. L. 283, 290–91 (2003) (footnotes omitted) (focusing on state provisions that have federal counterparts, and in context of prophylactic rules, author observes that, in era of new federalism, there is diversity but

But, reliance on interpretive rules derived from statutory construction concepts is tempered by robust countervailing limitations particular to the constitutional arena. Notable among these limitations—and particularly relevant here—is the recognition that "the Constitution is an integrated whole" and, as a result, the Court must strive in its interpretation to give concomitant effect to all constitutional provisions. *See Jubelirer*, 953 A.2d at 528; *Sprague v. Casey*, 520 Pa. 38, 550 A.2d 184, 191 (1988); *Cavanaugh v. Davis*, 497 Pa. 351, 440 A.2d 1380, 1381–82 (1982). This rule of constitutional interpretation reflects an understanding that our charter is a fundamental document, which, in recognizing citizens' rights and establishing government, provides essential checks and balances whose complexity is to be neither undervalued nor disregarded. *See, e.g., Driscoll v. Corbett*, 620 Pa. 494, 69 A.3d 197 (2013) (interpreting Article V, Section 16(b) vis-à-vis relevant provisions of Declaration of Rights); *Robinson Twp.*, 83 A.3d at 946–50 (placing Article I, Section 27 within constitutional context). Additionally, reliance upon legislative history, especially those statements memorializing the intent of individual framers, is particularly suspect in a constitutional context because the emphasis in constitutional construction is upon the intent of the ratifying citizenry. *Accord Commonwealth ex rel. MacCallum v. Acker*, 308 Pa. 29, 162 A. 159, 160 (1932). As a practical matter, the ratifying voters can hardly be deemed to have approved a supposed intention that is not fairly encompassed in the language of the provision put before them. Long ago, in *Commonwealth v. Balph*, 111 Pa. 365, 3 A. 220 (1886), the Court explained the reasons for exercising restraint in relying on constitutional debates to resolve interpretative disputes:

> also some consensus among state courts in approach to development of constitutional decisional law)); *accord* Robert F. Williams, THE BRENNAN LECTURE: INTERPRETING STATE CONSTITUTIONS AS UNIQUE LEGAL DOCUMENTS, 27 Okla. City U.L.Rev. 189, 194–95 & 200 (2002) (state constitutions, ratified by electorate, are characterized as "voice of the people," which invites inquiry into "common understanding" of provision; relevant considerations include constitutional convention debates that reflect collective intent of body, circumstances leading to adoption of provision, and purpose sought to be accomplished).

In the consideration and discussion of this section of the [C]onstitution we throw out of view the copious citations which have been furnished us from the debates in the convention. They are of value as showing the views of individual members, and as indicating the reasons for their votes; but they give us no light as to the views of the large majority who did not talk; much less of the mass of our fellow citizens whose votes at the polls gave that instrument the force of fundamental law. We think it safer to construe the [C]onstitution from what appears upon its face, nor do we propose to go beyond the necessities of this case. Other delicate questions may arise in the future upon this section, and we leave them until they are presented.

*Id.* at 229; *accord Bowers v. Pa. Labor Relations Bd.*, 402 Pa. 542, 167 A.2d 480, 487 (1961) (relevancy of constitutional debates limited). For these reasons, examination of the purposes and policies underlying constitutional provisions is not "routinely" performed and becomes appropriate "only when a constitutional precept contends with a precept of equal or greater authority.... Then it devolves upon the Court to discern which should control the facts presented, by among other things, assessing the purposes and policies underlying each." *In Re: Interbranch Comm'n on Juvenile Justice*, 605 Pa. 224, 988 A.2d 1269, 1273 (2010) ("*ICJJ* ") (quoting *JIRB Subpoena*, 517 A.2d at 953). The Pennsylvania Constitution and the Judicial Code do not expressly address questions regarding the Court's jurisdiction and power to act in cases such as that of Judge Bruno. The authority and the respective spheres within which the CJD and the Supreme Court operate are a function of their respective roles—constitutional and statutory—within the structure of Pennsylvania's judiciary.

## A. The Court of Judicial Discipline

In May 1993, the voters approved an amendment to Section 18 of Article V of the Pennsylvania Constitution, which created the Judicial Conduct Board as a prosecutorial body, and the Court of Judicial Discipline as an adjudicatory body. *See*

*ICJJ*, 988 A.2d at 1273 n. 4. Section 18 addresses, among other things, the composition of the CJD. The CJD consists of eight members: three judges, one magisterial district judge, two non judge attorneys, and two non-lawyer electors. Of these members, four are appointed by the Supreme Court and four are appointed by the Governor, each for a term of four years. Members cannot serve consecutive terms; any additional term can only follow after a year in which the person was not on the CJD. As a result, the CJD is not devised for easy decisional continuity. The members of the CJD are unpaid, entitled only to reimbursement of expenses, and by constitutional command not all are judges, and not all can be lawyers. In essence, it is a court of citizen volunteers, who should be commended and deeply appreciated for their donation of time and talents to the betterment of the cause of justice. *See* PA. CONST. art. V, § 18(b)(1)-(3).

■ Section 18 makes clear that the CJD is a court of extremely limited jurisdiction and power, passing upon a single subject matter. The provision authorizes the CJD to review and decide formal disciplinary charges filed by the Board against judicial officers, including magisterial district judges. *See* PA. CONST. art. V, § 18(b)-(d); 42 Pa.C.S. § 1604; *accord* 42 Pa.C.S. §§ 3331–32 ("suspension, removal, discipline and compulsory retirement of magisterial district judges" governed by Article V, Section 18). The CJD has the authority to "order removal from office, suspension, censure or other discipline" of jurists. PA. CONST. art. V, § 18(b)(5). The CJD is not the highest authority, even within its sphere: final decisions of the CJD are subject to direct appellate review by the Supreme Court, upon application of the jurist or of the Board.[14] *See* PA. CONST. art. V, §§ 9 & 18(c)(1)-(3); *see also In Re: Carney*, 621 Pa. 476, 79 A.3d 490, 509–10 (2013) (reversing CJD's decision to dismiss Board's complaint relating to jurist's conduct in road rage incident, which was held to constitute

14. The only exception is where a Justice of the Supreme Court is subject to CJD discipline. *See* PA. CONST. art. V, § 18(c)(1). An appeal from a disciplinary decision implicating a Justice is subject to review by a special tribunal selected from among judges of the intermediate appellate courts.

"disrepute" in violation of Article V, Section 18(d)(1) of Pennsylvania Constitution; remand for proceedings to determine sanction).

The CJD has original jurisdiction over actions alleging judicial wrongdoing prosecuted by the Board. *See* PA. CONST. art. V, § 18(b)(5). The Supreme Court has exclusive jurisdiction over appeals from the CJD. 42 Pa.C.S. § 725(2); *see* PA. CONST. art. V, § 18(c)(1).

Section 18(b) denominates the CJD a court of record, which is to conduct hearings "in accordance with the principles of due process and the law of evidence" and whose decisions must be in writing and must contain findings of fact and conclusions of law. PA. CONST. art. V, § 18(b)(5). Members of the CJD enjoy immunity "from suit for all conduct in the course of their official duties." PA. CONST. art. V, § 18(b)(6).

Section 18(d) demarcates the constitutional bounds of the CJD's authority. The CJD may act in enumerated circumstances to issue orders involving a jurist subject to disciplinary action. The actions which the CJD may take against a jurist are also specified; such actions include suspension or removal from office, and forfeiture of judicial office. *See* PA. CONST. art. V, § 18(d)(1), (3)-(4). Additionally, the CJD is empowered to order the interim suspension, with or without pay, of any jurist "against whom formal charges have been filed with the [CJD] by the [B]oard or against whom has been filed an indictment or information charging a felony." PA. CONST. art. V, § 18(d)(2).

██ As an Article V adjudicative body and a "court of record," the CJD is a part of the Unified Judicial System. The Constitution states that enumerated courts of the Commonwealth and magisterial district judges, in addition to "such other courts as may be provided by law," compose the Unified Judicial System. *See* PA. CONST. art. V, § 1. Among such other courts for which "law" provides—here, the Constitution—is the CJD. *See* PA. CONST. art. V, § 18(b); 42 Pa.C.S. §§ 1601–1606.[15]

---

15. Parenthetically, other provisions confirm that the CJD is a part of the Unified Judicial System. For example, funding for the CJD is

## B. The Supreme Court of Pennsylvania

### 1. Constitutional and Statutory Framework

The Unified Judicial System exercises the judicial power of the Commonwealth. *See* PA. CONST. art. V, § 1. At the apex of the Unified Judicial System is the Pennsylvania Supreme Court. PA. CONST. art. V, § 2(a) (Supreme Court is "highest court" of the Commonwealth). In its capacity as the highest court of the Commonwealth, the Supreme Court is vested with important constitutional and statutory powers and responsibilities. The structure and composition of the Court ensure a measure of experience, stability and continuity, and place the Court in a position to call upon the broad experience of its members in matters affecting all aspects of the Unified Judicial System, while remaining accountable to the public.

The Supreme Court is composed of seven members, all of whom are members of the Pennsylvania bar, who are elected statewide, not appointed (except in cases of intra-term vacancy), and serve ten-year terms. There is no restriction upon consecutive terms of service (excepting age). Following initial contested elections, Justices may obtain successive terms by way of non-partisan, uncontested retention elections, that permit electors to indicate their confidence in the jurist by a yes or no vote. Justices are salaried, with the amount set by the General Assembly, but with a constitutional protection against diminution in salary intended to protect the independence of the judicial branch. *See generally Stilp*, 588 Pa. 539, 905 A.2d 918.[16]

secured as part of the annual budget request by the Supreme Court on behalf of the Judicial Branch to the General Assembly. PA. CONST. art. V, § 18(b)(4); 42 Pa.C.S. § 1603.

16. By way of illustration respecting the stability and continuity of the Court, the Chief Justice is determined by seniority. *See* PA. CONST. art. V, § 10(d); Pa. R.J.A. No. 706(a). The last six Chief Justices assumed that role with the following years of Court service under their belts: Castille (14); Cappy (13); Zappala (19); Flaherty (17); Nix (12); Roberts (20). Mr. Chief Justice Roberts, the last chief justice elected under the provisions of the Constitution of 1874, was also the last of the 21–year term justices: under that charter, justices served a single 21–year term. Of the Justices currently on the Court, many have over a decade of experience on this Court, and all have been in continuous

The Constitution is explicit regarding the breadth of the Court's authority over the Unified Judicial System. In the Supreme Court "shall be reposed the supreme judicial power of the Commonwealth." PA. CONST. art. V, § 2(a). Moreover, in addition to its judicial power, the Supreme Court has "general supervisory and administrative authority over all the courts and [magisterial district judges]...." PA. CONST. art. V, § 10(a). The Judicial Code helps to implement the primacy of the Supreme Court within the Unified Judicial System. *See* 42 Pa.C.S. § 501 (derived from PA. CONST. art. V, § 2). The General Assembly has also recognized that the Court has "[a]ll powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law" and any powers vested in it by statute, including the Judicial Code. 42 Pa.C.S. § 502. Section 1701 of the Judicial Code states that the Court has general supervisory and administrative authority over the judicial system and may exercise powers enumerated in subsequent provisions "in aid" of that authority. 42 Pa.C.S. § 1701 (derived from PA. CONST. art. V, § 10(a)). The enumerated powers include authority over "all courts and magisterial district judges" and over "personnel of the system." 42 Pa.C.S. §§ 1723, 1724. Personnel of the system include "judicial officers," among them magisterial district judges. *See* 42 Pa.C.S. § 102 (definitions: personnel of the system, judicial officers, judges).

As part of its administrative responsibility, the Court oversees the daily operations of the entire Unified Judicial System, which provides a broad perspective on how the various parts of the system operate together to ensure access to justice, justice in fact, and the appearance that justice is being admin-

judicial service for over a decade: Castille (21st year on the Court); Saylor (17th year on the Court, preceded by service on the Superior Court); Eakin (13th year on the Court, preceded by service on the Superior Court); Baer (11th year on the Court); Todd (7th year on the Court, preceded by service on the Superior Court); McCaffery (7th year on the Court, preceded by service on the Superior Court). Mr. Justice Stevens, before his appointment to this Court in 2013, had served on the Superior Court for 16 years, including as President Judge of that Court for two years. In addition, Justices Baer, McCaffery, and Stevens all have experience as trial judges.

istered even-handedly. *See* PA. CONST. art. V, § 10 (judicial administration). One aspect of this responsibility is management of judicial personnel. Thus, for example: (1) the Chief Justice, acting upon requests from the AOPC, may assign additional jurists to temporary judicial service on any court; (2) the Court may certify jurists for senior status, and these jurists may be assigned by the Chief Justice as needed; and (3) the Court approves jurists for assignment or re-assignment to divisions of the courts of common pleas. *See* PA. CONST. art. V, §§ 10(a), 16(c); Pa. R.J.A. Nos. 701, 702. Judicial leave is monitored by the Supreme Court, and jurists are required to file reports related to the status of cases submitted to them for adjudication. Pa. R.J.A. Nos. 703, 704. The AOPC records, reviews, and reports to the Supreme Court on matters related to the operation and efficiency of the Unified Judicial System and its component parts; system personnel are expected to cooperate with the AOPC in these respects and any failure to cooperate is referred to the Supreme Court for review. *See* PA. CONST. art. V, § 10(b); Pa. R.J.A. Nos. 505, 506; 701–704.

Another important facet of judicial administration is the authority to devise rules of procedure governing adjudications before inferior tribunals (excepting the CJD). *See* PA. CONST. art. V, § 10(c). While the CJD is permitted to devise its own rules of procedure, the CJD is nevertheless bound in its substantive task to take general direction from the Supreme Court, as this Court is responsible for the substance of the codes of conduct that govern Pennsylvania jurists, which the CJD enforces, and our interpretation of those codes controls. *See* PA. CONST. art. V, § 10(c); *see also* Pa.Code of Jud. Conduct Canon 1 *et seq.;* Pa. St. Mag. Dist. J. Rule 1 *et seq.; Carney, supra.* Additionally, the Court regulates the conduct of jurists via the Rules of Judicial Administration. Notably among the Rules of Judicial Administration is the requirement that any jurist who receives notice that s/he is the subject of any federal or state criminal investigation must report the receipt of that notice in writing to the Chief Justice within five days of its receipt. Pa. R.J.A. No. 1921.

Moreover, the Court oversees judicial education, whether of judges who are law-trained or of non-attorney jurists via dedicated courses of training and instruction. *See* PA. CONST. art. V, § 12 (magisterial district judges "shall be members of the bar of the Supreme Court or shall complete a course of training and instruction in the duties of their respective offices and pass an examination prior to assuming office. Such courses and examinations shall be as provided by law."); 42 Pa.C.S. § 3112 (same); 42 Pa.C.S. § 3113 (subject to approval of Supreme Court, Minor Judiciary Education Board to prescribe subject matter and examination for course of training and instruction required of magisterial district judges and other judges not members of bar); 42 Pa.C.S. §§ 2132–34 (members, officers, and staff of Minor Judiciary Education Board appointed by, or with authorization of, Supreme Court); 42 Pa.C.S. § 3118 (continuing legal education for magisterial district judges); Pa. St. Mag. Dist. J. Rule Nos. 19–21. And, for all members of the Unified Judicial System, the Court provides training to maintain professional competence under the auspices of the AOPC. Finally, the Court is responsible for aspects of the legal profession involving the members of the judiciary indirectly: thus, we oversee bar admission, continuing legal education of attorneys, and are responsible for the Rules of Professional Conduct that govern lawyers and attorney discipline. *See* PA. CONST. art. V, § 10(c); *see also* Pa. Rules of Prof'l Conduct 1.0 *et seq.*

In addition to its general powers of adjudication, supervision and administration, the Supreme Court also has "the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722." 42 Pa.C.S. § 502 (derived from Judiciary Act of May 22, 1722, 1 Smith's Law 131). The Judicial Code recognizes that these additional powers are vested in the Supreme Court by the Constitution of Pennsylvania. *Id.* The Pennsylvania Constitution confirms that the Supreme Court retains all powers vested in the Court

at the time of the 1968 amendments of Article V, amendments that realized significant reform and modernization of Pennsylvania's judicial branch. PA. CONST. SCHED. art. V, § 1.[17] The Court has explained that its powers may be continued by statute "so far as they are unimpaired by our constitutions, state and national." *Chase v. Miller*, 41 Pa. 403, 411 (Pa. 1862).

To aid in the exercise of these powers, the Court has such jurisdiction as "shall be provided by law." PA. CONST. art. V, § 2(c). Section 721 of the Judicial Code enumerates the types of cases over which the Court has original jurisdiction: *habeas corpus*, mandamus or prohibition to courts of inferior jurisdiction, and *quo warranto* as to any officer of statewide jurisdiction. 42 Pa.C.S. § 721. Sections 722 through 725 describe the Supreme Court's appellate jurisdiction. Section 726 addresses the Court's extraordinary jurisdiction to take cognizance, *sua sponte* or upon petition of a party, of any matter pending before an inferior tribunal "involving an issue of immediate public importance." 42 Pa.C.S. § 726. In addition, the schedule to Article V of the Constitution continues postratification the jurisdiction vested in the Supreme Court in 1968—such as the jurisdiction of the King's Bench. PA. CONST. SCHED. art. V, § 1; *see, e.g., City of Philadelphia v. Int'l Ass'n of Firefighters, Local 22*, 606 Pa. 447, 999 A.2d 555 (2010) (Supreme Court exercised King's Bench jurisdiction to review arbitration award upon writ of certiorari, where right of appeal was statutorily prohibited).

### 2. King's Bench Powers Generally

 Particularly relevant to the dispute *sub judice*, as the parties recognize, are the powers and jurisdiction of the Court at King's Bench. In 1968, upon amendment of the Constitution and as before, the people positioned the Supreme Court "in the same relation" to all inferior tribunals as the justices of the King's Bench at Westminster had occupied on May 22, 1722. PA. CONST. SCHED. art. V, § 1; 42 Pa.C.S. § 502; *Com-*

---

17. The schedule is a part of the Constitution and it is intended that its provisions "have the same force and effect as those contained in the numbered sections of [Article V]." PA. CONST. SCHED. Preamble.

*monwealth v. Ickhoff,* 33 Pa. 80, 80–81 (Pa.1859); *see Stander v. Kelley,* 433 Pa. 406, 250 A.2d 474, 483 (1969) (plurality opinion)(summarily finding no merit to appellants' contention that Pennsylvania Constitution of 1968 infringed upon King's Bench powers of Supreme Court). In *Stander,* a three-Justice concurrence expanded upon the Court's holding to explain that the judicial power of the Court continued as it existed before the 1968 amendments. 250 A.2d at 487 (Roberts, J., concurring, joined by Jones and Pomeroy, JJ.).[18] The concurrence noted that "some" of the original King's Bench powers of the Court were recited in the newly-ratified 1968 Constitution, among them the authority to remove and discipline judges, the authority to transfer judicial manpower, and the general supervisory and administrative authority of the Supreme Court over all other courts and justices of the peace (now, magisterial district judges). *Id.* at 486–87 (citing PA. CONST. art. V, §§ 2, 10, 18). Derived from the continuing authority at King's Bench, the Court possesses "every judicial power that the people of the Commonwealth can bestow under the Constitution of the United States," whether enumerated in the Constitution or residual. *See id.* at 487 (citing PA. CONST. art. V, § 2). In this sense, King's Bench powers exist independently of any statutory grant of jurisdiction. *Housing Auth. of County of Chester,* 730 A.2d at 941 n. 13; *accord Stander,* 250 A.2d at 487 (Roberts, J., concurring) ("judicial power reposed in this Court will continue as before, unimpaired by any mistaken notion that the Legislature has the constitutional authority to diminish, curtail or interfere with its functions").

The Constitution of 1968 also explicitly recognized several of the responsibilities of the Court which had been exercised, before then, via King's Bench. For example, the Court's earliest uses of the King's Bench power commonly implicated common law writs, primarily writs of error, writs of certiorari,

---

**18.** Although the concurrence in *Stander* stated that those three Justices concurred in the result, the expression offered no disagreement with the lead opinion; indeed, Justice Roberts began his expression by explaining that he wrote separately only because he "deem[ed] it appropriate to discuss further appellants' contentions dealing with the abrogation of the right to *habeas corpus,* the right to civil jury trial and the King's Bench powers of this Court." 250 A.2d at 485.

and writs of mandamus and prohibition. *See Pa. Labor Relations Bd. v. Butz,* 411 Pa. 360, 192 A.2d 707, 709–10 (1963) (citing Pollock and Maitland, *History of English Law before Edward I* ) (footnote omitted) ("Alone of English judicial tribunals, the High Courts of Westminster had the power to issue the great prerogative writs of prohibition, certiorari, mandamus and *quo warranto.* These writs, unlike other writs, were not mere formal judicial tools but rather weapons wielded by the judicial arm of the Crown to curb ecclesiastical and baronial encroachments and, as such, they were, as a matter of policy, used but sparingly and only when no other remedy savoring less of monarchial arbitrariness was available."); *see, e.g., Petition of Bell,* 396 Pa. 592, 152 A.2d 731, 739 (1959) (writ of certiorari); *Martonick v. Beattie,* 383 Pa. 168, 117 A.2d 715, 717 (1955) (writ of certiorari); *Carpentertown,* 61 A.2d at 428–29 (writ of prohibition); *Schmuck v. Hartman,* 222 Pa. 190, 70 A. 1091, 1092 (1908) (writ of certiorari); *Appeal of Comm'rs of Northampton County,* 57 Pa. 452, 453–54 (Pa.1868) (writ of certiorari); *Commonwealth v. McCloskey,* 2 Rawle 369, 379–80 (Pa.1830) (writ of *quo warranto* ); *Ebersoll v. Krug,* 3 Binn. 528, 528 (Pa.1811) (writ of error); *Livezey v. Gorgas,* 2 Binn. 192, 194 (Pa.1809) (writ of certiorari). In these instances, the Court afforded relief or review of inferior tribunal decisions for which existing law did not provide or which existing law prohibited. *See, e.g., Schmuck,* 70 A. at 1092 (where no statutory right of appeal exists, Supreme Court may review decision at King's Bench upon writ of certiorari).

The 1968 Constitution explicitly articulated a "right of appeal" which obviously diminished the necessity of the resort to common law writs of error or certiorari employed by the Court at King's Bench. *See* PA. CONST. art. V, § 9 ("There shall be a right of appeal in all cases to a court of record from a court not of record; and there shall also be a right of appeal from a court of record or from an administrative agency to a court of record or to an appellate court, the selection of such court to be as provided by law; and there shall be such other rights of appeal as may be provided by law."). Notably,

however, the Court has deemed the writ of certiorari to be viable in circumstances where the Court's duties might not otherwise be dischargeable. *See, e.g., City of Philadelphia,* 999 A.2d at 563 (arbitration awards, which are not appealable by statute, are reviewed by Court pursuant to certiorari procedure effecting King's Bench authority "because, among other things, no adjudicatory body has unlimited discretion, and each and every adjudicator is bound by the Constitution and particularly by the mandates of due process."); *accord City of Philadelphia v. Chase & Walker Corp.,* 429 Pa. 161, 240 A.2d 65, 68 (1968) (extension of Superior Court's statutory jurisdiction enacted to overcome effect of *Bell,* 396 Pa. 592, 152 A.2d 731, which held that Superior Court lacked subject matter jurisdiction over appeal because General Assembly did not grant right to appeal decision of county court; review available only within Supreme Court's King's Bench jurisdiction upon writ of certiorari).

The General Assembly has also standardized procedures for pursuing *quo warranto,* mandamus, prohibition, and *habeas corpus* relief. *See* 42 Pa.C.S. §§ 721, 9541–9546; *see, e.g., Commonwealth v. Fahy,* 558 Pa. 313, 737 A.2d 214, 223–24 (1999) (Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546, subsumes writ of *habeas corpus* with respect to remedies offered by Act; reject request to review at King's Bench merits of statutorily time-barred claim). Again, however, these codifications do not affect the judicial power to employ the writs in appropriate circumstances, where no other vehicle is available; and, in the case of habeas corpus, the General Assembly has explicitly recognized the fact. 42 Pa. C.S. § 6501 ("The privilege of the writ of habeas corpus shall not be suspended, unless when in the case of rebellion or invasion the public safety may require it."); *see also Commonwealth v. Judge,* 591 Pa. 126, 916 A.2d 511, 518–21 (2007). Furthermore, in implementing legislative provisions addressing the Court's traditional powers—again, as demonstrated most clearly in the case of *habeas corpus*—the Court has stressed the need to engage in broad constructions so as to avoid tension with the traditional scope of the writ. *See, e.g.,*

*Commonwealth v. Haun,* 613 Pa. 97, 32 A.3d 697, 702–05 (2011); *Commonwealth v. Cruz,* 578 Pa. 263, 851 A.2d 870, 877–78 (2004).

Another example of the Court's residual powers, even in the face of narrowing legislation, may be found in cases arising under the Sentencing Code. The General Assembly has severely limited the Court's jurisdiction to review on allocatur claims that implicate the discretionary aspects of sentencing. *See* 42 Pa.C.S. § 9781(f) ("No appeal of the discretionary aspects of the sentence shall be permitted beyond the appellate court that has initial jurisdiction for such appeals."). This Court has construed the provision so as not to hinder the Court's ability to review the Superior Court's application of governing legal principles in the discretionary sentencing arena. *See Commonwealth v. Smith,* 543 Pa. 566, 673 A.2d 893, 895 (1996); *accord Commonwealth v. Walls,* 592 Pa. 557, 926 A.2d 957, 968 (2007). Given the Court's supervisory responsibility, and the need for consistent review paradigms in Pennsylvania, the approach could hardly be otherwise.

The General Assembly has also codified the Court's power to exercise plenary jurisdiction "in any matter ... involving an issue of immediate public importance" pending before an inferior tribunal at any stage, for the purposes of "enter[ing] a final order or otherwise caus[ing] right and justice to be done." 42 Pa.C.S. § 726 (extraordinary jurisdiction); *see In re Dauphin County Fourth Investigating Grand Jury,* 596 Pa. 378, 943 A.2d 929, 933 n. 3 (2007) (Court takes cognizance pursuant to Section 726 of matters pending before lower tribunal, and at King's Bench to exercise supervisory power, when no matter is pending before lower court); *Avellino I,* 690 A.2d at 1140–41 (same); Pa. R.A.P. 3309(a) (same); *see, e.g., Joseph v. Scranton Times L.P.,* 604 Pa. 677, 987 A.2d 633, 636 (2009) (*per curiam* ) (Court exercised supervisory power in matter over which it took cognizance via extraordinary jurisdiction).

The Constitution of 1968 further addressed expressly the authority of the Court to undertake specific administrative and supervisory tasks, which in the past had been the subject of

Supreme Court action premised upon the King's Bench power. *Compare*, e.g., PA. CONST. art. V, § 10(a) *with In re Carbon County Judicial Vacancy*, 292 Pa. 300, 141 A. 249 (1928) (relating to temporary assignments of judges to fill vacancies on bench); PA. CONST. art. V, § 10(e) *with In re President Judge for 30th Judicial Dist.*, 420 Pa. 243, 216 A.2d 326 (1966) (relating to establishment of priority of judicial commission). Importantly, although the 1968 Constitution enumerated certain of the King's Bench powers, the Constitution and the Judicial Code continue to recognize that the Court's King's Bench authority is broader still. *See Commonwealth v. Reilly*, 324 Pa. 558, 188 A. 574, 581 (1936) (statute addressing change of venue did not impair Supreme Court's supervisory powers to direct change of venue but made occasions for use of writ of certiorari for such purposes fewer because parties could seek statutory relief); *Fahy*, 737 A.2d at 224 (same, respecting *habeas corpus*). The King's Bench power and jurisdiction of the Supreme Court continues today, in accordance with the following well-established principles.

The Supreme Court in 1859 explained that "justices of the King's Bench are the supreme and general justices (*capitales et generales*) of the kingdom, these terms indicating both the order and the extent of their jurisdiction." *Ickhoff*, 33 Pa. at 81. The 1968 Constitution articulated this concept in Sections 2 and 10 of Article V, which denominate the Court as the "supreme" judicial power in the Commonwealth and the "general" supervisory and administrative authority over all inferior tribunals in the Commonwealth. *See* PA. CONST. art. V, §§ 2(a), 10(a). In 1862, the Supreme Court noted that the abiding authority at King's Bench "is a large charter. There is no temptation to widen it by judicial construction—the inclination of the judicial mind is rather to narrow it. But as it is a trust for the people of Pennsylvania, judges have no right, from motives of ease and convenience, to surrender, weaken, or obscure, by judicial refinements, one single one of the powers granted." *Chase*, 41 Pa. at 411.

By its "supreme" nature, the inherent adjudicatory, supervisory, and administrative authority of this Court at

King's Bench "is very high and transcendent." *See Commonwealth v. Chimenti,* 510 Pa. 149, 507 A.2d 79, 81 (1986) (citing Blackstone, Book 3, ch. 4, § 42 and *Commonwealth v. Onda,* 376 Pa. 405, 103 A.2d 90, 91 (1954)); *accord Respublica v. Cobbet,* 3 Yeates 93, 1800 WL 2553, at *3 (Pa.1800) ("The justices of the Court of King's Bench are stiled [sic] the keepers of the morals of the kingdom of England; so are the justices of the Supreme Court as to this state."). The exercise of King's Bench authority is not limited by prescribed forms of procedure or to action upon writs of a particular nature; the Court may employ any type of process or procedure necessary for the circumstances. *Franciscus,* 369 A.2d at 1192–93 (citing *Petition of Squires & Constables Ass'n of Pa.,* 442 Pa. 502, 275 A.2d 657 (1971)); *Carpentertown,* 61 A.2d at 428–29 (same); *Schmuck,* 70 A. at 1092. The Court necessarily may exercise the powers and jurisdiction of the King's Bench *sua sponte.* See, e.g., *Chimenti,* 507 A.2d at 81 (invoking King's Bench powers, Court reviewed *sua sponte* question of whether Superior Court had power to entertain plea bargain after trial court entered judgment of sentence).

Not all of these exercises of power result in published decisions; thus, a survey of the Pennsylvania Reporter does not account for the parameters of the Court's authority. For example, in 2000, the Court *sua sponte* issued an order on the Judicial Administration Docket, unrelated to any particular case then before it, declaring that criminal defendants with a right of direct appeal to the Superior Court no longer had to seek allocatur in order for their claims to be deemed exhausted for purposes of federal *habeas corpus* review. *See In Re: Exhaustion of State Remedies in Criminal & Post Conviction Relief Cases,* No. 218 Jud. Admin. Docket No. 1 (Pa. May 9, 2000) (*per curiam* ).[19]

---

**19.** The exhaustion order reads:

> **AND NOW,** this 9th day of May, 2000, we hereby recognize that the Superior Court of Pennsylvania reviews criminal as well as civil appeals. Further, review of a final order of the Superior Court is not a matter of right, but of sound judicial discretion, and an appeal to this Court will only be allowed when there are special and important reasons therefor. Pa. R.A.P. 1114. Further, we hereby recognize

Similarly, to give full effect to its authority, the Court may assume plenary jurisdiction over a matter even where no dispute is pending in a lower court. *Avellino I*, 690 A.2d at 1140; *Balph*, 3 A. at 226 (Supreme Court at King's Bench, "by the plenitude of its power, may as well proceed on indictments removed by *certiorari* out of inferior courts as on those originally commenced here"); *see, e.g., Creamer v. Twelve Common Pleas Judges*, 443 Pa. 484, 281 A.2d 57, 58 (1971) (*per curiam*) (Supreme Court exercised King's Bench jurisdiction to review validity of governor's judicial appointments where no legal action was pending); *Summers v. Kramer*, 271 Pa. 189, 114 A. 525, 527–28 (1921) (Supreme Court exercised King's Bench jurisdiction to resolve dispute between judicial officers over payment to contractor examining common pleas files and records where no legal action was pending).

The "general" quality of the Court's authority at King's Bench denotes that the justices of the Court have cognizance of all causes statewide, whether civil or criminal. *Summers*, 114 A. at 528; *Balph*, 3 A. at 225 (quoting Blackstone, Book 3, ch. 4, § 42) (Supreme Court "takes cognizance both of criminal and civil causes"); *Commonwealth v. Simpson*, 2 Grant 438, 439 (Pa.1854) (same). The Court exercises a comprehensive jurisdiction over civil and criminal causes, which includes the competence to examine and decide, or to review decisions, relating to the type of causes committed generally or otherwise to an inferior jurisdiction. *See In re Pollard*, 127 Pa. 507, 17 A. 1087, 1090 (1889). The Court

that criminal and post-conviction relief litigants have petitioned and do routinely petition this Court for allowance of appeal upon the Superior Court's denial of relief in order to exhaust all available state remedies for purposes of federal *habeas corpus* relief.

In recognition of the above, we hereby declare that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing or allowance of appeal following an adverse decision by the Superior Court in order to be deemed to have exhausted all available state remedies respecting a claim of error. When a claim has been presented to the Superior Court, or to the Supreme Court of Pennsylvania, and relief has been denied in a final order, the litigant shall be deemed to have exhausted all available state remedies for purposes of federal *habeas corpus* relief. This Order shall be effective immediately.

has explained that the authority and jurisdiction to examine and decide matters in the first instance "means something more than the trial of the case before a jury," as the exercise of the King's Bench jurisdiction "is not, strictly speaking, [the exercise of] original jurisdiction." *Balph*, 3 A. at 230. The purpose of its exercise is not to permit or encourage parties to bypass an existing constitutional or statutory adjudicative process and have a matter decided by this Court, but aids the Court in its duty to keep all inferior tribunals within the bounds of their own authority. *See id.; Onda*, 103 A.2d at 91; *see, e.g., Fahy*, 737 A.2d at 224; *Reilly*, 188 A. at 581.

▪▪▪▪ Indeed, the Court will generally employ the King's Bench authority when the issue requires timely intervention by the court of last resort of the Commonwealth and is one of public importance. *See In re President Judge for 30th Judicial Dist.*, 216 A.2d at 326; *accord In re Smith's Estate*, 442 Pa. 249, 275 A.2d 323, 326 (1971) (circumstances did not warrant exercise of Court's supervisory authority and general power to "minister justice"). The King's Bench power is "exercised with extreme caution.... That it may be abused is possible." *Balph*, 3 A. at 230. But, the availability of the power is essential to a well-functioning judicial system; and it appears that this is a point that is difficult to fully appreciate without having served on the Court. The author of the opinion in *Balph* explained:

> I can readily imagine circumstances in the future which would make the exercise of this power the only barrier between a good citizen and gross oppression. If the people shall be of opinion that it was unwisely conferred, or that it is being improperly exercised, they can change it by a modification of fundamental law. The mere knowledge that such a power exists in th[e Supreme C]ourt it is believed will make its frequent use unnecessary.

*Id.* The Court has generally called upon the powers of the King's Bench to supplement existing procedural processes that had proven inadequate to carry out the judicial, administrative, or supervisory obligations of the Court in a manner that is expeditious and determinate. King's Bench authority

"commands magistrates and others to do what their duty requires in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition." *Commonwealth v. Beaumont*, 4 Rawle 366, 367 (Pa.1834) (quoting Blackstone Book 3, ch. 4, § 42). In certain instances, the Court cannot suffer the deleterious effect upon the public interest caused by delays incident to ordinary processes of law, or deficiencies in the ordinary processes of law making those avenues inadequate for the exigencies of the moment. In short, King's Bench allows the Supreme Court to exercise authority commensurate with its "ultimate responsibility" for the proper administration and supervision of the judicial system. *Avellino I*, 690 A.2d at 1144 n. 7.

We have often undertaken flexible measures deriving from our broad power at King's Bench. Perhaps the most notable examples of the flexibility necessary for this Court to ensure the integrity of the judiciary arose in our response to the revelation of criminal charges involving two trial judges in Luzerne County, Michael T. Conahan and Mark A. Ciavarella, Jr. The federal government announced guilty plea arrangements with the judges in January of 2009, and the Court responded by immediately suspending Ciavarella and revoking the certification of Conahan as a senior judge. When it materialized that the judges' illegal conduct also called into question the legitimacy of adjudications of delinquency and other dispositions in juvenile matters presided over by Ciavarella, the Court appointed the Honorable Arthur E. Grim, a Senior Judge from Berks County, to serve as its Special Master to review all Luzerne County juvenile court adjudications and dispositions that had been affected by Ciavarella's criminal actions, and to make recommendations to the Court concerning appropriate remedial actions to rectify the situation as fairly and swiftly as possible. The Court retained jurisdiction of the matter *sub nomine In re J.V.R.* Order (docketed at 81 MM 2008), 2/11/2009 (*per curiam*) (citing PA. CONST. art. V, § 10; 42 Pa.C.S. § 502). We appointed Judge Grim as our Master in order to determine the effects of

Ciavarella's misconduct upon the minors who had appeared before him in juvenile court.

The Court assumed "plenary jurisdiction over th[e] matter" and acted to afford relief—starting with the appointment of Judge Grim as the Court's Master, premised upon the Court's constitutional power to supervise inferior tribunals and Section 502 of the Judicial Code, which describes the King's Bench authority of the Court. The Court also directed the President Judge of the Luzerne County Court of Common Pleas to file monthly reports detailing significant events and actions taken to improve the functioning of that court and access to justice. *See* FINAL REPORT ON IMPLEMENTATION ON RECOMMENDATIONS OF THE INTERBRANCH COMMISSION ON JUVENILE JUSTICE at 1–5 (April 8, 2013) ("Final Report"), online at www.pacourts.us/assets/files/setting–2032/file2570.pdf?cb=9e7037 (last accessed on September 18, 2014).[20]

Judge Grim filed multiple reports and recommendations, upon which the Court acted at King's Bench to vacate adjudications of delinquency and consent decrees in all cases in which Ciavarella acted between January 1, 2003 and May 31, 2008. Moreover, the adjudications of delinquency and consent decrees were reversed and dismissed with prejudice, and the records of juvenile defendants were expunged: (1) in all cases, whether final or not, where a juvenile either proceeded before Ciavarella without counsel, or was committed by Ciavarella to PA Child Care or Western PA Child Care, the two juvenile facilities whose owner, Attorney Robert Powell, had secretly paid Ciavarella and Conahan; (2) in any remaining cases that proceeded before Ciavarella and were final, with copies of the records to be retained under seal in accordance with any other order of court; and (3) with respect to those remaining cases

---

**20.** This report also addresses the amendments to the rules of procedure and administration adopted in response to the recommendations of the Interbranch Commission on Juvenile Justice. Notably, the Court adopted Rules of Judicial Administration 1920 through 1922, which require a jurist to inform the Chief Justice within five days if s/he receives notice of an investigation by law enforcement, "in order for the Supreme Court to take appropriate action to prevent further misconduct and to remove a judicial officer from his or her position." Final Report at 2–3.

that were not yet final, the Luzerne County District Attorney was directed to submit a document under seal to Judge Grim identifying the specific juvenile cases in which it intended to proceed with further delinquency proceedings, and to file a sealed copy of the document with the Supreme Court Prothonotary's Office. The Court authorized Judge Grim to vacate and dismiss with prejudice 2,401 juvenile adjudications and consent decrees, and to expunge the records, in the remaining cases that were not identified by the Commonwealth as matters that it would intend to pursue. The Court explained that "[t]he situation at hand [wa]s so unique and extreme" that it had warranted exercise of the Court's King's Bench powers, in this fashion, in the interest of justice. The Court agreed with the Special Master that " 'neither the victims, the juveniles, nor the community w[ould] benefit by having new proceedings' in cases of juveniles who ha[d] received final discharge either from commitment, placement, probation or any other disposition and referral, and who ha[d] paid all fines, restitution, and fees. In addition, [the Court] note[d] that the Commonwealth, in its objections, ha[d] ... identified no interest that would be served by permitting reprosecution in th[o]se cases." Order (docketed at 347 Jud. Admin. Docket), 10/29/2009 (*per curiam*). Lastly, in October 2010, this Court authorized Judge Grim to implement the statute adopted by the General Assembly in the wake of the scandal, establishing a special fund to compensate the young victims of Conahan and Ciavarella's criminal conduct. Order (81 MM 2008), 10/21/2010 (*per curiam*).

Notably, the procedural and substantive measures we undertook in Luzerne County to provide a broad and appropriate remedy did not derive from any existing rules, statutes, or procedures. Following the announcement of the federal charges, the power of King's Bench allowed the Court to innovate a swift process and remedy appropriate to the exigencies of the event. The process and remedy were unrelated to and were unlike any disciplinary action or civil suit brought against Ciavarella or Conahan.[21]

21. In text, we describe the Court's actions undertaken via King's Bench after revelation of the federal criminal charges lodged against Luzerne

568

Nor were the Court's remedial actions in Luzerne County, arising from the criminal conduct of sitting jurists, confined to affording affected juveniles a measure of relief. Thus, in *Joseph v. Scranton Times L.P.*, 19 MM 2009, this Court assumed jurisdiction at King's Bench and appointed a master—the Honorable William H. Platt—to preside over a remand of a case involving a defamation action. The Court concluded that the defendants had proffered evidence, not previously available, regarding the irregular assignment of the case by Conahan and the non jury trial before Ciavarella, which raised a colorable claim that the judgment in favor of the plaintiffs was tainted by the involvement of the two former jurists. Order (docketed at 19 MM 2009), 4/7/2009 (*per curiam* ) (citing 42 Pa.C.S. § 502). The Court explained that "in terms of the present case, an appearance of impropriety in either the assignment or trial of this case is sufficient to establish prejudice." *Id.* (citing PA. CONST. art. I, § 11; art. V § 10; *In Interest of McFall*, 533 Pa. 24, 617 A.2d 707, 712–13 (1992)).

On remand, Judge Platt held a two-day hearing in July 2009 and submitted a thorough and thoughtful report to this Court. Subsequently, this Court reviewed Judge Platt's findings and conclusions *de novo* and endorsed the relief recommended: (1) the judgment in the case was vacated and a new trial was ordered; (2) the defendants' request for an out-

County Common Pleas Judges Conahan and Ciavarella, which is the circumstance directly relevant here: what can and should the Court do when a judge faces criminal charges relating to conduct on the bench. In concurrence, Mr. Justice McCaffery opines that the Court's response in Luzerne County was "slow," a position he justifies only by conflating the pending court actions in Luzerne County as they were challenged prior to the criminal charges being filed with the Court's remedial actions after criminal charges against Conahan and Ciavarella were announced. Make no mistake: no doubt all members of the Court wish that we could have perceived in the prior circumstances the criminal misconduct in Luzerne County, only made apparent by the filing of federal charges. But, the hindsight concern is off-point, indeed gratuitous, respecting the discussion here. Moreover, it is notable that Justice McCaffery never squares his hindsight misgivings with his predicate caution that "members of the judiciary are vulnerable to accusations of wrongdoing by disaffected litigants that are grounded in nothing more than dissatisfaction with the resolution of a case."

of-County judge was denied; and (3) the defendants' failure to request a jury remained binding for purposes of retrial. *Joseph*, 987 A.2d at 636–37. The Court relied upon its supervisory powers to grant relief: "[t]here is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings. A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety." *Id.* (citing PA. CONST. art. V, § 10(a); *McFall,* 617 A.2d at 714). As with our actions respecting juvenile defendants appearing before Ciavarella, our actions in *Joseph* were not undertaken to **discipline** Conahan and Ciavarella, but to remedy an injustice perpetrated by the duo in a distinct case.

*Malinowski v. Nanticoke Micro Technologies, Inc.,* docketed at 51 MM 2009, was yet another matter arising in the wake of the revelations concerning the criminal conduct of Conahan and Ciavarella. In *Malinowski,* the Court again acted at King's Bench and remanded the case to the Honorable Chester Muroski of the Luzerne County Court of Common Pleas for an examination of the plaintiff's allegations that judicial corruption had infected the matter. In the application for exercise of King's Bench jurisdiction, the plaintiff alleged that Conahan had been a member of the Board of Directors for First National Bank, one of the defendants in the *Malinowski* case, during the pendency of the matter, which was assigned to his co-conspirator Ciavarella for resolution. Furthermore, the plaintiff alleged other questionable ties, including that, in his capacity as president judge of the Luzerne County Court of Common Pleas, Conahan had ordered that all district justice court funds be deposited at First National Bank, and that Ciavarella and Conahan received financing from First National Bank to establish a depository in Jupiter, Florida, for laundering the illegal payments they were receiving from the owner of the juvenile facility to which Ciavarella routinely committed juvenile defendants. Judge Muroski was directed to submit a report and recommendations regarding what, if any, further action should be taken, and the Court retained

jurisdiction. Order (51 MM 2009), 8/5/2009 (*per curiam*) (citing 42 Pa.C.S. § 502).

Upon receiving Judge Muroski's report and recommendations, the Court concluded that the record amply supported the finding that there was an appearance of judicial impropriety that required corrective supervisory action. The Court thus vacated orders entered in December 2005 and May 2006, by which Ciavarella had dismissed First National Bank from the action with prejudice and had entered judgment in favor of all other defendants, and remanded the matter to the Luzerne County Court of Common Pleas for further proceedings. The Court granted relief premised upon the same reasoning as in *Joseph* and rejected arguments that the Superior Court's review of unrelated issues on appeal had cured any appearance of impropriety. Notably, because the plaintiff had exhausted the appeals process, the Court acted upon the miscellaneous filing while no matter was pending before an inferior tribunal, awarding relief "in the interest of justice, to remedy judicial impropriety, ... premised upon this Court's supervisory power over inferior tribunals." Order (51 MM 2009), 6/24/2010 (*per curiam*).

Other instances in which the Court has exercised aspects of its flexible and transcendent authority at King's Bench include:

1. *Pennsylvania State Ass'n of County Comm'rs v. Commonwealth* [545 Pa. 324], 681 A.2d 699 (Pa.1996) (citing 42 Pa.C.S. § 726): the Court took cognizance of the action in its extraordinary jurisdiction noting the immediate public importance of the matter, and granted the request of the Pennsylvania State Association of County Commissioners for a writ of mandamus to compel the General Assembly to enact a statewide scheme of funding the courts of Pennsylvania. The Court retained jurisdiction and appointed the Honorable Frank J. Montemuro, Jr., as the Court's master, for the purposes of recommending a scheme that would form the basis for the specific implementation of funding to be ordered.

2. *Annenberg v. Commonwealth* [562 Pa. 570], 757 A.2d 333 (Pa.1998), and *Annenberg v. Commonwealth* [562 Pa. 581], 757 A.2d 338 (Pa.2000): after the Commonwealth Court refused to take cognizance of the matter and remanded the case to the Montgomery County Court of Common Pleas, the Court granted the plaintiff's application for the exercise of extraordinary jurisdiction, 42 Pa.C.S. § 726. Initially, the Court held that the stock clause of the personal property tax, 72 P.S. § 4821, facially discriminated against interstate commerce and was, as a result, unconstitutional. The Court also retained jurisdiction but remanded the matter to the Montgomery County Court of Common Pleas. President Judge Joseph A. Smyth—serving as a special master for the Court—held a hearing and issued an interim report on whether the stock clause of the personal property tax was a "compensatory tax." Upon review of the report, the Court concluded "that the portion of the stock clause which excludes from the personal property tax stock held in companies which are subject to the capital stock and franchise taxes [wa]s unconstitutional."

3. *Commonwealth v. Banks* [596 Pa. 297], 943 A.2d 230 (Pa.2007) *(per curiam )* (citing 42 Pa.C.S. § 726): in December 2004, the Supreme Court assumed plenary jurisdiction over a serial PCRA petition filed by Banks's mother as "next friend" on his behalf, seeking a stay of execution and alleging, *inter alia,* that Banks was incompetent to be executed under *Ford v. Wainwright,* 477 U.S. 399 [106 S.Ct. 2595, 91 L.Ed.2d 335] (1986). At the time, there was no formal process—by statute or Court rule—in place for the adjudication of *Ford v. Wainwright* claims. The Court stayed the warrant of execution, and directed the trial court to hold a competency hearing expeditiously in accordance with *Ford v. Wainwright.* The Court retained jurisdiction, employing the trial judge as a master for the Court to decide the question of competency within the narrowly delimited parameters. (Notably, Conahan served as the trial judge in the matter and failed to act expeditiously or to confine himself to the task devised to him.) Subsequently,

the Court reviewed the Master's report, rejected the Master's adoption of Banks's proposed findings of fact and conclusions of law wholesale, and would have remanded the matter to the Master for an autonomous judicial expression were it not for Conahan's removal from the bench. The Court remanded the matter for appointment of a new jurist and a *de novo* hearing. *Commonwealth v. Banks* [605 Pa. 259], 989 A.2d 1 (Pa.2009) (*per curiam*). The Court relinquished jurisdiction in 2011. *Commonwealth v. Banks* [612 Pa. 56], 29 A.3d 1129 (Pa.2011).

4. *ICJJ*, 988 A.2d 1269: in January 2010, the Supreme Court assumed King's Bench jurisdiction over a petition of the Judicial Conduct Board, in which the Board requested a stay of an ICJJ's subpoena that sought to compel answers from witnesses and the production of documents relating to misconduct complaints as to which formal disciplinary charges had not been filed by the Board. The Court granted relief in part, holding that the confidentiality clause of Article V, Section 18 prevented discovery of some materials but not others.

5. *Fagan v. Smith* [615 Pa. 87], 41 A.3d 816 (Pa.2012) (*per curiam*): in February 2012, the Supreme Court exercised King's Bench jurisdiction over electors' petition for mandamus, and granted mandamus relief in part. The Court ordered the Speaker of Pennsylvania House of Representatives to issue forthwith writs of election for special elections to fill vacancies in enumerated legislative districts for remainder of then-current legislative term.

▇▇▇▇ These examples are obvious reminders that the Court's supervisory responsibilities only start at relatively mundane tasks relating to temporary assignments of judges to fill vacancies on the bench, priority of commission, or judicial assignments to divisions within a trial court, and related adjudicatory obligations. *See, e.g.*, PA. CONST. art. V, §§ 10(a), (e); *Avellino I*, 690 A.2d at 1141 ("Because the authority [of trial court's administrative judge] under which [judicial] assignments [to trial court divisions] are made ultimately derives from this Court, review and resolution of any disputes con-

cerning assignments must necessarily be subject to the authority of this Court."). But, the duties of the Court atop the Unified Judicial System transcend these ministerial tasks. The Supreme Court's principal obligations are to conscientiously guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth. *See Franciscus,* 369 A.2d at 1194; *Avellino I,* 690 A.2d at 1143; *accord In re Melograne,* 585 Pa. 357, 888 A.2d 753, 757 (2005) (disbarment is strongly considered sanction when "attorney who holds judicial office commits misconduct that affects the fairness of an adjudication"). "Under our system of government by law, the business of the court should therefore always be so conducted as to command the respect of the people, even in cases where some or many of them are not willing to accept its judgments or decrees as correct; and hence it is but a truism to say that these requirements are almost or quite as essential as the judicial system itself, if the stability of the government, under that system, is to be maintained." *Summers,* 114 A. at 527. The highest standard of professional and personal ethics and propriety is essential to maintain the confidence of the citizenry in the judicial system of the Commonwealth. *See Franciscus,* 369 A.2d at 1194. This Court takes seriously the observation of the Rev. Henry Ward Beecher: "[i]f you should take all the robes of all the good judges that ever lived on the face of the earth, they would not be large enough to cover the iniquity of one corrupt judge." HENRY WARD BEECHER IN THE PULPIT 96 (Hugh R. Haweis ed., 1886).

It bears reiteration that the Court's King's Bench authority and jurisdiction encompass, supplement, and transcend the other powers and jurisdiction enumerated in the 1968 Constitution and the Judicial Code. As a corollary, the Supreme Court is neither divested of its King's Bench powers, nor is the supreme and general nature of these inherent powers limited, unless the divestiture or limitation is clearly expressed or necessarily implied in the Constitution. *Avellino I,* 690 A.2d at 1143; *accord Stander,* 250 A.2d at 487 (Roberts,

J., concurring) ("judicial power reposed in this Court will continue as before, unimpaired by any mistaken notion that the Legislature has the constitutional authority to diminish, curtail or interfere with its functions"). In *Avellino I*, the Court explained that sixteen years earlier, the *Franciscus* Court had held that the Court's supervisory power over inferior tribunals had neither been revoked nor diminished by the adoption of Article V, Section 18 and the creation of the JIRB. The *Avellino I* Court then rejected the claim that the alteration of the disciplinary process, which implicated the abolition of the JIRB in favor of creating the Judicial Conduct Board and the CJD, necessarily indicated the intent of legislators and the people to diminish the Supreme Court's King's Bench power. According to the Court, "had the people intended to revoke or diminish that power in amending Section 18, the amendment would have explicitly so provided." 690 A.2d at 1143; *accord Apex Hosiery Co. v. Philadelphia County*, 331 Pa. 177, 200 A. 598 (1938) (Article III, Section 23 did not implicitly remove inherent authority of Supreme Court to grant change of venue; only effect statutes adopted pursuant to Article III, Section 23 have is to confer upon trial courts power to change venue, power which they did not inherently possess); *JCB Subpoena*, 703 A.2d at 463 (Article V, Section 18 did not implicitly divest Commonwealth Court of power or jurisdiction to enforce Judicial Conduct Board's witness subpoena); *McCloskey*, 2 Rawle 369, 379–80 (statute giving local elected officials "full power and authority" to approve or set aside election did not implicitly remove Supreme Court's supervisory and King's Bench authority to determine right to office following election via writ of *quo warranto* ); *Respublica*, 3 Yeates 93, 1800 WL 2553, at *4 ("There was a strong necessity for giving [lower court judges] the authority of justices of the peace, by the express words of the [C]onstitution, because it was intended that a new power should be superadded to their offices; but that reason does not hold in our case, the members of this [C]ourt having uniformly exercised the power, near seventy years before[,]" by virtue of King's Bench).

█ Similarly, the Constitution provides that the Supreme Court exercises all jurisdiction vested in the Court at the time of the adoption of the 1968 Constitution, until otherwise provided by law. PA. CONST. SCHED. art. V, § 1. Jurisdiction granted **by statute** may be removed by the General Assembly or via constitutional amendment, either expressly or by necessary implication. *See McCloskey*, 2 Rawle at 379–80. By comparison, the jurisdiction necessary to the exercise of the Court's King's Bench powers—constitutionally-granted powers that are by nature comprehensive and inherently vested in the highest authority of the judicial branch—may be divested only by the people, expressly or by necessary implication. *See Ebersoll*, 3 Binn. at 531 ("It is fully settled that the jurisdiction of the Court of King's Bench is not ousted unless by express words."); *accord Stander*, 250 A.2d at 487 (Roberts, J., concurring) (General Assembly has no constitutional authority to diminish, curtail or interfere with functions of Supreme Court); *Robinson Twp.*, 83 A.3d at 977 (citing *Commonwealth ex rel. Carroll v.* Tate, 442 Pa. 45, 274 A.2d 193, 196–97 (1971)) (General Assembly has no authority to remove by statute attributes of governmental entity implicitly necessary to carry into effect entity's constitutional duties).

## V. Exercise of King's Bench Authority in this Case

### A. Petitioners' Challenges to the Court's Authority

█ As a general matter, "[j]urisdiction is the predicate upon which consideration of the merits must rest" and is the default threshold issue of any decision. *Riverlife Task Force v. Planning Comm'n of City of Pittsburgh*, 600 Pa. 378, 966 A.2d 551, 556–57 (2009). That is the case because most parties appear in a judicial tribunal to resolve a dispute, over which a tribunal of proper competence must exercise jurisdiction. The proceedings before us, however, commenced with the exercise by this Court of its authority at King's Bench as manifested in the order relating to the suspension of Judge Bruno. The orders generated a subsequent dispute, which is now before the Court. Accordingly, our analysis necessarily begins with the issue of whether the Court had the authori-

ty—at King's Bench or otherwise—to issue its initial order. *See Vine*, 9 A.3d at 1165 (court's power or authority measures capacity to order or effect certain result). As will become apparent from our analysis, determining whether the Court had the capacity to issue such an order is a necessary predicate to determining whether the Court has the competency to decide matters in the general class of controversies to which the dispute now before the Court belongs.

The main thrust of petitioners' argument is that, in suspending Bruno, the Supreme Court acted to discipline the jurist; but, petitioners argue, the authority to discipline a jurist is vested exclusively in the CJD by the Constitution of 1968, as amended in 1993. The exclusive "disciplinary" power of the CJD, according to petitioners, is a carve-out from the "supervisory and administrative" authority of the Supreme Court. Petitioners make the dual claim that the Supreme Court has **never** had the power to discipline jurists and that, if that power ever existed, it was removed by the "dramatic" revision of 1993 to Article V, Section 18. According to petitioners, the Supreme Court may now act in a disciplinary case only on appeal from the CJD, and under an "extremely" limited standard of review. Petitioners essentially claim that this Court usurped the exclusive constitutional authority of the CJD by ordering the interim suspension of Bruno (and also by ordering the appointment of a special master and raising the prospect of a temporary suspension in the related *Solomon* matter). The AOPC and PBA respond that the Supreme Court issued a suspension order to Bruno in a supervisory capacity, premised upon its King's Bench authority. According to the AOPC and the PBA, Section 18 of Article V created a disciplinary system for jurists, but there is nothing contradictory about having a disciplinary authority vested in the CJD and the concomitant exercise of the Supreme Court's supervisory and administrative power over the same jurist. The AOPC and the PBA suggest that the Court's authority to investigate and suspend a jurist is consistent with its overarching responsibilities and the necessity of ensuring the integrity of the Unified Judicial System. Having already

surveyed at length this Court's powers, there can be little doubt that the core position of the AOPC and the PBA is correct.

We begin by observing that petitioners create a false dichotomy in suggesting that the Supreme Court is categorically prohibited to act in these matters in a way that may be characterized as "disciplinary" rather than "supervisory/administrative"; petitioners would have the decision turn on whether the action of the Court involving a jurist may be characterized as punitive in the abstract. The proper focus of our inquiry is, instead, on whether the Supreme Court has the constitutional authority to proceed against a jurist in this fashion and, if that power exists, whether it may be exercised by, *inter alia*, ordering the temporary or interim suspension of the jurist.[22] We conclude that the Supreme Court has the authority at King's Bench to order the interim suspension of a jurist, independent of the CJD's authority to suspend the jurist pending criminal or other charges, or to adjudicate disciplinary charges against the same jurist, upon referral by the Judicial Conduct Board.

The Supreme Court's supervisory power over the Unified Judicial System is beyond question. *See, e.g., Respublica*, 3 Yeates 93, 1800 WL 2553, at *4; *accord* 42 Pa.C.S. § 502 (citing Judiciary Act of May 22, 1722, 1 Smith's Law 131). This power implicates a dual authority: (1) over personnel of

---

**22.** The decisions in *Franciscus, Avellino I* and *Avellino II, McFalls*, and *Merlo* are consistent with our approach. In *Franciscus*, the Court explained:

> The order [of suspension] which this petitioner seeks to vacate was not meted out as a form of punishment. Rather, we are constrained to exercise our powers of supervision under the circumstances present here in order to guard and protect the just rights and independence of the bar, the dignity and authority of the court, and the safety and protection of the public.

369 A.2d at 1195 (internal quotation marks and footnote omitted); *accord Avellino I*, 690 A.2d at 1143–44 (sanctions necessarily available to ensure effectiveness of Supreme Court's supervisory powers); *Avellino II*, 690 A.2d at 1145; *McFalls*, 795 A.2d at 373; *Merlo*, 17 A.3d at 871. In each instance, the Court was characterizing the nature of its action in relation to the jurist, rather than speaking of any categorical approach premised upon the type of remedy ordered, as petitioners would have it.

the system, among them jurists; and (2) over inferior tribu-
nals; both aspects are ultimately relevant to address petition-
ers' complaints. *Compare* 42 Pa.C.S. § 1723 *with* 42 Pa.C.S.
§ 1724. The two facets of the Court's supervisory authority
are aspects of the King's Bench power that, although recog-
nized by the 1968 Constitution and the Judicial Code, pre-date
the adoption of those laws. In practice, the express articula-
tion of the Court's supervisory authority in our governing
charter altered neither its constitutional effect nor its attrib-
utes as a power of the King's Bench. *Stander,* 250 A.2d at
483; *id.* at 487 (Roberts, J., concurring); *see* PA. CONST. art. V,
§§ 2, 10; PA. CONST. SCHED. art. V, § 1 (all powers at King's
Bench continued).

Stated otherwise, the Supreme Court exercises the express
supervisory authority in Article V, Section 10 as it would any
other power at King's Bench. We have examined at length
the nature and breadth of this Court's King's Bench power.
The exercise of that power does not exclude actions that may
be perceived as punitive, and thus, we respectfully reject
petitioners' invitation to interpret our supervisory authority
over judicial personnel narrowly, on the ground that the
King's Bench power had not been applied in that manner
before ratification of the 1968 Constitution and was, as a
result, "untried and untested." [23] That the Court had not
spoken in a published opinion to its authority to suspend
jurists (or to take any action that could be perceived as
punitive) before the ratification of the 1968 Constitution does
not preclude recognition and enforcement of the constitutional
authority of the Court at King's Bench as originally under-

**23.** For the purposes of decision, we assume the accuracy of petitioners'
proposition that the Court did not exercise its King's Bench powers to
suspend a jurist before the ratification of the 1968 Constitution. We
nevertheless note, for accuracy, that not all decisions and orders of the
Court are published, in particular those of earlier days. We also note
that we cannot simply assume that the same matters of grave and
timely importance facing the Court in recent years—consider the exam-
ple of former Judges Ciavarella and Conahan in Luzerne County—
presented themselves to our judicial predecessors. *See ICJJ,* 988 A.2d
1269. We cannot allow the absence of specific judicial precedent to
impair our own core duties brought about by the necessities of this day
and age.

stood. *Robinson Twp.*, 83 A.3d at 950; *see District of Columbia v. Heller*, 554 U.S. 570, 625, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). The Court has explained the prudential principle at work: "our decisional law generally develops incrementally, within the confines of the circumstances of cases as they come before the Court." Determinations spring from the facts of the case; however, the Supreme Court's "task is not simply to decide th[e] case [before it], but also to provide [prospective] guidance upon the broader legal issue." *Scampone v. Highland Park Care Center, LLC*, 618 Pa. 363, 57 A.3d 582, 604–05 (2012) (citing *Maloney v. Valley Med. Facilities, Inc.*, 603 Pa. 399, 984 A.2d 478, 489–90 (2009) and *Thierfelder v. Wolfert*, 617 Pa. 295, 52 A.3d 1251, 1264 n. 9 (2012)).

As a substantive matter, established precedent pre-dating 1968 described the King's Bench power in the broadest of terms when providing prospective guidance regarding the legal principle at issue. We would be remiss to interpret the Court's supervisory authority at King's Bench in narrow terms, contrary to precedent and the transcendent nature and purpose of the power. The Court long ago warned against any judicial inclination to narrow that authority, lest the members of the Court abandon their duty to exercise the power they hold in trust for the people. *See Chase*, 41 Pa. at 411. From its adoption by the Commonwealth's colonial government, the power of the King's Bench was intended to be supreme and general, and was understood to transcend forms of procedure and requirements of action upon particular writs. *See Schmuck*, 70 A. at 1092. Such a broad articulation of the King's Bench power obviously admits the use of the Court's supervisory authority to inquire into issues affecting the lower courts and to suspend jurists, where that remedy is deemed necessary and appropriate. Petitioners offer no convincing legal or logical support for the proposition that the large supervisory charter of the Supreme Court cannot embrace the interim suspension of jurists.[24]

24. Petitioners cite the Court's decisions in *Bowman*, 225 Pa. 364, 74 A. 203, and *Gamble*, 62 Pa. 343, for the proposition that this Court has held that the methods for removal of jurists from office expressly

The effect of the 1993 amendment to Article V, Section 18, as relevant to the Court's King's Bench power, at least, is negligible. Petitioners are correct that the 1993 amendment to Article V, Section 18 realized an overhaul of the formal process for disciplining jurists. *Compare* PA. CONST. art. V, § 18 (1993) *with* PA. CONST. art. V, § 18 (1968). As amended, the provision abolished the disciplinary process by which the Supreme Court imposed judicial discipline in cases brought to us upon the recommendation of the JIRB. Section 18 now describes a "self-contained system for the investigation, prosecution, and imposition of discipline in cases of judicial wrongdoing." *Commonwealth ex rel. Judicial Conduct Bd. v. Grif-*

included in the Constitution are exclusive and the Supreme Court is absent from the process. *See* Board's Brief at 28–29. These matters are distinguishable. Both *Bowman* and *Gamble* implicated the constitutionality of acts of the General Assembly that purported to permit removal of judicial officers from office by means other than those articulated in the Constitution. In *Bowman*, the General Assembly authorized courts of common pleas to declare vacant an office of a justice of the peace who failed for more than six months to reside or maintain an office in the district where he was elected. 74 A. at 204. In *Gamble*, the General Assembly repealed a statute that had created the judicial district to which the jurist had been elected, thereby removing the jurist from his office as president judge of the abolished district. 62 Pa. at 345. In both instances, the Supreme Court held that the statutes in question violated constitutional provisions that expressly directed the means by which the legislative branch may remove members of the judicial branch from office. The *Bowman* Court said that "[a] constitutional direction as to how a thing is to be done is exclusive and prohibitory of any other mode which the Legislature may deem better or more convenient." The *Gamble* Court, meanwhile, explained the substantial separation of powers concerns that justified its holding.

Petitioners suggest that, in acting in the *Bruno* matter, this Court fails to abide by the same principle because Section 18 of Article V articulates the exclusive means of suspending a jurist. But, Article V, Section 18 addresses the circumstances and means by which the CJD, a body of limited powers—and not the Supreme Court—may suspend a jurist. And, as the AOPC has noted, the word "exclusive" simply does not appear in the provision; petitioners read it into the text. There is no constitutional provision that places restrictions on the Supreme Court similar to those on the General Assembly respecting the ability to restrict a judicial officer's exercise of his or her office by removal, suspension, or otherwise. Moreover, the exercise of the Court's supervisory authority in this respect does not implicate the separation of powers concerns that undergird the restrictions on the General Assembly upon which the *Gamble* decision elaborated.

*fin,* 591 Pa. 351, 918 A.2d 87, 94 (2007) (*"Griffin "*). The initial adjudicatory authority in disciplinary matters under the new scheme is the CJD. The CJD is a court of record of limited scope—an appointed tribunal within the judicial system whose functions are deliberately enumerated. *See* PA. CONST. art. V, § 18(b)-(c); *accord Griffin,* 918 A.2d at 94 (describing in similar terms prosecutorial function of Board). As a general rule, jurists have the right to appeal an adverse decision of the CJD to the Supreme Court. The provision also seeks to ensure basic conditions of fairness in the adjudication of formal disciplinary grievances lodged against jurists. *See, e.g.,* PA. CONST. art. V, § 18(b)(5) (due process). That the 1993 amendment transformed the disciplinary apparatus and process in Pennsylvania is beyond dispute. We disagree, however, with the inferences petitioners derive from this structure and with the meaning that petitioners attribute to Article V, Section 18, as amended, as against this Court's inherent powers.[25]

**25.** In their briefs, petitioners cite portions of the legislative debates on Article V, Section 18 in 1993, which support this undisputed notion of an overhaul of the disciplinary system. Petitioners claim that debate rhetoric addressing the "dramatic" nature of the amendment support their opinion that the Supreme Court was "stripped" of any authority to act in matters such as *Solomon* and *Bruno, i.e.,* matters where the Board and the CJD might act. Petitioners' reliance on the debates is of questionable value as the statements they quote, unencumbered by petitioners' gloss, offer no insight regarding the issues actually before the Court today. *See* Board's Brief at 55–57; Solomon & Bruno Brief at 26–28.

We also note that petitioners' recounting of the legislative debates is so selective as to undermine their argument. For example, petitioners emphasize statements in support of defeated amendments—which, unlike the 1993 amendment as ultimately adopted by the electorate, proposed that a majority of the Board's and CJD's membership would be appointed by the Governor and that the budget of the disciplinary system would be separate from that of the judiciary—to suggest that Article V, Section 18 was intended to create a disciplinary process entirely independent of the Judicial Branch. *See* 1993 Pa. Legislative Journal–House 53, 62 (January 27, 1993) (Piccola amendment). Proponents of the version of Article V, Section 18 that actually **prevailed,** however, emphasized dual principles supporting the 1993 amendment: "first, the independence of the judiciary, and second, the accountability of the judiciary.... We should look in the long run and in the long term as to the impact that too strong an independent board would in fact wreck [sic] upon the separation of powers. We cannot risk the intimi-

Article V, Section 18 provides no textual predicate for petitioners' assertion that the drafters and the ratifying voters intended the 1993 amendment to oust the supervisory authority of the Court over judicial officers suspected of or chargeable with wrongdoing. For the ouster of King's Bench authority to be effective, the intent of the ratifying voters must be expressed or necessarily implied by the constitutional language itself. *Avellino I*, 690 A.2d at 1143; *McCloskey*, 2 Rawle at 379–80. Such intent is plainly not expressed: the Supreme Court's King's Bench powers simply are not among the subjects addressed by Article V, Section 18. *See generally* PA. CONST. art. V, § 18.

Nevertheless, petitioners argue that the creation of the self-contained disciplinary apparatus and installation of the CJD as an adjudicatory authority in formal disciplinary cases, necessarily implies that the Supreme Court has been divested of power in all matters implicating judicial wrongdoing. Petitioners claim that the disciplinary apparatus of Article V, Section 18 operates entirely outside the inherent authority of the Supreme Court, and that the CJD's authority is paramount and exclusive in cases implicating judicial wrongdoing. We respectfully, but no less fundamentally, disagree: the structure of the disciplinary apparatus and the nature of the CJD make clear that the CJD is a judicial body inferior to the Supreme Court, like every other tribunal within the Unified Judicial System. PA. CONST. art. V, §§ 1, 2(a), 18(b)(5). The Supreme Court—via its inherent and exclusive constitutional supervisory power at King's Bench—keeps inferior tribunals, including the CJD, within the bounds of their authority. *Onda*, 103 A.2d at 91; *see also Bell*, 152 A.2d at 735. By comparison, the CJD is an entity of extremely limited powers,

---

dation of judges." Parenthetically, what is absent from petitioners' presentations to this Court is any reference to that part of the debate in which the supporters of this prevailing version also noted with disapproval the case of a former jurist who, although suspended by the Court, was not removed from the bench and continued to receive pay for two years after conviction for public corruption. The legislators decried inaction of the sort that petitioners now advocate should be this Court's chosen course. *See* 1992 Pa. Legislative Journal–House 1513, 1515–16, 1519 (June 24, 1992) (Broujos amendment).

possessing no inherent authority but only that authority expressly conferred upon it by Article V, Section 18. Also worth noting is that, as we have explained, the power to articulate substantive standards governing judicial conduct is vested in this Court, both by promulgation of codes of conduct and our appellate decisions in matters of judicial discipline. Any adjudicative discretion reposed in the CJD is cabined by these standards. Neither adjudicative discretion, nor for that matter the CJD's authority to promulgate procedures governing the disciplinary proceedings before it, authorize deviation from the substantive standards of conduct articulated by this Court. That the CJD has the enumerated power to discipline Pennsylvania jurists, including justices of the Supreme Court, in matters that the Judicial Conduct Board decides to pursue, does not act to remove the CJD from the Unified Judicial System, nor does it elevate the CJD by necessary implication above the reach of the Supreme Court's supervision and King's Bench authority. *Cf. Apex Hosiery Co.*, 200 A. at 598; *McCloskey*, 2 Rawle at 379–80.

By creating a regularly convened apparatus to investigate, prosecute, and adjudicate formal matters involving allegations of judicial wrongdoing, Article V, Section 18 did not impair the Supreme Court's supervisory powers over personnel of the Unified Judicial System, including judicial officers, although it certainly reduced the occasion for the use of these powers to extraordinary circumstances. *See Fahy*, 737 A.2d at 224 (Court's power to grant *habeas corpus* relief); *Reilly*, 188 A. at 581 (Court's power to grant change of venue relief); *accord Balph*, 3 A. at 230 (King's Bench jurisdiction is not exercise of original jurisdiction). In the regular course of its business, the Judicial Conduct Board receives and investigates complaints of judicial conduct, and may initiate proceedings against Pennsylvania jurists. The CJD adjudicates those complaints. We have no doubt that the diligent operation of the Board and the CJD over the last twenty years has contributed significantly to maintaining high standards of integrity and professionalism for judicial officers in Pennsylvania. This two-tiered disciplinary process also has the advan-

tage of preserving the resources of the Supreme Court, which otherwise would have been obliged to act in every case of judicial wrongdoing pursuant to its supervisory powers. Nevertheless, the existence of the Article V, Section 18 disciplinary process does not encompass and exhaust the Supreme Court's duty to the citizens nor does it discount the Court's authority to act to discharge those obligations. *Franciscus*, 369 A.2d at 1194 ("As the highest court of this Commonwealth, we would be remiss in our duty if we neglected to exercise our inherent supervisory power on the theory that another means to resolve the problem may be available, when the alternative solution would not adequately meet the exigencies of the circumstances presented.").

Placed in the proper context, the respective constitutional responsibilities and powers of the Supreme Court and of the CJD emerge plainly. It is also important to note, however, that the fundamental distinction between this Court and the CJD is not limited to our different constitutional roles and our places in the constitutional hierarchy. We are well familiar with the core function of the CJD; a large part of our duties involves varying levels of review with respect to decisions of similar adjudicative bodies. These bodies determine the matters that come before them in the ordinary course. This Court, in contrast, has a duty and a perspective that is exponentially broader. The Court's experience has proven the essential and continuing role of our King's Bench authority in addressing extraordinary or emergent circumstances. See examples, *supra.*

## B. The Exercise of Discretion in Employing the Court's Supervisory Authority

As we have explained, within the large charter of the King's Bench authority, the Pennsylvania Supreme Court has the capacity to bring its supervisory power to bear swiftly to vindicate its responsibilities to the citizens, in matters affecting the Unified Judicial System. But, it is a very different question of whether and when, in our discretion, we should exercise that power. This litigation—including in no small

part the presentations of the parties and of the PBA—has brought about a greater appreciation of the fact that the Article V, Section 18 process has diminished the necessity and reduced the occasion for use of these powers to extraordinary circumstances. We have confidence that the standardized procedure of Article V, Section 18 will, in the vast majority of circumstances, adequately respond to punitive concerns **and** the necessities of protecting the integrity of the Unified Judicial System, against judicial impropriety and the appearance of judicial impropriety.

Having explained that the King's Bench authority persists, we need not decide here what circumstances are sufficiently extraordinary to demand the exercise of that authority in a supervisory context. Judge Bruno has been acquitted, and we have vacated our suspension order. The law in this area can develop incrementally, should the occasion arise. We write now to note some general concerns illustrated by the parties' presentations.

■■■■■■ In determining whether to exercise the discretion to act in matters implicating judicial misconduct, and in calibrating a response to specific incidents of misconduct, the critical inquiry is what impact the alleged or established judicial wrongdoing and its aftermath may have on subsequent actions of the jurist on the bench, how these actions affect and reflect upon the Unified Judicial System generally, and what measures may be required to instill confidence in the citizenry that the delivery of fair and even-handed justice will not be poisoned. *Accord Joseph,* 987 A.2d at 634 (quoting *McFall,* 617 A.2d at 714) ("A trial judge should not only avoid impropriety but must also avoid the appearance of impropriety."). The Court has discretion in fashioning the appropriate remedy.[26]

26. The remedy at issue in the *Bruno* matter is the interim suspension of the jurist without pay. Article V, Section 18 permits the Board to request, and the CJD to grant, this type of relief via a standardized procedure that reduces the necessity for the Court to act in a similar fashion. We note, however, that the range of remedies available to this Court as an administrative or supervisory matter is broader, in accord with the powers at King's Bench. Available remedies would include,

 Our discretion is cabined primarily by the interests we have already examined: supervisory orders issued upon judicial personnel must be congruent with our ultimate responsibility to maintain the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system in Pennsylvania. The countervailing consideration implicates due process or fairness concerns. *See City of Philadelphia*, 999 A.2d at 563 ("no adjudicatory body has unlimited discretion, and each and every adjudicator is bound by the Constitution and particularly by the mandates of due process"); *accord In re Hasay*, 546 Pa. 481, 686 A.2d 809, 815 (1996) (disciplinary matter is civil proceeding but, in light of severity of potential sanctions, recognize that jurist is "clothed with the fundamental constitutional rights available to criminal defendants").

 We do not take the prospect of exercising our supervisory power or of imposing sanctions upon a jurist lightly. We are judges as well. We approach cases aware of the presumption of innocence attending criminal charges and mindful of the obligation that our supervisory intervention be fair to the jurist. Nevertheless, in appropriate cases, any private interest of the jurist in continuing to preside over cases, and, furthermore, to receive compensation if suspended, may have to yield to the public interest of protecting the fairness and probity of the judicial process, and the integrity, dignity, and authority of the Unified Judicial System. *See Franciscus*, 369 A.2d at 1194; *Avellino I*, 690 A.2d at 1143; *see also* 1 Pa.C.S. § 1922(5). We have explained that "[a] judicial office represents a public trust," and the conduct of a judicial officer in the decisionmaking process and in his or her private life may "stain[ ] the integrity of the position" and "bear[s] upon the independence and integrity of the judiciary." *Carney*, 79 A.3d at 506. Those holding the privileged office of judge should be acutely sensitive to situations that may impugn the integrity and dignity of the office, and thereby of the judiciary as a whole. And so, for example, jurists should hold

for example, removal from duties to preside over cases, administrative leave, and also interim suspension in extraordinary cases.

themselves to a standard higher than one of merely avoiding a felony conviction; conduct leading to a colorable felony charge is sufficient to implicate the supervisory authority of this Court. The failure of a judicial officer to appreciate the seriousness and effect on the entire system of his or her conduct raises questions as to the competency of that individual to hold judicial office. *Cf. Matter of Cunningham,* 517 Pa. 417, 538 A.2d 473, 482 (1988) (receipt of cash for favorable adjudication prohibited by canons of judicial conduct; reject claim that Canon 1 of Code of Judicial Conduct was not violated because language was aspirational and vague, and did not specifically address circumstances at issue: "one who asserts his or her competency to hold judicial office [should not] have difficulty in understanding concepts such as 'integrity,' 'independence' and 'impartiality' ").[27, 28]

27. Parenthetically, we note that this Court also exercises its supervisory power over judicial officers in its adoption of the Code of Judicial Conduct and the Rules Governing Standards of Conduct of Magisterial District Judges. The last few decades have witnessed this Court implementing increasingly more comprehensive prophylactic rules respecting judicial conduct. *See, e.g.,* Final Report at 3 (noting that Court directed review of existing rules of judicial conduct in light of Luzerne County events). In drafting these rules, we persist in the aspiration that the judicial office summons in those who serve the highest quality of professionalism and personal comportment. Yet, situations find us that defy these lofty expectations and call for judicial discipline or supervisory action, and further refinement of the rules. The exercise of the transcendent King's Bench power in individual cases permits the Court to address novel, extraordinary circumstances for which the existing rules of judicial conduct may not yet provide. "The mere knowledge that such a power exists in th[e Supreme C]ourt it is believed will make its frequent use unnecessary." *Balph,* 3 A. at 230. As a corollary, we note that not only the formal rules and the spirit in which they were drafted, but also each case of judicial wrongdoing and attendant disciplinary and supervisory actions puts judges on notice of the potential pitfalls and consequences of judicial wrongdoing.

28. With respect to the issue of consistency in the actions of this Court and the CJD, petitioners have stressed the fact that the language of Article V, Section 18 does not permit an appeal to this Court from an interim order of the CJD. *See* PA. CONST. art. V, § 18(d)(2) ("An interim order under this paragraph shall not be considered a final order from which an appeal may be taken."). However, that restriction is not a limitation on this Court's King's Bench authority over an inferior tribunal to review such an order *sua sponte* or upon application of the Board or of the jurist for the exercise of extraordinary jurisdiction. And, as in other areas, we can exercise the power to ensure consistency

## VI. The Jurisdiction of the Supreme Court

We also address whether the Court is competent to determine controversies in the general class to which the *Bruno* matter belongs.[29] Petitioners argue that the Supreme Court lacks jurisdiction because such disputes implicate the discipline of jurists, over which jurisdiction is vested exclusively in the CJD by the Pennsylvania Constitution. According to petitioners, Article V, Section 18 explicitly divested the Supreme Court of jurisdiction over judicial discipline matters. Petitioners then seek to distinguish *Franciscus* and *Avellino* as supervisory or administrative (rather than disciplinary) matters, over which petitioners concede the Court has jurisdiction. The AOPC and the PBA question petitioners' approach. According to the AOPC and the PBA, irrespective of the disciplinary process created by Article V, Section 18, the Court has jurisdiction at King's Bench to act.

We have already announced and explained our conclusion that the Supreme Court has the **authority** to order interim suspensions pursuant to the Court's supervisory authority. Nevertheless, we address petitioners' overarching claim that any controversy that may be characterized as "disciplinary" is within the exclusive original jurisdiction of the CJD.

We recognize that Article V, Section 18 grants the CJD "original" jurisdiction over those causes of action implicating

in review paradigms. *See* discussion and examples cited in Part IV, *supra*.

**29.** There is an apparent contradiction between petitioners' argument that the Court lacks jurisdiction over that general class of cases to which the *Bruno* matter belongs and their acquiescence in the exercise of the Court's jurisdiction. For the reasons we explain, we hold that the Court has jurisdiction. Indeed, if it were otherwise, an adjudication on the merits of the dispute would be inappropriate, because "[a] party, or the parties by agreement, may not vest subject matter jurisdiction in a court which does not have it otherwise." *Mercury Trucking*, 55 A.3d at 1066 (citing *Smethport Area Sch. Dist. v. Bowers*, 440 Pa. 310, 269 A.2d 712, 715 (1970)). Equally importantly, we note that the issues which we ordered briefed were articulated in terms of "jurisdiction." Although, as we explain, the central dispositive principle implicates the Court's "authority," we acknowledge that the parties' briefs have implicated both questions of authority and jurisdiction, and so we proceed to address the jurisdiction question.

Board-initiated prosecutions of misconduct charges against jurists; the Supreme Court has "appellate" jurisdiction in such cases, with a limited exception not applicable here. *See* PA. CONST. art. V, § 18(b)-(c). Article V, Section 18 does not purport to allow the CJD to take cognizance of any other type of action.

■ A dispute in which a jurist challenges the Supreme Court's exercise of its supervisory authority to investigate and/or suspend the jurist is a type of action distinct from that which is subject to the CJD's original jurisdiction. In such cases, as in *Bruno*, the Board is not the prosecuting body. Rather, the Supreme Court's decision to exercise its supervisory power is what gave rise to the dispute now before the Court. Petitioners concede, and there can be no reasonable dispute, that this Court is competent at King's Bench to review and resolve disputes that implicate the Court's exercise of its supervisory and administrative powers over jurists, including members of the minor judiciary. *See Avellino I*, 690 A.2d at 1141 (where authority for administrative decision derives from Court, resolution of dispute is necessarily within jurisdiction of Court); *see, e.g., Carbon County Judicial Vacancy*, 141 A. at 250 (exercise of King's Bench jurisdiction relating to temporary assignments of judges to fill vacancies on bench); *President Judge for 30th Judicial Dist.*, 216 A.2d at 326 (exercise of King's Bench jurisdiction relating to establishment of priority of commission).

■ As we have already explained, the exercise of King's Bench jurisdiction is distinct from the exercise of the Court's original jurisdiction. *Balph*, 3 A. at 230 (King's Bench jurisdiction "is not, strictly speaking, original jurisdiction"); *accord* 42 Pa.C.S. § 721 (original jurisdiction of Court). At King's Bench, the Court may take cognizance over any civil matter statewide, regardless of whether the matter is pending before an inferior tribunal. *See Summers*, 114 A. at 528. Article V, Section 18 of the Constitution is not to the contrary because it simply addresses the narrow jurisdiction of the CJD over Board-prosecuted cases of judicial misconduct. The provision

neither expressly, nor impliedly, purports to restrain the exercise of King's Bench jurisdiction by this Court. *See Ebersoll*, 3 Binn. at 531 (comprehensive jurisdiction at King's Bench may be ousted only by express words).

Accordingly, the Court's supervisory action with respect to a judicial officer is separate from any disciplinary proceeding that the Judicial Conduct Board may initiate and disciplinary sanction that the CJD may ultimately enter against the same jurist pursuant to their respective Article V, Section 18 authorities. The distinct nature of the proceedings before the CJD and proceedings at King's Bench has two practical implications.

First, the principle of concurrent original jurisdiction is inapplicable here. Concurrent jurisdiction refers to the notion that two tribunals share the competency to determine controversies of the general class to which the case under consideration belongs. *See, e.g., Dep't of Pub. Welfare v. Presbyterian Med. Ctr. of Oakmont*, 583 Pa. 336, 877 A.2d 419 (2005). *Bruno* is in the general class of controversies that implicate the jurisdiction at King's Bench, which is exclusively vested in the Supreme Court. *See Avellino I*, 690 A.2d at 1141; *Bell*, 152 A.2d at 735. The CJD's jurisdiction is limited to the adjudication of matters enumerated in Article V, Section 18, *i.e.*, Board-prosecuted charges of judicial misconduct. Whether the Supreme Court may also take cognizance over matters committed generally to an inferior jurisdiction, *i.e.*, the CJD, in the exercise of King's Bench jurisdiction or of concurrent original jurisdiction is not an issue implicated in the actions before us. *Cf. Griffin*, 918 A.2d at 94–95 (power of Judicial Conduct Board delineated to include prosecution of judicial misconduct before CJD but not *quo warranto* action). *See Pollard*, 17 A. at 1090.

Second, even where this Court would choose to act, in an extraordinary matter, the Board may continue to pursue sanctions before the CJD. The Supreme Court's exercise of its supervisory authority does not intrude upon the CJD's constitutional authority to mete out disciplinary sanc-

tions upon jurists, nor does it preclude the CJD from imposing disciplinary sanctions upon a later Board-filed complaint. *See Merlo*, 17 A.3d at 871. The constitutional powers of the Supreme Court and the CJD, and the legal predicates for their respective actions, are distinct and may comfortably operate separately. That the remedies available to the Supreme Court and the CJD are similar in some instances—such as temporary suspensions or interim suspensions—does not equate to exposing a jurist to two "disciplinary sanctions" for the same conduct, as petitioners suggest. Properly understood, any such supervisory action is not punishment, but instead represents action undertaken to preserve the integrity of the judiciary. Moreover, because the supervisory action does not punish a jurist for alleged misconduct, and as no decision of the CJD is before the Court for review, we also reject petitioners' argument that the Court would be placed in a position of appearing to have prejudged an appeal from the CJD's ultimate disciplinary decision. The issues are distinct: on appeal, the Supreme Court reviews the decision of the CJD for error on the law or facts and for whether the sanctions imposed were lawful; in a supervisory action, the Court is guided by the duty to safeguard the fairness and integrity of the Unified Judicial System. *Compare* PA. CONST. art. V, § 18(c)(2) *with Avellino I*, 690 A.2d at 1143.[30]

Finally, we reject Judge Bruno's suggestion that notions of fairness require the Supreme Court to refer all matters like these to the Board and the CJD, respectively, for further investigation and hearing. Having already rejected the jurists' claims of *per se* due process violations in the processes

**30.** The question of whether the Supreme Court may exercise another facet of King's Bench jurisdiction—extraordinary jurisdiction—to take cognizance of a matter pending before the CJD is a separate issue. *See* 42 Pa.C.S. § 726. That question implicates the supervisory power of this Court over the CJD, an inferior tribunal, and is not before us. *See, e.g., Joseph*, 987 A.2d at 636. We note that, in a case in which the Court exercises extraordinary jurisdiction over a pending matter, the exercise of the Court's jurisdiction would preempt proceedings before the CJD. *See, e.g., Carpentertown*, 61 A.2d at 428. This is not the scenario presented to the Court here, since the Court and the CJD are acting independently, within their separate respective spheres of authority.

employed by the Court, we simply note that the Court certainly had the authority and discretion to rely on or defer to the disciplinary system. At the time we acted, the exigencies of the cases—viewed in the context of the widespread corruption in the Traffic Court—and the uncertainty of whether the CJD would act and in what manner, impressed upon the Court the necessity to proceed swiftly.[31] We might prefer that the present situation had not found us; indeed, it is disappointing that any judge in Pennsylvania would think to interfere ex parte in a case (or even act in a fashion that would give rise to an appearance of interfering ex parte in a case). But, such were the allegations which this Court was required to assess in determining whether it was necessary to act, and the life of the law being largely a function of experience, we acted. *See* OLIVER WENDELL HOLMES, JR., THE COMMON LAW 1 (1881) ("The life of the law has not been logic: it has been experience.").

Having said this, the Court nevertheless is suitably appreciative of the reassuring swiftness and responsibility displayed by both the Judicial Conduct Board and the CJD in this matter. We are also cognizant of the salutary benefits of avoiding even the prospect of competing orders arising from the same basic conduct. The *sui generis* nature of this appeal has provided an unforeseen opportunity at dialogue and greater understanding for all entities. As a result of the process, which included excellent advocacy from all participants, this Court will surely proceed in future such matters with a greater awareness and sensitivity to the issues (and inherent tensions) which have been so ably articulated to us.

## VII. Hierarchy of Authority

Last, we address a question upon which we have already touched in part: when an order of the Supreme Court and an

---

31. The Court may assume plenary jurisdiction in a matter pending before an inferior tribunal pursuant to Section 726 of the Judicial Code. *See* 42 Pa.C.S. § 726. This provision is inapplicable. The Court assumed plenary jurisdiction immediately without knowing whether, if, or when a disciplinary action might be pursued before the CJD; accordingly, the Court exercised its King's Bench powers rather than extraordinary jurisdiction.

order of the CJD relating to the suspension of a jurist conflict, which order takes priority?

Petitioners reiterate their absolutist position that the Supreme Court is prohibited from acting in "disciplinary" matters and that, as a result, only the CJD's orders are valid and should be enforced. Petitioners suggest that the Supreme Court has already acknowledged this constitutionally-derived system by ordering continued payment of Judge Bruno's salary and "essentially enforc[ing] the CJD's order." Judge Bruno adds that inconsistent adherence by the AOPC to directions regarding pay—withholding pay each time, whether upon order of this Court or of the CJD—harms the public perception of the Unified Judicial System. The AOPC and the PBA reject the notion that the Court must defer to the CJD because the Court is the supreme judicial power in the Commonwealth and its orders may not be disturbed by an inferior tribunal. Where the Supreme Court has made a decision, that decision is "preeminent," according to the AOPC. While remaining sensitive to the concerns we articulated at the conclusion of the prior section of this Opinion, where there is such a conflict, we agree with the core position of the AOPC and PBA.

As we have explained at length, supervisory actions of the Supreme Court and disciplinary proceedings prosecuted by the Board and adjudicated by the CJD are distinct. The Supreme Court and the CJD have constitutional authority to investigate a jurist and order sanctions, if warranted, where the legal predicates for their respective actions are met. Where the orders of the CJD and the Supreme Court are in accord with respect to the propriety of a suspension and the continuation or withholding of a jurist's pay, the directive to the AOPC is clear.

Where the orders of the Supreme Court and the CJD are dissonant, however, any order of this Court obviously is "supreme." As we explained, the Supreme Court has supreme and general authority over the Unified Judicial System, which includes inferior tribunals and its personnel. *See* Pa.

CONST. art. V, § 2(a); 42 Pa.C.S. §§ 502, 1723, 1724. This authority articulated by the 1968 Constitution is derived from the power at King's Bench, inherent only to the Supreme Court. *Bell,* 152 A.2d at 735. In practical terms, the Supreme Court's broad King's Bench mandate manifests as the power to sanction a jurist as a supervisory matter, *see Avellino I,* 690 A.2d at 1143, and as the power to keep inferior tribunals within the bounds of their authority, *see Onda,* 103 A.2d at 91.

Going forward, we expect that our present explanation of the fundamental underpinnings at work, as well as our greater appreciation for the concerns articulated to us in these matters, will help avoid any conflicts between orders of the Supreme Court and the CJD.

This Opinion disposes of the broad constitutional questions presented to us concerning the Court's responsibility, authority, and jurisdiction. Having already vacated the February 2013 Order suspending Judge Bruno without pay, jurisdiction is now hereby relinquished.

Justices EAKIN, BAER, and STEVENS join the opinion.

Chief Justice CASTILLE files a special concurring opinion.

Justice SAYLOR files a concurring opinion, in which Justice TODD joins.

Justice BAER files a concurring opinion.

Justice TODD files a concurring opinion.

Justice McCAFFERY files a concurring opinion.

Chief Justice CASTILLE, concurring.

The Opinion of the Court, which I authored, addresses the constitutional issues raised, and is filed in support of the dispositive *per curiam* order already entered by the Court. I write separately, unconstrained by majority authorship, to

explain my own views on additional points not resolved by the Opinion.[1]

The Court today holds that we have broad authority at King's Bench to effectuate our supervisory function over judicial personnel including, if appropriate, by suspending without pay jurists charged with a felony for conduct on the bench. We explained that the exercise of King's Bench authority is discretionary; the expectation is that the Court of Judicial Discipline (the "CJD") will address all matters subject to that court's Article V, Section 18(d)(2) authority, and that this Court's exercise of discretion will generally be reserved for extraordinary circumstances.

In this case, Judge Bruno's trial and acquittal of federal felony charges (criminal conspiracy, mail fraud, and wire fraud) relating to service on the bench in Philadelphia Traffic Court has diminished the necessity of addressing the propriety of the Court entering its February 1, 2013, Order of suspension without pay in the first instance. The Court was not necessarily of one mind on the question; the arguments of the parties before us, as the Majority Opinion illustrates, illuminated pertinent tensions and considerations; and the event of the acquittal counseled a more modest approach.

For my part, I believe that the Order, when entered in February 2013, was appropriate, and indeed essential. Furthermore, in my view, the Judicial Conduct Board (the "Board") properly recognized that essentiality, and thus was correct to seek an interim suspension without pay. In addition, in my respectful view, the CJD's rationale in restoring Judge Bruno's salary during his suspension from the bench, a decision which obviously (and helpfully) was also intended to open a dialogue with this Court, was unpersuasive. Interim suspension orders issued by the CJD do not afford a direct opportunity for this Court to provide the sort of necessary, supreme guidance that we can in matters arising from a final

1. As Mr. Justice Saylor has noted, special concurrences such as this are "somewhat unusual but not without precedent." *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 633 n. 1 (2012) (Saylor, J., specially concurring) (collecting cases).

decision of the CJD. *See, e.g., In re Carney,* 621 Pa. 476, 79 A.3d 490, 509–10 (2013) (addressing whether jurist's off-bench conduct in road rage incident constituted "disrepute" in violation of Article V, Section 18(d)(1) of Pennsylvania Constitution; reversing CJD). Thus, the CJD's decision on interim suspension rejecting the Board's position left the Board without a direct review remedy.[2]

I write separately, therefore, to embrace the opportunity to engage in the dialogue prompted by the CJD.

### I. Exercise of Discretion to Suspend, With or Without Pay, Pending Accusations of Wrongdoing

There is no serious contest in this matter, as briefed by the parties, that the purpose of vesting in the CJD the authority to suspend, with or without pay, a jurist "against whom formal charges have been filed with the court by the [B]oard or against whom has been filed an indictment or information charging a felony" is to protect the appearance and actuality of fair tribunals in the Commonwealth. An interim suspension, by its nature, is not punitive as a result. *Compare* PA. CONST. art. V, § 18(d)(1) (listing disciplinary sanctions) *with* PA. CONST. art. V, § 18(d)(2) (authorizing interim suspension; no right to appeal suspension). The concern vindicated by the CJD's authority relating to interim suspensions is the necessity to guard the fairness and probity of the judicial process and the dignity, integrity, and authority of the judicial system, all for the protection of the citizens of this Commonwealth. *Accord In re Franciscus,* 471 Pa. 53, 369 A.2d 1190, 1194 (1977); *In re Assignment of Avellino,* 547 Pa. 385, 690 A.2d 1138, 1143 (1997) *("Avellino I ")*. Although premised upon different constitutional authority, the responsibility is akin to that of this Court and the considerations justifying the exercise of legal discretion by the CJD are similarly cabined by its justification. The countervailing considerations implicate due

2. In light of the constitutional language prohibiting an appeal from an interim suspension order of the CJD, limited review of a decision would be available only at King's Bench or via a certification procedure. *See, e.g., City of Philadelphia v. International Ass'n of Firefighters, Local 22,* 606 Pa. 447, 999 A.2d 555, 563–64 (2010).

process or fairness concerns. *See City of Philadelphia v. International Ass'n of Firefighters, Local 22*, 606 Pa. 447, 999 A.2d 555, 563 (2010) ("no adjudicatory body has unlimited discretion, and each and every adjudicator is bound by the Constitution and particularly by the mandates of due process"); *accord In re Hasay*, 546 Pa. 481, 686 A.2d 809, 815 (1996) (disciplinary matter is civil proceeding but, in light of severity of potential sanctions, recognize that jurist is "clothed with the fundamental constitutional rights available to criminal defendants"). Evidence critical to an interim suspension decision, and conditions of pay, is that which addresses these concerns in the context of the two distinct questions implicated: (1) is a suspension suitable and (2) is the withholding of pay warranted, pending resolution of, here, the federal felony charges against Judge Bruno relating to his service on the bench.

Where, as in Judge Bruno's case, the allegations of wrongdoing consist of felony charges related to conduct on the bench, the justification for suspension pending resolution of the felony charges is immediately obvious. Pending charges of any nature can create perverse incentives for a presiding jurist to decide cases in a manner that would curry favor with prosecuting authorities (including when the prosecuting authority is distinct from that appearing before the jurist) or with a potential jury. *See In Interest of McFall*, 533 Pa. 24, 617 A.2d 707, 712–14 (1992) (Common Pleas Judge Mary Rose Fante Cunningham, who surreptitiously conducted surveillance for FBI pursuant to agreement that her cooperation would be made known to Philadelphia District Attorney, had "direct, personal, substantial, and pecuniary interests" in matters before her because "she faced potential prosecution by the same authorities that prosecuted defendants in her courtroom every day."). On the other hand, an accused jurist who believes the charges are baseless could be biased against governmental authorities. A jurist acting unconsciously or overtly upon these incentives undermines those values of justice that all judges are sworn to uphold.[3]

3. These same incentives operate even where, unbeknownst to this Court or the Board, the defendant jurist was negotiating with prosecutors

The appearance of impropriety that would arise from allowing a charged but not yet tried or convicted judge to sit in judgment of others adds a secondary indirect, but no less momentous, burden upon the judicial system by undermining the confidence of the bar and ultimately of the public. *See McFall,* 617 A.2d at 712 ("In order for the integrity of the [J]udiciary to be compromised, we have held that a judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient."). These considerations were especially poignant when this Court entered its interim suspension order because Judge Bruno's felony indictment related to allegations that his objectivity as a jurist was compromised, and the allegations occurred in the broader context of systemic judicial corruption in the Philadelphia Traffic Court, on which he was serving by assignment of this Court. To state it bluntly, a jurist who sets about to "fix" a case, or even to interfere *ex parte* in a case in a way that could influence a decision, has no business on the bench. Improper influences are not limited to bribery or *quid pro quo* exchanges of favors or consideration. And, this is not esoteric: all judges know what is proper and what is not; and those who stray should expect and accept severe consequences.

Withholding Judge Bruno's judicial salary during his suspension was plainly warranted by the circumstances. Initially, I stress that I do not advocate withholding salary automatically whenever a judicial officer faces charges, or even felony charges. Here, Judge Bruno was indicted on one count of

before the charges, or a plea arrangement, are announced—as was the case with two disgraced jurists at the center of the Luzerne County juvenile justice scandal, Michael T. Conahan and Mark A. Ciavarella. As a result, a suspension immediately following announcement of the charges or of a plea is not a full remedy and may justify this Court's intervention before the CJD is able to act. *See* PA. CONST. art. V, § 18(d)(2) (CJD may suspend jurist "against whom formal charges have been filed with the court by the board or against whom has been filed an indictment or information charging a felony"). The object of Rule of Judicial Administration 1921 (requiring judge to report to Chief Justice in the event s/he is subject to any federal or state investigation or prosecution) is to ameliorate this situation. Moreover, awareness of the prospect of immediate suspension without pay obviously would serve as a further disincentive to those in robes who consider criminal conduct relating to their judicial duties.

mail fraud, one count of wire fraud, and one count of conspiracy to commit wire and mail fraud. *See* 18 U.S.C. §§ 1341, 1343, 1349. In the abstract, these charges can derive from a variety of conduct. In Judge Bruno's case, however, the indictment was premised upon alleged conduct involving his judicial duties, *i.e.*, allegations that he "elevat[ed] his self-interest over his core judicial obligations." *See Joseph v. Scranton Times L.P.*, 604 Pa. 677, 987 A.2d 633, 636 (2009). By their oaths and governing conduct rules, judges are put on notice that more is expected of them than of other citizens. The stain of one implicates all, and all judicial officers are, or should be, aware of that fact. When this Court acted, it did so in light of Judge Bruno's alleged conduct on the bench, which was irreconcilable with the judicial oath of office.

Equally as important, the allegations against Judge Bruno could not be viewed in isolation, but only in the context of an investigation into widespread corruption within the Philadelphia Traffic Court, including *ex parte* adjusting of cases. In the aftermath of the federal investigation, this Court appointed the Honorable Gary S. Glazer of the Philadelphia County Court of Common Pleas to supervise the administration and reform of the Traffic Court, with the goal of improving operations and ensuring restoration of the integrity of adjudications of traffic offenses in Philadelphia. And, the General Assembly has commenced the process of amending the Constitution to abolish Traffic Court. *See* S.B. 333, 2013–2014 Gen. Assem., Reg. Sess. (2013).

Judge Bruno's necessary suspension pending resolution of the federal charges means that the citizens were not benefitting from the services of the jurist. *Cf. Matter of Cunningham*, 517 Pa. 417, 538 A.2d 473, 478 n. 8 (1988) (loss of productivity of suspended jurist "results in an intolerable burden placed upon the people of th[e] judicial district and would further strain the resources of the entire system"); *id.* at 478 (in disciplinary context, "possible [sanction] should assist in ameliorating the injury caused by the dereliction" of jurist). Of course, there is a presumption of innocence, and jurists facing criminal charges have the same right to demand

that the government prove its criminal case. But, the practical reality is that, in the event of a conviction, restitution to the Commonwealth of the salary paid during the suspension may be difficult or impossible. If, as it so happened in Judge Bruno's case, charges against the jurist are dismissed or the jurist is acquitted, reinstatement with back pay is always available to make the jurist whole. In my view, on balance, withholding salary in the case of felonies relating to conduct on the bench—and thereby allocating the risk of an erroneous decision regarding pay to the accused jurist—better vindicates the public interests in the integrity and dignity of the judicial system, while sufficiently accommodating any concerns of fairness to the jurist. Indeed, I may be "old school," but in my view, it is disappointing that a judge facing this sort of felony charges, for conduct occurring on the bench, would even pursue the relief Judge Bruno pursued here. The message to Pennsylvania jurists should be made clear, as the Board recognized in pursuing suspension without pay before the CJD: more, much more, is required of those who would judge others.

Last, I would note that this result is consistent with the administrative approach of the executive branch in the event an employee or official appointed by the Governor is "formally charged with criminal conduct related to his employment with the Commonwealth or which constitutes a felony." By executive order, the employee or appointed official is to be suspended without pay as soon as practicable after the employee or official is formally charged. See 4 Pa.Code §§ 7.171–7.173, 7.178. I suggest that, in future cases, the CJD reconsider its contrary position. In circumstances like these, it is beyond unseemly that the CJD would afford criminally accused members of the Judiciary special treatment.

## II. The CJD Opinion and Potential Pitfalls of CJD's Approach

On May 24, 2013, the CJD ordered the interim suspension of Judge Bruno with pay, pending further order of that court,

and issued an opinion explaining the court's reasoning.[4] The CJD held that the federal crimes with which Judge Bruno was charged related to his everyday duties as a judicial officer and, as a result, his continued presence on the bench pending resolution of the charges would have "a possible negative impact on the administration of justice and could possibly harm the public confidence in the [J]udiciary." *In re Bruno,* 69 A.3d 780, 782 (Pa.Ct.Jud.Disc.2013). (That is an understatement.)

The CJD also held that suspension with pay was appropriate. In reaching this conclusion, the CJD undertook to assess the strength of the case against Judge Bruno and expressed its collective skepticism that the federal government would be able to meet its burden of proving criminal conspiracy, and mail or wire fraud, premised upon the facts averred in the federal charging document and its interpretation of federal criminal law precedent. The CJD discounted and explained the allegations in the complaint, without the benefit of hearing the evidence introduced at trial. *Id.* at 783–86, 789–90 (citing 18 U.S.C. § 1341; *U.S. v. Cross,* 128 F.3d 145 (3d Cir.1997)). The CJD also opined upon the proper interpretation of federal decisional law, to conclude that the federal government had a questionable probability of success in proving that Judge Bruno engaged in the criminal conduct alleged. *Id.* at 794.

The CJD then noted with approval Judge Bruno's election record, long tenure as a magisterial district judge, election to leadership positions of trade associations by his peers, and his appointment by the Court to the Minor Court Rules Committee. The CJD also compared Judge Bruno's case with others that had been deemed to merit suspension, to determine whether suspension would be with or without pay.

4. The CJD also ordered the Administrative Office of Pennsylvania Court to provide Judge Bruno backpay, from February 1, 2013 to May 24, 2013. The Office did not comply and Bruno filed a Petition to Vacate the Order of the Pennsylvania Supreme Court dated February 1, 2013. On July 11, 2013, the Court acted upon Bruno's petition by entertaining oral argument on the issues addressed by the Majority. The Court also directed the AOPC to recommence paying Bruno's salary pending final resolution of the dispute, retroactive to February 1, 2013.

The CJD weighed under a totality of circumstances test the nature of the charges, its estimation of the chance of success in convicting Judge Bruno in the federal proceedings, the time in which the case would come to trial, and the type of suspension imposed in similar cases. The CJD determined that the appropriate action was an interim suspension with pay. *Id.*

Out of deference to the concerns aired by the CJD in rejecting the position of the Board (and of this Court, as reflected in our unanimous February 1, 2013, Order) and concluding that a suspension with pay was the appropriate maximum response, I will explain why I am not persuaded by its approach. In my view, the several elements identified by the CJD as relevant to the interim suspension inquiry are incongruent with the purposes of the Article V, Section 18(d)(2) authority of the CJD to issue interim suspensions.

Initially, I agree that the nature of criminal charges leveled against a jurist are relevant to an interim suspension inquiry and to pay conditions. I also agree that if, unlike here, there was some specific reason to question the competence or the good faith of the federal prosecutor, an assessment of the merits of the criminal charges may be relevant. In other instances, however, I believe that a deconstruction of a criminal case premised upon a charging document and one-sided advocacy is a troubling criterion which loses sight of the imperative of judicial integrity—not only in the actuality of integrity, but in the appearance of integrity. The fact that a jury later did not find guilt beyond a reasonable doubt, as it so happened, and for whatever reason, does not change the question of the appropriate response to felony charges implicating judicial misconduct.

The CJD's analysis seemed to suggest: one, that the federal prosecuting authorities would be unable to prove the felonies charged as a matter of law and, two, that the facts averred in the complaint were insufficient to prove that Judge Bruno engaged in any criminal conduct. Starting with the second point, it is important to note that the purpose of a charging document is to state a *prima facie* case. The burden on the

government to make a *prima facie* case is far lower than that which the government is required for the case to proceed to a jury (or to a judicial factfinder) to determine conviction or acquittal. As a result, the assumption that a charging document reflects the universe of evidence available for trial is wrong. More importantly, as the Pennsylvania Bar Association (the "PBA") recognizes, where the CJD does not, the deconstruction of a charging document "risks an inappropriate collateral attack on the validity of th[e criminal] charges" and potentially embarrassing conflicts with the criminal court adjudicating the charges. PBA Brief at 21.[5] In addition, even

5. The PBA's view proved to be prescient. For example, the CJD concluded that allegations relating to the "ticket fixing" scheme failed as a matter of law to show how any victim had been defrauded of a "property right." According to the CJD's definitive assessment of federal law, the City of Philadelphia and the Commonwealth of Pennsylvania are not legally entitled to fines and costs from alleged traffic offenders. "[I]t isn't until that finding is made that those citizens have a legal obligation to pay fines and costs associated with some crime.... An adjudication of guilty is a prerequisite" to a finding that the City of Philadelphia and the Commonwealth of Pennsylvania "have been deprived of property or of a property right within the meaning of the mail and wire fraud statutes...." *Bruno*, 69 A.3d at 793. Moreover, the CJD concluded, "[t]he Commonwealth's interest in license suspensions and revocations is ancillary to its power to regulate, and is not a property interest." *Id.* (quoting *U.S. v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991)).

The district court addressed this very point of federal law and rejected a similar argument in disposing of the motion to dismiss of Judge Bruno's co-defendant:

Sullivan's argument ... fails under the specific facts of this case because the Indictment charges Defendants with the object of the alleged fraud as being the prevention of guilty adjudications; thereby, resulting in statutorily required fees and costs not being assessed or paid to the Commonwealth and the City. It is the fact that the specific tickets at issue did not result in guilty adjudications with fees and costs which is at the heart of the entire "ticket-fixing" scheme alleged in the Indictment. The crux of the Government's conspiracy claim is Defendants' unique ability to prevent guilty adjudications that allows them to give preferential treatment to certain ticketholders for those with whom they were politically and socially connected. In this case, Defendants are in the unique position of being Traffic Court judges who have the power and, according to the Indictment, used such power to not permit the adjudication of specific traffic citations as guilty with fees and costs. Finding in favor of Defendants' argument that the Commonwealth and the City have not suffered economic harm because the right to fees and costs here is only triggered by a

an acquittal does not mean the government failed to adduce sufficient evidence to convict, and thus, the jury's verdict in this case does not justify an approach by which the merits of charges of wrongdoing pending elsewhere are analyzed anticipatorily. And, finally, the question of whether the federal government will ultimately prove violations of federal criminal law is not coterminous with the question of whether there was misconduct on the bench. A defense of "fixing tickets is not a federal offense, even though it may be unethical, if money did not change hands" may prevail with jurors in an individual case; but an allegation of *ex parte* interference to fix a case is most certainly a basis for a response, including an interim suspension with or without pay, by the CJD or, if necessary, by this Court.

> guilty adjudication, an assessment or deficiency being imposed, is circular in the context of this case. To accept Defendants' argument would permit the alleged conspirators in this case to enter into a scheme to commit fraud and then hide behind the argument that the success of their fraud precludes prosecution under the "money or property interest" requirement of the mail and wire fraud statutes.
>
> Additionally, we point out that the Indictment alleges that Defendants conspired and schemed to prevent the payment of actual fines, not merely potential fines. Defendants argue that, "[a]t most, the City and Commonwealth have a potential entitlement to collect a fine that might be assessed at a future point, but such a speculative property interest by definition is not 'property in the [government's] hands.'" Regarding the Indictment before us, Defendants' argument misses the mark because the Indictment does not address traffic citations awaiting adjudication, but addresses traffic citations that have been adjudicated. Adjudicated, argues the Government, pursuant to a conspiratorial scheme designed to prevent guilty rulings resulting in the payment of fines.
>
> Defendants' argument implies that the Government has to prove that the Commonwealth and the City were actually deprived of money or property. This is not required. The relevant inquiry concerns what Defendants intended-not whether the Commonwealth and the City were actually deprived of money or property.
>
> *U.S. v. Sullivan,* 2013 WL 3305217, at *7–8 (E.D.Pa.2013) (internal citations omitted) (citing *U.S. v. Tulio,* 263 Fed.Appx. 258, 261 (3d Cir.2008)).
>
> The outcome of the federal trial perhaps reflected that, in this unfortunately cynical age, jurors want more than what federal criminal law requires—*i.e.,* that they want evidence of actual bribery, or money changing hands. But, that does not mean that the government had no case, nor does it mean that the prosecution was unwarranted.

For better or for worse, the CJD's opinion in *Bruno* now stands as precedent for a jurist charged with corruption on the bench to seek to pre-litigate the strength of the government's criminal case, in order to subsidize his criminal defense. I agree with the Board that more should be expected of Pennsylvania jurists (just as more is expected of executive employees); and I hope that the Board continues to pursue its righteous cause and that the CJD will one day come to embrace that view.

Justice SAYLOR, concurring.

I agree with the majority's holding that this Court retains jurisdiction and power at King's Bench to direct the interim suspension of jurists in extraordinary circumstances. My thinking is also aligned with much of the majority's reasoning, but I note the difficulty inherent in attaining full assent to an opinion of such ambitious breadth as the majority's. Presently, I write to elaborate on some of my differences both in approach and substance.

Initially, I believe that Judge Bruno, the Judicial Conduct Board, and *amicus,* the Special Court Judges Association, have presented serious, focused, and comprehensive advocacy supporting the position that the constitutionally prescribed procedures for interim suspensions and discipline should be deemed exclusive.[1] While recognizing that such contention has been rejected in previous decisions, moreover, I observe that the doctrine of *stare decisis* has lesser force in matters of constitutional (as opposed to statutory) interpretation, given that, short of recourse to the cumbersome process of amending the constitution, this Court is the only body positioned to adjust previous constructions in light of new information or

---

1. Judge Clement of the Court of Judicial Discipline also presented a well-developed line of reasoning in his concurrence in *In re Bruno,* 69 A.3d 780 (Pa.Ct.Jud.Disc.2013) (Clement, J., concurring), albeit, as concerns the King's Bench power, ultimately this reasoning rested on advocating for restraint, as opposed to asserting a disability. *See id.* at 808–09 (Clement, J., concurring).

experience. *Accord, e.g., Hunt v. PSP,* 603 Pa. 156, 174, 983 A.2d 627, 637–38 (2009).[2]

Ultimately, in light of the placement of the Court of Judicial Discipline within the Unified Judicial System over which this Court presides, and in the absence of any affirmative restraint upon King's Bench, I agree that this Court's power of interim suspension persists. Upon reflection, and in light of the current presentations and the underlying circumstances as they have unfolded, however, I believe that it was error on our part to routinize a practice of interim suspension upon the indictment of judges on felony charges. I supported that practice, particularly in cases involving allegations of judicial corruption, because I found it unseemly for judges under the cloud of indictments to sit in judgment of their fellow citizens. Nevertheless, I have come to the view that, especially in the areas of interim suspension and discipline expressly directed by the Constitution to a separate constitutional body, the Court of Judicial Discipline's role should be given primacy, and I find salience in the suggestion that any exercise of King's Bench authority on our part should occur only in "extraordinary circumstances." Majority Opinion, at 583, 101 A.3d at 682.[3] For example, the Court of Judicial Discipline appears better equipped to make factual determinations in the context of judicial disciplinary proceedings while preserving the jurist's procedural safeguards and a restrained course on

**2.** With regard to the majority's observation that the word "exclusive" does not appear in the text of Article V, Section 18, *see* Majority Opinion, at 580 n. 24, 101 A.3d at 680 n. 24, I would observe that treatment of a constitutionally-designated power as exclusive in the absence of an express prescription for such exclusivity is not without precedent. For example, this Court's constitutional "power to prescribe general rules governing practice, procedure and the conduct of all courts," PA. CONST. art. V, § 10(c), is also not expressly made to be exclusive, and yet this Court has so interpreted it. *See, e.g., Payne v. Dep't of Corr.,* 582 Pa. 375, 385, 871 A.2d 795, 801 (2005) (rules of procedure); *In re Suspension of Capital Unitary Review Act,* 554 Pa. 625, 629, 722 A.2d 676, 679 (1999) (same); *Reilly by Reilly v. SEPTA,* 507 Pa. 204, 219, 489 A.2d 1291, 1298 (1985) (rules for supervising the conduct of courts).

**3.** I also favor making all assertions of the exceptional King's Bench powers express, so that any order reflecting their exercise would indicate this basis.

our part would minimize the prospect for overlapping and/or inconsistent orders.

I am aware that this process can be slower than necessary to protect the integrity of the Unified Judicial System, as indeed a four-month delay ensued between Judge Bruno's indictment and his suspension by the Court of Judicial Discipline, and his presiding over court proceedings during that interval would have raised the same difficulties that became evident in *In re Franciscus*, 471 Pa. 53, 369 A.2d 1190 (1977). *See id.* at 55, 369 A.2d at 1191 (reflecting that this Court had suspended Judge Franciscus from office because he was indicted on federal charges relating to his judicial duties, but continued to preside over court proceedings). However, as this Court presently recognizes, we can alleviate any such concerns through our general supervisory and administrative powers under Section 10(a) by directing that the judicial officer in question be assigned to duties which do not entail presiding over court proceedings. *See* Majority Opinion, at 585–86 n. 26, 101 A.3d at 683 n. 26; PA. CONST. art. V, § 10(a) (providing that this Court "shall exercise general supervisory and administrative authority over all the courts and justices of the peace"). Although this type of action is more limited than an interim suspension order in that it would leave the jurist's pay unaffected—whereas an interim suspension may be without pay—to my mind such limitation is not especially problematic when compared with the prospect of conflicting orders issuing from this Court and the Court of Judicial Discipline, as occurred vis-à-vis Judge Bruno. While the majority suggests that concurrent operation of the Supreme Court and the Court of Judicial Discipline in the suspension arena can occur "comfortably," Majority Opinion, at 589–92, 101 A.3d at 686–87, in my opinion the Judicial Conduct Board rightly observes that such conflicting orders are "inexplicable to the public." Brief for Judicial Conduct Board at 62.

In terms of more acute differences, I would incorporate the extraordinary circumstances overlay into the actual holding from the outset of the opinion and scale back on the breadth of the statement of the holding. *See* Majority Opinion, at 516,

101 A.3d at 641. For example, the statement that this Court "has exclusive jurisdiction at King's Bench to resolve the instant dispute, which implicates supervisory actions of the Court relating to personnel of the Unified Judicial System," *id.*, can be read as being in tension with the core recognition of the Court of Judicial Discipline's jurisdiction and power relative to interim suspensions.

The majority opinion also uses the concept of the subsistence of King's Bench powers as a vehicle to suggest that there are limits on the General Assembly's ability to remove jurisdiction by statute, notwithstanding its contemporaneous explanation that this Court may exercise jurisdiction "until otherwise provided by law." Majority Opinion, at 575, 101 A.3d at 678–79. While there may indeed be some limits on the *legislative* curtailment of our jurisdiction, those limits are not being tested here. The majority nonetheless deems it relevant to specify that:

> Jurisdiction granted **by statute** may be removed by the General Assembly or via constitutional amendment, either expressly or by necessary implication. By comparison, the jurisdiction necessary to the exercise of the Court's King's Bench powers ... may be divested only by the people, expressly or by necessary implication.

*Id.* at 575, 101 A.3d at 677 (bolding in original, citation omitted). Far from trying to eliminate such powers, the General Assembly has confirmed them. *See* 42 Pa.C.S. § 502. Therefore, I do not see any present need to make a definitive pronouncement as to what powers may or may not be impacted by the authority relegated by the Constitution to the General Assembly relative to this Court's jurisdiction.

I also question whether the Court's supervisory authority should be seen as part of, or interchangeable with, its King's Bench powers. *See, e.g.*, Majority Opinion, at 516, 101 A.3d at 641 (referring to the supervisory authority as an "aspect of" King's Bench power), at 575, 582–84, 101 A.3d 679, 681–82 (referring to these concepts in essentially an interchangeable manner). In my view, this Court's supervisory powers and duties arise by specific constitutional mandate (Article V,

Section 10(a)) and are designed to handle ordinary matters involving the supervision of Pennsylvania courts and justices of the peace, including such things as the temporary assignment of jurists to various courts as workload demands. *Accord Stander v. Kelley*, 433 Pa. 406, 428, 250 A.2d 474, 487 (1969) (Roberts, J., concurring) (referring to Section 10(a) as addressing, *inter alia*, the "transfer [of] judicial manpower in light of the overall needs of the Commonwealth"). King's Bench, on the other hand, should be reserved for extraordinary circumstances—and all the more so where, as here, the type of action involved is, by constitutional design, expressly allocated to a distinct investigative/disciplinary structure.

Justice TODD joins this concurring opinion.

Justice BAER, concurring.

I join the majority opinion in its entirety, and write separately to set forth my concerns regarding the evolution of this case and to offer insight concerning how this Court should exercise its discretion in future cases involving a sitting jurist accused of misconduct.

As noted by the majority, Judge Bruno was indicted on January 29, 2013, in the United States District Court for the Eastern District of Pennsylvania based on alleged impropriety in carrying out his obligations in the Philadelphia Traffic Court. He was charged with one count of conspiracy, one count of wire fraud, and one count of mail fraud. On January 30, 2013, the Judicial Conduct Board ("JCB") filed with the Court of Judicial Discipline ("CJD") a petition seeking Judge Bruno's interim suspension without pay. Unaware that the CJD had been presented with the JCB's petition the day before, this Court entered an interim order on February 1, 2013, suspending Judge Bruno without pay, pending further order of this Court. We acted with confidence that the federal indictment set forth a *prima facie* case in accordance with its articulated facts, although, notably, we did not afford Judge Bruno an opportunity to respond to the indictment or otherwise present his "side of the story."

What complicated this matter was that after we entered the interim order suspending Judge Bruno without pay, the CJD proceeded to adjudicate the JCB's previously filed petition for his interim suspension. Following an evidentiary hearing and argument by the parties, the CJD determined that the indictment may not be as strong as its facial appearance, and that the appropriate sanction was to enter an order of temporary suspension, without elimination of Judge Bruno's salary. Accordingly, the CJD issued an order suspending Judge Bruno with pay, in direct contradiction to our order suspending him without pay. Judge Bruno subsequently filed a petition in this Court, requesting that we vacate our order suspending him without pay. This Court ordered briefing and oral argument on the merits of his petition; but, by interim order dated July 11, 2013, retroactively reinstated Judge Bruno's pay, pending final disposition of his petition. On July 23, 2014, Judge Bruno was acquitted of all charges. Thus, on August 28, 2014, we finally vacated our order of February 1, 2013, suspending Judge Bruno without pay, and indicated that an opinion would follow.

In that thorough and well-reasoned opinion, the majority holds that this Court possesses the authority at King's Bench to order the interim suspension without pay of sitting jurists, such as Judge Bruno. It rejects Judge Bruno's contention that this Court's supervisory authority over "the administration of all courts and supervision of all officers of the Judicial Branch," as granted by Article V, Section 10(c) of the Pennsylvania Constitution, and as invoked in this case pursuant to our King's Bench authority, was either rescinded or diminished by the adoption of Article V, Section 18, which created the Judicial Conduct Board ("JCB") and the CJD, and gave those tribunals authority to prosecute and adjudicate claims of judicial misconduct.

The majority further acknowledges, however, that our exercise of King's Bench authority is discretionary and should be employed in judicial misconduct cases only in extraordinary circumstances, with the CJD addressing routine matters with-

in that court's Article V, Section 18(d)(2) authority.[1] The majority declares that "[a]cting within their respective authorities and jurisdictions, both the Supreme Court and the CJD have authority to issue orders of interim suspension and to impose sanctions upon jurists. To the extent that any such orders ultimately or necessarily conflict, the order of the Supreme Court is 'supreme' and controlling." Op. at 516, 101 A.3d at 641.

The majority's recognition that both this Court and the CJD possess authority to impose an interim order suspending a jurist, while jurisprudentially sound, raises its own complications. As the circumstances of this matter illustrate, the fact that this Court has authority to enter an order does not necessarily mean that we should. Notably, the proceeding before the CJD encompassed an evidentiary hearing and the presentation of oral argument on the propriety of suspending Judge Bruno without pay, while this Court acted without affording him an opportunity to respond to the federal indictment.[2]

Learning from this case, I favor a deliberative approach that would afford deference to the tribunal possessing concurrent authority, which conducted the factual inquiry and heard argument on the appropriateness of the loss of salary, considered the equities of the scenario, and determined that removal of Judge Bruno from the bench was sufficient to protect the

1. Article V, Section 18(d)(2) of the Pennsylvania Constitution provides:
 Prior to a hearing, the [Court of Judicial Discipline] may issue an interim order directing the suspension, with or without pay, of any justice, judge or justice of the peace against whom formal charges have been filed with the court by the board or against whom has been filed an indictment or information charging a felony. An interim order under this paragraph shall not be considered a final order from which an appeal may be taken.
 PA. CONST. art. V, § 18(d)(2).

2. In its decision, the CJD emphasized:
 [T]he abundant factual background discussed in this Court's opinion was made available to this Court at the time of our evidentiary hearing, April 8, 2013. This information was not formally of record before the Supreme Court at any time up to and through the time of the issuance of its February 1, 2013 order suspending Bruno without pay.
 *In re Bruno*, 69 A.3d 780, 798 (Pa.Ct.Jud.Disc.2013).

integrity of the judicial system until the federal criminal charges were adjudicated. In all candor, had I known that the JCB had already filed in the CJD the petition seeking the temporary suspension of Judge Bruno without pay, and that the CJD was prepared to take imminent action thereon, I would have been content to await the CJD's action, rather than issue our *sua sponte* interim order of February 1, 2013, suspending Judge Bruno without pay.

That being said, I believe that unanswered questions remain regarding the appropriate exercise of this Court's discretion in future judicial misconduct cases. For instance, the majority holds that the CJD should address routine matters of judicial misconduct, with this Court acting only in extraordinary circumstances. The majority does not, however, define what constitutes extraordinary circumstances, and leaves that determination to develop incrementally in the law. Further, there is the question of the appropriate timing for this Court to act. As a general matter, I believe we should allow the CJD a fair opportunity to act before we determine whether our involvement in a judicial misconduct case is necessary. While I do not endeavor to define extraordinary circumstances or pronounce precise timeframes in the paradigm of the facts presented, or more broadly, I suggest that we coordinate the efforts of this Court and the CJD to utilize judicial resources in the best manner and avoid issuance of conflicting orders.

In furtherance of these goals, I propose that the JCB provide notice to this Court, and inform the parties of such notice, when it files in the CJD a petition for interim suspension of a jurist. Mere knowledge that the JCB is pursuing a particular judicial misconduct matter in the CJD would allow this Court deliberately to either await action by the CJD or decide that immediate action by this Court is, nevertheless, required. Either way, we would proceed with open eyes, and the possibility of both tribunals employing duplicative judicial resources and entering inconsistent directives would be reduced or eliminated.

This could be accomplished by amendment to the Judicial Conduct Board Rules, which already contemplate notice to the

CJD when a judicial officer is charged with a felony, and notice to this Court when the JCB becomes aware of information warranting the exercise of our supervisory jurisdiction over judicial officers. Specifically, Judicial Conduct Board Rule 14 provides:

Rule 14. Special Notice to the Supreme Court or the Court of Judicial Discipline.

(A) Whenever the Board becomes aware of an indictment or information charging a felony against a Judicial Officer, the Board may file appropriate notice with the Court of Judicial Discipline.

(B) Whenever the Board becomes aware of information related to a Judicial Officer which may, as provided by law, require or permit the exercise of the Supreme Court's inherent power over the unified judicial system, the Board may file appropriate notice with the Supreme Court.

In light of the difficulties that arose in the instant case, the JCB should consider amending Judicial Conduct Board Rule 14 to provide for additional notice to this Court when it has filed in the CJD a petition for interim suspension of a jurist, regardless of its underlying justification.[3] Providing such notice to this Court would enable us to be more cognizant of potential parallel proceedings when acting to protect the integrity and dignity of the unified judicial system and the citizens of this Commonwealth in these important matters.[4]

---

3. The JCB has the constitutional authority to "establish and promulgate its own rules of procedure." Pa. Const. art. V., § 18(a)(6). I suggest consideration of the issue only to facilitate a more efficient exercise of concurrent authority.

4. In considering a potential rule change, strict adherence to the constitutional protections of confidentiality, of course, is required. In that regard, Article V, Section 18(a)(8) provides, in relevant part, as follows:

Complaints filed with the board or initiated by the board shall not be public information. Statements, testimony, documents, records or other information or evidence acquired by the board in the conduct of an investigation shall not be public information.... All proceedings of the board shall be confidential except when the subject of the investigation waives confidentiality....

Pa. Const. art. V, § 18(a)(8). While the matter will have to be examined in detail prior to the promulgation of any new rules, the limited notice to this Court suggested herein does not appear to violate Art. V,

In this regard, I note the approach followed in child custody disputes pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), 23 Pa.C.S. §§ 5401–5482, which requires communication between trial court judges in Pennsylvania and judges from different states involved in ongoing child custody disputes. *See e.g.* 23 Pa.C.S. § 5447 (providing that when a proceeding to enforce a custody order is commenced in Pennsylvania, and a proceeding to modify the same order is pending in another state, the Pennsylvania court shall immediately communicate with the other court to avoid duplicative litigation). Admittedly, this analogy is not directly on point because, unlike trial courts with equivalent authority, the CJD is an inferior tribunal to this Court. Nevertheless, similar to trial courts in different jurisdictions acting in furtherance of the unified goal of avoiding contradictory custody rulings, this Court's knowledge of a pending action in the CJD would be helpful in determining the appropriate course of action and avoiding inconsistent edicts in judicial misconduct cases.

Justice TODD, concurring.

While I agree with much of the Majority Opinion, I join Justice Saylor's thoughtful Concurring Opinion, which acknowledges our jurisdiction and power to suspend a jurist on an interim basis, but at the same time (1) reserves our King's Bench power in this constitutionally complex and delicate area to extraordinary circumstances; and (2) emphasizes the primacy of the role of the Court of Judicial Discipline ("CJD"), as prescribed by our citizenry through the 1993 amendment to Article V, Section 18 of our Constitution.

I write separately to emphasize that the interplay between Article V, Section 18 and our King's Bench powers may be distinct from that addressing a magisterial district judge, as in

§ 18(a)(8), as the JCB can file under seal in this Court a notice indicating that it has sought interim suspension of a jurist in the CJD. This procedural notice to our Court will not render public any complaint, statement, testimony, document, record or other evidence acquired by the JCB in its investigation; nor does it appear to violate the confidentiality afforded the actual proceedings of the Board.

the instant case, or in the case of a trial or appellate judge, versus when the conduct at issue is that of a Justice of our Supreme Court. Unlike in the case of any other jurist, this Court has no appellate review of a CJD's decision concerning the discipline of a Justice. Pa. Const. art. V, § 18(c)(1). While the majority speaks in sweeping terms, it notes only as an aside this limitation, in stating that our Court has appellate jurisdiction to review CJD determinations "with a limited exception not applicable here," Majority Opinion at 589, 101 A.3d at 685, and in otherwise relegating any discussion of this limitation to a brief footnote, see Majority Opinion at 550 n. 14, 101 A.3d at 662 n. 14 (CJD decisions are not subject to direct appellate review by our Court "where a Justice of the Supreme Court is subject to CJD discipline."). Yet, the 1993 amendment to our organic charter was born of public disapproval of our Court's expansion of judicial power and a desire for judicial reform. The resulting amendment constituted a momentous and far-reaching overhaul of the method for disciplining jurists in Pennsylvania, including implementing an idiosyncratic process for the discipline of Justices. Our Court must be loath to unwittingly write out of the Constitution the peoples' intent vis-à-vis the process for addressing alleged Justice misconduct through the exercise of our "supervisory and administrative" responsibilities and authority.

Of course, we do not currently have before us questions regarding the appropriate process for addressing alleged misbehavior by a Justice of this Court. However, given the breadth of the Majority Opinion, and this "unforeseen opportunity at dialogue and greater understanding for all entities," Majority Opinion at 592, 101 A.3d at 687, it is important to caution that the calculus regarding the extent of our King's Bench powers may be different when it is a Justice's alleged impropriety that is at issue.

Justice McCAFFERY, concurring.

I concur in the result reached by the majority that both this Court and the Court of Judicial Discipline ("CJD") have constitutional authority to order sanction of a jurist, although

this Court should reserve the exercise of that authority for truly extraordinary circumstances. I further agree that, in the event that incompatible orders are filed by this Court and the CJD, the order of this Court takes precedence. In my view, this result follows directly from the plain text of the relevant constitutional provisions regarding this Court, the Judicial Conduct Board ("Board") and the CJD, as well as the well-established understanding of the broad scope of this Court's King's Bench authority, as set forth in this Court's precedential decisions.

As an initial matter, I note that members of the judiciary are vulnerable to accusations of wrongdoing by disaffected litigants that are grounded in nothing more than dissatisfaction with the resolution of a case. In particular, those judges who serve on the front-line trial courts are open to false accusations by vindictive litigants, given the large number of cases adjudicated in this Commonwealth and the ease with which a complaint may be lodged with various investigative authorities. With this vulnerability in mind, I would urge extreme caution in the imposition of the sanction of suspension without pay for an accused jurist. Such a sanction carries the potential for severe, irreparable economic harm to the jurist, even if he or she is subsequently vindicated by the investigatory authority or in a criminal proceeding. For this reason, I favor as the norm the process set forth in the Pennsylvania Constitution by which a full investigation of any alleged judicial misconduct takes place. The Judicial Conduct Board is the body invested by the Pennsylvania Constitution with the specific authority to appoint a staff and

> receive and investigate complaints regarding judicial conduct filed by individuals or initiated by the board; issue subpoenas to compel testimony under oath of witnesses, including the subject of the investigation, and to compel the production of documents, books, accounts and other records relevant to the investigation; determine whether there is probable cause to file formal charges against a justice, judge or justice of the peace for conduct proscribed by this

section; and present the case in support of the charges before the Court of Judicial Discipline.

Pa. Con., Art. V, § 18(a)(7).

Therefore, while I agree that this Court and the CJD each has the authority to order sanction of a jurist, I also fully support the conclusion that it is only in truly extraordinary circumstances that this Court should exercise its authority. I believe that these conclusions do not constitute a departure from this Court's jurisprudence, but rather are firmly supported by the historical context and precedential decisions discussed in the majority opinion, and more succinctly below.

In this Court is "reposed the supreme judicial power of the Commonwealth," and as part of the supreme judicial power, this Court is required to "exercise general supervisory and administrative authority over all the courts" in the Commonwealth. Pa. Con., Art. V, §§ 2 and 10(a), respectively. As we have explained, authority over the lower courts was vested in this Court from its very creation, as a part of the conferral of King's Bench powers to this Court under the Act of May 22, 1722, 1 Sm.L. 131, Section XIII. *See In re Franciscus,* 471 Pa. 53, 369 A.2d 1190, 1192 (1977); *Commonwealth v. Onda,* 376 Pa. 405, 103 A.2d 90, 91 (1954). The King's Bench power to supervise lower courts is not only longstanding, but also broad and extensive: "Inherent in the Court of King's Bench was the power of general superintendency over inferior tribunals, a power which was of ancient inception and recognized by the common law from its very beginnings.... The power of controlling the action of inferior courts is so general and comprehensive that it has never been limited by prescribed forms of procedure...." *Franciscus, supra* at 1192–93 (quoting *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, 61 A.2d 426, 428–29 (1948)). The 1968 amendments to the Pennsylvania Constitution included a reiteration of the authority of this Court to exercise King's Bench and other powers. See Pa. Const. Sched. Art. V, § 1 ("The Supreme Court shall exercise all the powers ... now vested in the present Supreme Court...."); *see also In re Avellino,* 547 Pa. 385, 690 A.2d 1138, 1140 (1997); 42 Pa.C.S. § 502.

In *Franciscus, supra* at 1191, this Court relied on its constitutionally derived supervisory authority to suspend a justice of the peace from his office following his federal indictment related to his official duties. Contending that this Court had overstepped its authority, the jurist argued that he could only be suspended pursuant to a recommendation by the then-extant Judicial Inquiry and Review Board, which, pursuant to the 1968 version of Art. V, § 18 of the Pennsylvania Constitution, was granted the power to investigate possible judicial impropriety. This Court rejected the jurist's view. We recognized that the 1968 version of Art. V, § 18 established a procedure by which jurists may be removed or subjected to disciplinary proceedings, but we concluded that the establishment of that procedure did not in any sense "revoke or diminish the inherent authority of this Court to exercise its superintendency powers over the lower judiciary." *Franciscus, supra* at 1191–92 (citing Pa. Con. Art. V, §§ 1 and 10(a))

Thus, *Franciscus* stands for the proposition that, as part of its supervisory power over the lower judiciary, this Court has the authority to suspend a jurist indicted for criminal activity. We explained that the Court's suspension of the jurist was not meted out as a form of punishment, but rather was necessary to ensure not just the fact, but also the appearance of fairness and probity in the judiciary.

> We are constrained to exercise our powers of supervision under the circumstances present here in order to guard and protect the just rights and independence of the bar, the dignity and authority of the court, and the safety and protection of the public.

*Id.* at 1195 (internal quotation marks and citation omitted).

In 1993, Art. V, § 18 of the Pennsylvania Constitution was extensively amended to create a Judicial Conduct Board to "receive and investigate complaints regarding judicial conduct filed by individuals or initiated by the board," and a Court of Judicial Discipline which, upon the filing of formal charges by the Board, was to "promptly schedule a hearing or hearings to

determine whether a sanction should be imposed" against a jurist. Pa. Con., Art. V, § 18(a)(7) and (b)(5).

Four years later, in *In re Avellino,* 547 Pa. 385, 690 A.2d 1138 (1997) (*"Avellino I "*), this Court considered the effect of the 1993 amendments to Art. V, § 18 on our supervisory authority over all courts, as set forth in Art. V, § 10(a). Avellino, then a judge in the court of common pleas, had refused to comply with his assignment to preside over certain criminal trials. We directed him to show cause why he should not comply with the assignment and ordered him to comply. *Avellino I, supra* at 1139. Avellino argued that we had no jurisdiction in the dispute because the 1993 amendments to Art. V, § 18 "manifest an intent to limit [this Court's] authority to impose discipline *de novo." Avellino I, supra* at 1143. We rejected this argument, citing our holding in *Franciscus,* and explaining as follows:

> The 1993 amendments [ ] altered the mechanism for investigating and adjudicating charges of judicial misconduct by abolishing the Judicial Inquiry and Review Board and creating the Judicial Conduct Board and the Court of Judicial Discipline. Given our clear holding sixteen years earlier in *Franciscus* that our supervisory power was neither revoked nor diminished by Section 18, had the people intended to revoke or diminish that power in amending Section 18[,] the amendment would have explicitly so provided. Nowhere in the amended Section is such an intention expressed or even implied.

*Avellino I, supra* at 1143 (footnote omitted).

Furthermore, we made expressly clear that if this Court's supervisory authority is to be effective, then, under circumstances such as those presented in *Avellino I,* it is necessary for the Court to be able to consider the imposition of sanctions. *Id.* at 1144. We expanded on this concept in *In re Avellino,* 547 Pa. 398, 690 A.2d 1144 (1997) (*"Avellino II"),* wherein Avellino argued that, while this Court's power to supervise the lower courts permitted the imposition of *remedial* measures, it did not permit the imposition of *punitive* measures, as the latter were exclusively within the authority

of the CJD. We rejected this argument, concluding that Avellino's actions "unquestionably undermined the public perception of the judiciary ... [and his] refusal to comply with an assignment of an administrative judge, [and] to obey an order of this Court, is in complete derogation of respect for the law and the integrity of the judiciary." *Avellino II, supra* at 1145. Accordingly, we ordered the suspension of Avellino for a period of three months without pay. *Id.* at 1146.[1]

Here, Petitioners make essentially the same arguments that we rejected in *Avellino I, Avellino II,* and *Franciscus.* I believe those precedents were correctly decided and form a solid grounding for our decision here. Specifically, under the holdings of *Avellino I, Avellino II,* and *Franciscus,* there is no merit to Petitioners' assertion that this Court's historic and constitutionally derived supervisory and administrative authority over the lower courts was curtailed by the 1993 amendments to Art. V, § 18 in such manner as to eliminate any disciplinary authority.[2]

Looking to the specifics of Judge Bruno's case and mindful of the need of this Court to exercise extreme caution in ordering a jurist's suspension from service without pay, I believe that this Court acted properly in its July 11, 2013 order directing the recommencement of payment of Judge

1. A factual situation similar to *Avellino* was presented to this Court in *In re: McFalls,* 568 Pa. 228, 795 A.2d 367 (2002). McFalls, also a judge in the court of common pleas, failed to comply with his judicial assignments, resulting in this Court's order directing him to show cause for his failure to comply and as to why he should not be subject to interim suspension. While McFalls did not dispute the authority of this Court to take such action, he did argue that it would be preferable for this Court to decline to act and defer to the Judicial Conduct Board. We rejected McFalls's position, imposed a thirty-day suspension without pay as a "proper response" to his defiance, and referred the matter to the Judicial Conduct Board.

2. Petitioners attempt to distinguish the facts of the instant cases from our precedents, arguing that *Franciscus* and *Avellino I* and *Avellino II* were supervisory or administrative matters and the instant case is a disciplinary matter. These arguments are unconvincing, and would lead to endless haggling in future cases as to whether the issue presented was supervisory/administrative or disciplinary. Furthermore, Petitioners seem to ignore the fact that this Court imposed suspensions on both jurists in *Franciscus* and *Avellino II.*

Bruno's salary pending final disposition of the matter. Our order entered August 28, 2014, vacating the February 1, 2013 order, after Judge Bruno's outright acquittal of all federal charges, clears the way for Judge Bruno to resume his place on the bench of Chester County.

Finally, I observe that our retention of King's Bench jurisdiction over the supervision of jurists does not guarantee that this Court will always recognize when there are truly extraordinary circumstances that present the need for immediate action to ensure the administration of justice. Specifically, my appraisal of this Court's response time to the Luzerne County crisis and our reaction to the conduct of then-Judges Ciavarella and Conahan differs from that of the majority.

An application for the exercise of King's Bench power was filed on April 29, 2008, by the Juvenile Law Center on behalf of Luzerne County juveniles involved in delinquency proceedings who were unrepresented by counsel. *In re J.V.R.*, No. 81 MM 2008. The application alleged that these juveniles had been improperly denied their right to counsel and, as a consequence, had been unjustly sent to out-of-home placements. It is this application that first "called into question the legitimacy of adjudications of delinquency and other dispositions," not the subsequent criminal indictments. *See* Majority Opinion at 565, 101 A.3d at 671. Within two weeks of the April 2008 application, briefs were filed by the Pennsylvania Department of Public Welfare and the Office of the Attorney General in support of the application for the exercise of King's Bench jurisdiction.[3]

The Department of Public Welfare described the disparity between the rate at which juveniles were unrepresented by counsel in Luzerne County and that of other counties in Pennsylvania as "so dramatic as to require an inference of a systematic deprivation of the constitutional rights of accused juveniles by the Luzerne County Court of Common Pleas." Brief of Department of Public Welfare at 3, *In re J.V.R.*, No. 81 MM 2008, filed May 12, 2008. The Attorney General urged

3. By the end of May 2008, Luzerne County and Judge Ciavarella had filed briefs in opposition to the application.

this Court to consider the allegations because they raised "serious questions about the fairness and integrity of juvenile proceedings in Luzerne County." Brief of Office of the Attorney General at 3, *In re J.V.R.*, No. 81 MM 2008, filed May 15, 2008. Thus, "we **could have** perceived" from these pleadings "the criminal conduct in Luzerne County," which potential criminal misconduct was not "**only made apparent** by the filing of federal charges." *See* Majority Opinion at 568 n. 21, 101 A.3d at 672 n. 21 (emphases supplied).

Despite the gravity of the allegations and the support of the Commonwealth's chief legal and law enforcement officer, this Court took no action until January 8, 2009, when it entered an order **denying** the application for the exercise of King's Bench power. On January 30, 2009, the Juvenile Law Center filed a motion for reconsideration based upon the federal indictments of Judges Ciavarella and Conahan on January 26, 2009. On February 2nd, this Court vacated its January 8th order, pursuant to its constitutional authority under Article V § 10 (general supervisory and administrative authority) and statutory authority under 42 Pa.C.S. § 502 (King's Bench). Finally, on February 11, 2009, some nine months after the first application for the exercise of King's Bench power had been filed, this Court exercised plenary jurisdiction over the matter "in light of the recent revelation of federal criminal charges and pending guilty plea agreements" of Judges Ciavarella and Conahan, and appointed a special master. *In re J.V.R.*, No. 81 MM 2008, Order dated 2/11/09. That is, only upon the issuance of federal indictments was this Court moved to exercise its "flexible and transcendent" authority. Majority Opinion at 563–64, 568–70 101 A.3d at 670–71, 673–74. This chronology causes me to conclude that this Court did not "innovate a swift process" addressing the allegations of denial of the right to counsel and the improper imposition of out-of-home placements. Majority Opinion at 567–70, 563–70, 568–70 101 A.3d at 672–73, 670–71, 673–74. Notwithstanding our slow response to the crisis in Luzerne County, ultimately this Court properly exercised its King's Bench power in response to the presentation of truly extraordinary circumstances, addressed

the need to restore propriety to the administration of juvenile justice in Luzerne County, and effected a wide range of remedies to do so.